**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| KNOX KINLAW, M.D., | § | |
| Plaintiff, vs. | § | |
| | § | Case No. _____ |
| RICHARD S. SACKLER; RICHARD S. | § | |
| SACKLER AND DAVID A. SACKLER, AS | § | The Hon. Judge _____ |
| CO-EXECUTORS OF THE ESTATE OF | § | |
| BEVERLY SACKLER; DAVID A. | § | |
| SACKLER; ILENE SACKLER | § | |
| LEFCOURT; GARRETT LYNAM, AS | § | |
| EXECUTOR OF THE ESTATE OF | § | **COMPLAINT** |
| JONATHAN D. SACKLER; KATHE | § | |
| SACKLER; MORTIMER D. A. SACKLER; | § | |
| RICHARD SACKLER AND DAVID | § | |
| SACKLER AS CO-EXECUTORS OF THE | § | |
| ESTATE OF RAYMOND SACKLER, AND | § | |
| THERESA SACKLER | § | |

Defendants.

## <u>PLAINTIFF'S CLASS ACTION COMPLAINT</u>

Plaintiff, Knox Kinlaw M. D., is an emergency room physician and brings this action on behalf of himself and all others similarly situated. Plaintiff brings this Complaint against Defendants RICHARD S. SACKLER, RICHARD AND DAVID SACKLER AS CO-EXECUTOR'S OF THE ESTATE OF BEVERLY SACKLER, DAVID A. SACKLER, ILENE SACKLER LEFCOURT, GARRETT LYNAM AS THE EXECUTOR OF THE ESTATE OF JONATHAN D. SACKLER, KATHE SACKLER, MORTIMER D. A. SACKLER, RICHARD SACKLER AND DAVID SACKLER AS CO-EXECUTORS OF THE ESTATE OF RAYMOND SACKLER, AND THERESA SACKLER, (collectively the "Sacklers" or "Defendants") and alleges, upon information and belief, as follows:

*(Remainder of page intentionally left blank.)*

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 6

II.  PARTIES ........................................................................................................... 24

    A.  Plaintiff ................................................................................................... 24

    B.  Defendants ............................................................................................. 24

III.  JURISDICTION AND VENUE ....................................................................... 28

IV.  FACTUAL BACKGROUND ........................................................................... 30

    A.  The Sacklers directed the use of multiple avenues to disseminate its unfair and deceptive statements about the use of opioids for chronic pain ..................... 33

        1.  Purdue and the Sacklers maintained inappropriate relationships with FDA Directors and deceived the FDA in gaining approval of OxyContin. .......................................................................................... 33

        2.  Unfair and deceptive statements spread through direct marketing of its brand opioids. ...................................................................................... 34

        3.  The Sacklers used a diverse group of seemingly independent third parties to spread unfair and deceptive statements about the risks and benefits of using opioids for chronic pain. ........................................... 36

    B.  Key Opinion Leaders ("KOLs") .............................................................. 37

    C.  Front Groups .......................................................................................... 39

    D.  The Sacklers misrepresented the risks and benefits of using opioids for chronic pain. ......................................................................................................... 40

    E.  The Sacklers grossly overstated the benefits of chronic opioid therapy. ........ 48

    F.  The Sacklers exaggerated the relative risks and limitations of non-opioid pain medications. .......................................................................................... 51

    G.  Inadequate controls failed to prevent and report diversion. ........................... 52

        a.  The Sackler Defendants Failed to Ensure That Purdue Met Its Legal Obligations to Maintain Effective Diversion Controls. ...................... 54

        b.  In Order To Accelerate OxyContin Sales, The Sacklers Willfully Disregarded Their Anti-Diversion duties, And Failed To Maintain Effective Suspicious Order Monitoring ("SOM") And Abuse and

Diversion Detection Program (the "ADD Program"). ....................... 56

H.  The Sacklers Also Misrepresented Their Compliance With Controlling Federal Law With Respect To Efforts To Detect, Prevent And Report Diversion Of Its Opioid Products. ................................................. 62

I.  The Sacklers also engaged in other unfair conduct......................................... 63

J.  The Sacklers targeted susceptible prescribers and vulnerable patient populations. ..................................................................................................... 63

a. Vulnerable patient populations were given free product coupons. ............. 64

K.  The Sackler Defendants' directed falsely marketed progressively higher doses and encouraged doctors to prescribe higher doses of opioid medications...... 65

L.  Purdue and the Sacklers maintained distribution agreements with specialty pharmacies in order to circumvent safeguards against the dispensation of suspicious prescriptions. ................................................................................. 68

M.  The Sacklers directed and led the alleged misconduct. .................................. 71

N.  The Sacklers' efforts to conceal their misconduct internally......................... 72

O.  The Sacklers' misconduct leading to the 2007 judgment ............................... 75

P.  The Sacklers' misconduct from 2007 until approximately 2019 .................... 82

a.  2007........................................................................................ 83

b.  2008........................................................................................ 85

c.  2009........................................................................................ 92

d.  2010........................................................................................ 95

e.  2011...................................................................................... 103

f.  2012...................................................................................... 108

g.  2013...................................................................................... 112

h.  2014...................................................................................... 121

Q.  Project Tango ................................................................................................ 124

a.  2015...................................................................................... 126

b.  2016...................................................................................... 128

c.    2017 ................................................................................ 132

d.    2018 ................................................................................ 134

e.    2020 Guilty Plea ........................................................... 136

V.    RICO ALLEGATIONS ................................................................ 138

A.    Defendants Conducted the Opioid Enterprise's Affairs Through a Pattern of Racketeering Activity ................................................... 141

B.    Defendants' and the Manufacturing and Marketing Members' Conduct in the Opioid Marketing Scheme ........................................... 146

VI.    CLASS ALLEGATIONS ............................................................. 155

VII.    CLAIMS FOR RELIEF .............................................................. 158

A.    FIRST CLAIM FOR RELIEF .................................................. 158

VIII.    PRAYER FOR RELIEF ............................................................ 171

IX.    JURY DEMAND ......................................................................... 172

## COMPLAINT

Plaintiff, Knox Kinlaw, M.D., brings this Complaint, on behalf of himself and a nationwide class of independent emergency room physicians, against Defendants Richard S. Sackler, Richard and David Sackler as Co-Executor's of the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler Lefcourt, Garrett Lynam as the executor of the Estate of Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard Sackler and David Sackler as Co-Executors of the Estate of Raymond Sackler, Theresa Sackler, as well as any current and former trustees of all trusts that own or control any interest in Purdue on behalf of any members of the Sackler family or any trusts for the benefit of any members of the Sackler family that have received any value from Purdue (collectively, the "Sacklers" or "Defendants") and alleges, upon information and belief, as follows:

## I.    INTRODUCTION

1.    Plaintiff Kinlaw brings this civil enforcement action seeking civil penalties and other relief for Defendants' negligent, unfair and deceptive marketing of prescription opioids (hereinafter "opioids").[1]

2.    This nation has been facing an unprecedented opioid addiction epidemic that was initiated and perpetuated by the Sacklers for their own financial gain.  The "Sacklers" include Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Raymond Sackler, Theresa Sackler, as well as any current and former

---

[1] The conduct alleged in this complaint relates not only to the narcotics and opioids explicitly mentioned herein, but also includes Purdue's sale and marketing of various branded opioid medications including, and without limitation: MS Contin, OxyContin, Hysingla, Butrans, Dilaudid, Targiniq, Palladone, and Ryzolt, as well as generic opioid medications.

trustees of all trusts that own or control any interest in Purdue, on behalf of any members of the Sackler family, or any trusts for the benefit of any members of the Sackler family that have received any value from Purdue. The Sacklers engaged in unfair, deceptive, and negligent marketing of prescription opioids as safe and non-addictive through their closely held companies including: Purdue Pharma L.P., The Purdue Frederick Company, Purdue Pharma Inc., Purdue Pharmaceutical Products L.P. and Purdue Products L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, Rhodes Technologies Inc., Avrio Health Limited Partnership, Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF L.P., SVC Pharma L.P. and SVC Pharma Inc. any other Debtor entities or any other entities owned or controlled, in whole or in part, directly or indirectly, by or on behalf of the Sackler family. (collectively "Purdue").

3.    This case is about one thing: corporate greed. Defendants put their desire for profits above the health and well-being of consumers and emergency room physician health care providers at the cost to Plaintiff and the putative class of Independent Emergency Room Physicians[2] that he seeks to represent.[3]

---

[2] Independent Emergency Room Physicians is defined as those emergency room physicians that are non-hospital employees and worked in emergency room as defined by the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd .
[3] It is estimated that approximately 77% of all Emergency Room Doctors are not hospital employees. Carol K. Kane, PHD, "Policy Research Perspectives, Updated Data on Physician

4.      Tens of thousands of patients have been treated by independent emergency room physicians because of the "opioid epidemic" throughout the United States.

5.      The Sackler Defendants' conduct has created a foreseeable, ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including public health, welfare, safety, peace, comfort, and convenience of the Plaintiff's and Proposed Class Members' communities through their work in marketing, promoting, distributing, and selling massive doses of opioids throughout the states where Plaintiff and Proposed Class Members are located, fueling and opioid epidemic in those communities.

6.      By their conduct, the Sackler Defendants knowingly exacerbated an opioid epidemic that affects entire communities, municipalities, towns, and states, including Plaintiff's and Proposed Class Members' communities. The Sackler Defendants knew, or reasonably should have known, that opioids would be used, possessed, and/or diverted unlawfully nationwide, including in and around Plaintiffs' and Proposed Class Members' communities.

7.      The Sackler Defendants nuisance-creating conduct has been intentional and unreasonable and/or violated statutes imposing specific legal requirements for the protection of others.

8.      As a direct and proximate result of the Sackler Defendants' intentional, unreasonable, and unlawful conduct, Plaintiff and the Proposed Class (as defined herein) lost millions of dollars each year in providing emergency room health care services to patients who were opioid addicted, had opioid misuse issues, including "pill seeking," as well as those that were uninsured, indigent (i.e., lacked resources to pay for the services), or otherwise eligible for

---

Practice Arrangements". American Medical Association, 2019.

services through programs such as Medicaid.

9.    Medicaid payments were at below market rates. At times Plaintiff and the Proposed Class were not compensated at all for services provided by uninsured patients.

10.    All of these services to be referred to as "Opioid Treatment Services" were necessary for Plaintiff and the Proposed Class to provide because 1) regardless of whether a patient can pay, they must be provided medical care under prevailing federal and state law for medical and possible psychiatric care, and 2) of the adverse effects to patients from prescription opium painkillers which are manufactured, marketed, promoted, sold, and/or distributed by the Defendants.

11.    By incurring pecuniary losses as a result of the increase in uncompensated care provided to patients with opioid use disorder and increased costs associated with the opioid epidemic due in part to Defendants' conduct, Plaintiff and Proposed Class Members have suffered harm that is different in kind to the harm suffered by the general public in their respective states.

12.    This is because Independent Emergency Room Physicians across the United States are the front-line treatment for victims of the opioid epidemic. Independent Emergency Room Physicians are legally compelled to treat patients with opioid-related conditions and, as a result, have been directly damaged by the epidemic.[4] Plaintiff and the Proposed Class, in essence, have been forced to provide an inordinate amount of emergency room services related to the "opioid epidemic," either for no compensation or for compensation substantially below market rates due to the unlawful marketing, distribution and sale of opioids. They have also been

---

[4] EMTALA, 42 U.S.C. § 1395dd.

forced to spend time in training on accepted uses in order to renew necessary licenses or face loss of prescribing abilities. Substance use disorders are a spectrum that range from misuse and abuse of drugs to addiction.[5] Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder spectrum.

13.    Defendants knew that opioids were effective treatments for only short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care. Yet they also knew—and had known for years—those opioids were highly addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should therefore not be used except as a last-resort.

14.    Defendants knew that, barring exceptional circumstances, opioids were too addictive and too debilitating for long-term use for chronic non-cancer pain.

15.    Defendants further knew—and had known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of known significant side effects and addiction.[6,7]

16.    Defendants also knew that controlled studies on the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*,

---

[5] Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V").

[6] *See, e.g.*, Russell K. Portenoy, Opioid Therapy for Chronic Nonmalignant Pain: Current Status, 1 Progress in Pain Res. & Mgmt. 247 (1994).

[7] The authoritative Diagnostic and Statistical Manual of Mental Disorders, (5th ed. 2013) ("DSM-V") "substance use disorders" are a spectrum that ranges from misuse and abuse of drugs to addiction. Patients suffernegativeconsequenceswhereeverytheyfallonthesubstanceusedisordercontinuum. Throughout this Complaint, "addiction" refers to this range of substance use disorders.

hospitals), where the risk of addiction and other adverse outcomes was much less significant.

17.    Indeed, the U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.[8]

18.    According to the Centers for Disease Control ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.[9]

19.    Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, and generics like oxycodone and hydrocodone; are narcotics. They are derived from or possess properties similar to opium and heroin, which is why they are regulated as controlled substances.[10] Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain. Opioids also can create a euphoric high, which can make them addictive. At certain doses, opioids can slow the user's breathing, causing respiratory depression and death.

---

[8] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).
[9] Centers for Disease Control and Prevention, *Prescribing Data*, *available at* https://www.cdc.gov/drugoverdose/data/prescribing.html, (last accessed April 30, 2018).
[10] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence.

20.     Defendants' success in extending the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendants' scheme supplies both ends of the secondary market for opioids—producing both the inventory of narcotics to sell and causing people to become addicted to their products and thereby creating the market seeking those narcotics. One researcher who has closely studied the public health consequences of opioids has found, not surprisingly, that a "substantial increase in the nonmedical use of opioids is a predictable adverse effect of substantial increases in the extent of prescriptive use."[11] It has been estimated that the majority of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.

21.     According to the CDC, opioid overdoses killed more than 45,000 people in the 12 months that ended in September 2017. It is already the deadliest drug epidemic in American history.[12] If trends continue, lost lives from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.

22.     Between the start of the century and the year 2014, opioid-related death rates increased by 200%. Fourteen percent of that increase occurred between 2013 and 2014.[13]

23.     The opioid epidemic is killing scores of individuals each day, and having a similarly drastic impact on the total price tag for emergency room care provided by Independent Emergency Room Physicians. According to the CDC, the United States is currently seeing the

---

[11] G. Caleb Alexander et al., Rethinking Opioid Prescribing to Protect Patient Safety and Public Health, 308(18) JAMA 1865 (2012).
[12] The Editorial Board, *An Opioid Crisis Foretold*, (Apr. 21, 2018), https://www.nytimes.com/2018/04/21/opinion/an-opioid-crisis-foretold.html
[13] Id.

highest overdose death rates ever recorded. [14] As opioid related deaths increase, the life

expectancy in the United States has decreased.[15]

24.    On October 28, 2017, the opioid crisis was declared a public health emergency.[16]

25.    From 2005 to 2014, emergency department visits exhibited a 99.4% cumulative

increase.[17] The rate of opioid related emergency department visits nearly doubled.[18]

26.    Independent Emergency Room Physicians directly bear the brunt of the opioid

crisis. They are the main place most addicts and/or those with addiction related medical needs

and issues will first seek care or attempt to obtain more opioids for their addiction. This was

reasonably foreseeable by Defendants as a result of their actions and consequence to the opioid

prescription epidemic. Defendants relied on Independent Emergency Room Physicians to

mitigate the health consequences of their illegal activities. Defendants knew that but for

Independent Emergency Room Physicians providing some safety net, the number of overdose

---

[14] Jessica Glenza, *Opioid crisis: overdoes increased by a third across US in 14 months, says CDC*, THE GUARDIAN (March 6, 2018),https://www.theguardian.com/us-news/2018/mar/06/opioid-crisis-overdoses-increased-by-a-third-across-us-in-14-months-says-cdc

[15] National Center for Health Statistics, Life Expectancy, *available at* https://www.cdc.gov/nchs/fastats/life-expectancy.htm, (last accessed April 30, 2018); Centers for Disease Control and Prevention, U.S. drug overdose deaths continue to rise; increase fueled by synthetic opioids, (March 18, 2018),https://www.cdc.gov/media/releases/2018/p0329-drug-overdose-deaths.html

[16] Julie Hirschfeld Davis, *Trump Declares Opioid Crisis a 'Health Emergency' but Requests No Funds*, The New York Times (Oct. 26, 2017),https://www.nytimes.com/2017/10/26/us/politics/trump-opioid-crisis.html

[17] Jennifer Bresnick, *Hospitals Face Higher Costs, More ED Visits from Opioid Abuse*, HealthIT Analytics (Dec. 21, 2016),https://healthitanalytics.com/news/hospitals-face-higher-costs-more-ed-visits-from-opioid-abuse, (last accessed on April 26, 2018).

[18] Audrey J. Weiss, et al, *Patient Characteristics of Opioid-Related Inpatient Stays and Emergency Department Visits Nationally and by State, 2014* (June 2017),https://www.hcup-us.ahrq.gov/reports/statbriefs/sb224-Patient-Characteristics-Opioid-Hospital-Stays-ED-Visits-by-State.pdf

deaths and other related health issues would have been far greater.

27.    In a 2021 survey of emergency physicians and professionals involved with billing for emergency department care, the most common response on the amount collected from uninsured patients for emergency physician professional services in 1,265 ED-Years for the period 2006-2021 was $21-$25. According to a May 2003 American Medical Association (AMA) study, emergency physicians annually incur, on average, $138,300 of EMTALA-related bad debt. Approximately 95.2% of emergency physicians provide some EMTALA mandated care in a typical week and more than one-third of emergency physicians provide more than 30 hours of EMTALA-related care each week and in many circumstances and, depending on the state in question, may not cover emergency physician costs for providing service.[19]

28.    This suit takes aim at a primary cause of the opioid crisis: the actions of Defendants. In order to expand the market for opioids and realize blockbuster profits, Defendants, through the use of unfair and deceptive practices, created a sea of change in the medical and public perception that the use of opioids were not just safe and effective for acute and palliative care, but also safe for use for long periods to treat more common aches and pains, like lower back pain, arthritis, and headaches.

29.    In 2014, more than 47,000 people died in the United States from lethal drug overdoses.  In 2015, that number exceeded 52,000.[20]  In 2016, it exceeded 63,000 – more than the

---

[19] American College of Emergency Physicians, The Impact of Unreimbursed Care on the Emergency Physician, https://www.acep.org/administration/reimbursement/the-impact-of-unreimbursed-care-on-the-emergency-physician/
[20] *Overdose Death Rates*, National Institute of Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (hereinafter, "*Overdose Death Rates*") (last visited Dec. 14, 2018).

number of Americans who died during the entirety of the Vietnam War, and more than the number of Americans who die from breast cancer every year.[21] Nationwide, opioids were involved in 47,600 overdose deaths in 2017—a sixfold increase from 1999—according to the latest data from the U.S. Centers for Disease Control and Prevention ("CDC").[22]

30.      More than three out of five of those deaths involve opioids—a dangerous, highly addictive and often lethal class of natural, synthetic and semi-synthetic painkillers.[23] Prescription opioids include brand-name medications like OxyContin, Opana, Subsys, Fentora and Duragesic, as well as generics like oxycodone, hydrocodone and fentanyl.

31.      That number does not take into account the staggering number of additional illicit opioid deaths that can be related back to prescribed opioids. Four out of five new heroin users began first with prescription opioid misuse.[24] It is thus unsurprising that heroin overdose deaths increased in lockstep with those attributed to prescription opioids; the Centers for Disease Control found a fivefold increase in the heroin death rate between 2002 and 2014.[25] According to an

---

[21] *Vietnam War U.S. Military Fatal Casualty Statistics*, National Archives, https://www.archives.gov/ research/military/vietnam-war/casualty-statistics.html (last visited Dec. 14, 2018); Rose A. Rudd et al., *Increases in Drug and Opioid Involved Overdose Deaths – United States, 2010-2015*, 65 Morbidity & Mortality Weekly Report 1445-52 (2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm (hereinafter, "Rudd, *Increases in Drug and Opioid Involved Overdose*"); Nadia Kounang, *Opioids now kill more people than breast cancer*, CNN (Dec. 21, 2017), https://www.cnn.com/2017/12/21/health/drug-overdoses-2016-final- numbers/index.html
[22] *See*   https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates
[23] And nearly half of those involve legal opioids prescribed by doctors to treat pain.
[24] Christopher M. Jones, *Heroin use and heroin use risk behaviors among nonmedical users of prescription opioid pain relievers – United States, 2002-2004 and 2008-2010*, 132 (1-2) Drug and Alcohol Dependence 95-100 (Sept. 1, 2013), http://www.drugandalcoholdependence.com/article/ S0376- 8716(13)00019-7/fulltext
[25] Centers for Disease Control and Prevention National Center for Health Statistics, *Number and age-adjusted rates of drug-poisoning deaths involving opioid analgesics and heroin: United States, 1999- 2014*,

article published in the *New England Journal of Medicine*, two studies found that almost 80% of

heroin users reported using prescription opioids before initiating heroin use.[26] Further, heroin use

increased almost 140% among non-medical users of prescription opioids from the period 2002-

2004 to the period 2011-2013.[27] These changes appear to be driven primarily by market forces –

"increased accessibility, reduced price, and high purity of heroin appear to be major drivers of the

recent increases in rates of heroin use" and predate most policies aimed at combatting the abuse

and diversion of prescription opioids.[28]

32.    Further, according to Robert Anderson ("Anderson"), Chief of the Mortality

Statistics Branch of the National Center for Health Statistics, deaths from synthetic opioids have

undergone "more than an exponential increase"[29] with an expected trend line for 2017 deaths that

"will be at least as steep as 2016, if not steeper."[30] Between 2005 and 2016, fatal overdoses from

synthetic opioids doubled. "This surge in overdose deaths resulted in the first two-year drop in

average U.S. life expectancy since the early 1960s." In all, more than 200,000 people died in the

United States between 1999 and 2016 from overdoses directly related to prescription opioids.[31]

---

http://www.cdc.gov/nchs/data/health_policy/AADR_drug_poisoning_involving_OA_Heroin_US_ 2000- 2014.pdf (last visited Dec. 14, 2018)

[26] Wilson M. Compton et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 N. Eng. J. Med 154-63 (2016), https://www.nejm.org/doi/full/10.1056/ NEJMra1508490

[27] *Id.*

[28] *Id.*

[29] Internal quotation marks are omitted throughout this complaint except where the internal quotation marks set off a quote that resides within a longer quoted passage.

[30] Christopher Ingraham, *CDC releases grim new opioid overdose figures: 'We're talking about more than an exponential increase,'* Wash. Post (Dec. 21, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/12/21/cdc -releases-grim-new-opioid-overdose- figures-were-talking-about-more-than-an-exponential-increase/?utm_term=.ad8 576e16bea

[31] *Prescription Opioid Overdose Data*, Centers for Disease Control and Prevention: Opioid

33.     Public health officials have called the current opioid epidemic the worst drug crisis in American history.[32]  According to Anderson, "I don't think we've ever seen anything like this. Certainly not in modern times."[33]  On October 26, 2017, President Donald Trump declared it a public health emergency.  According to recent estimates, as many as 145 people in the United States die every day from opioid overdoses.[34]

34.     This demonstrated need for caution comports with the historical understanding of both the medical community and the American culture at large regarding the serious consequences of opioid use and misuse.  Indeed, thousands of years of experience have taught that opioids' ability to relieve pain comes at a steep price; opioids are dangerously addictive and often lethal substances.  For generations, physicians were taught that opioid painkillers were highly addictive and should be used sparingly and primarily for patients near death.[35]  The medical community also understood that opioids were poorly suited for long-term use because tolerance would require escalating doses and dependence would make it extremely difficult to discontinue their use.

35.     The prevailing and accurate understanding of the enormous risks and limited benefits of long-term opioid use constrained drug manufacturers' ability to drive sales.  In order

Overdose, https://www.cdc.gov/drugoverdose/data/overdose.html (last visited Dec. 14, 2018).
[32] Julie Bosman, *Inside a Killer Drug Epidemic: A Look at America's Opioid Crisis*, N.Y. Times (Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/opioid-crisis-epidemic.html.
[33] *Drug overdoses now kill more Americans than guns*, CBS News (Dec. 9, 2016), https://www.cbs news.com/news/drug-overdose-deaths-heroin-opioid-prescription-painkillers-more-than-guns
[34] Patrick R. Keefe, *The Family that Built an Empire of Pain*, The New Yorker (Oct. 30, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain (hereinafter, "Keefe, *Empire of Pain*").
[35] Harriet Ryan et al., *OxyContin goes global – "We're only just getting started*," L.A. Times (Dec. 18, 2016), http://www.latimes.com/projects/la-me-oxycontin-part3/ (hereinafter, "Ryan, *OxyContin goes global*").

to decrease reasonable concerns about opioids and to maximize profits, the Sacklers engaged in a concerted, coordinated strategy to shift the way in which doctors and patients think about pain and, specifically, to encourage the use of opioids to treat not just the relative few who suffer from acute post-surgical pain and end-stage cancer pain, but the masses who suffer from common chronic pain conditions.

36.     Purdue manufactures, markets, sells and distributes prescription opioid pain medications, including the brand-name drugs OxyContin, Butrans, and Hysingla ER. Through a deceptive and illegal scheme spanning more than two decades, the Sacklers created and profited immensely from a tragic epidemic of opioid abuse and addiction across the nation, including New Mexico. Eight members of a single family—the Sackler family—personally led the deception and personally pocketed billions of dollars.

37.     Borrowing from the tobacco industry's playbook, the Sacklers employed new marketing strategies, as detailed further herein, designed to "reeducate" the public and prescribers.  The Sacklers deliberately conceived these strategies to create, and in fact did create, an entirely new "health care" narrative—one in which opioids are considered safe and effective for long-term use, and pain is aggressively treated at all costs.  According to this newly fabricated narrative, pain was seriously under-treated throughout the United States because opioids were under-prescribed, and doctors came under enormous pressure to treat all kinds of pain with opioids.

38.     The Sacklers' intention was to normalize aggressive prescribing of opioids for various kinds of pain by downplaying the very real risks of opioids, especially the risk of addiction, and by exaggerating the benefits of use.  To accomplish this goal, they intentionally mislead

doctors and patients about the appropriate uses, risks, safety and efficacy of prescription opioids. They did so directly through sales representatives and marketing materials and indirectly through financial relationships with academic physicians, professional societies, hospitals, trade associations for state medical boards and seemingly neutral third-party foundations.

39.     At the Sacklers' direction, the public and prescribers were assured that the risk of becoming addicted to prescription opioids among patients being treated for pain was less than 1%. In reality, many people with no addiction history can become addicted after just weeks or even days of use.[36] According to estimates, as many as 56% of patients receiving long-term prescription opioid painkillers become addicted.[37] Indeed, almost one in five people who receive an opioid prescription with ten days' supply will still be taking opioids one year later.[38]

40.     Put simply, the Sacklers manipulated and misrepresented medical science to serve their own agenda at great human cost. Indeed, in a study published on March 6, 2018 in the *Journal of the American Medical Association* ("*JAMA*"),[21][39] researchers who conducted the first randomized clinical trial designed to compare the efficacy of opioids and non-opioids (including acetaminophen, ibuprofen and lidocaine) for the treatment of moderate to severe back pain, hip

---

[36] Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop* 22 (Johns Hopkins University Press 2016) (hereinafter, "Lembke (2016)").

[37] Bridget A. Martell et al., *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007), http://annals.org/aim/article/732048/systematic-review-opioid-treatment-chronic-back-pain-prevalence- efficacy-association (hereinafter, "Martell, *Systematic Review*").

[38] Sarah Frostenson, *The risk of a single 5-day opioid prescription, in one chart*, Vox (Mar. 18, 20107, 7:30 AM), www.vox.com/2017/3/18/14954626/one-simple-way-to-curb-opioid-overuse-prescribe-them-for-3-days-or-less

[39] Erin E. Krebs et al., *Effect of Opioid vs. Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain, The SPACE Randomized Clinical Trial*, 319(9) JAMA 872-82 (2018) (hereinafter, "Krebs, *Effect of Opioid vs. Nonopioid Medications*").

pain or knee osteoarthritis pain concluded that patients who took opioids over the long term experienced improvements in pain-related function no better than patients who used safer alternatives.

41.    Defendants' scheme was tremendously successful, if measured by profit. The Sackler family is listed on *Fortune*'s list of America's wealthiest families; its "ruthless marketing of painkillers has generated billions of dollars—and millions of addicts."[40] The Sackler family wealth is estimated at $13 billion.

42.    Notwithstanding the admission of unlawful marketing and sale of opioids, the Sacklers continued to direct deceptive marketing strategies and turn a blind eye to suspicious orders and the diversion of their opioid products.  The profits realized by the aggressive marketing and prescribing of opioids dwarf the penalties imposed as a result of violations admitted to.  Thus, the incentive to push opioids remains.

43.    As discussed in detail below, the Sacklers orchestrated the growth of the prescription opioid market through negligent, and deceptive and untruthful marketing tactics pioneered by their uncle, Arthur Sackler. Not only did the Sacklers create and aggressively market opioids for general use, but the Defendants knew about the dangers of prescription opioids and pushed to increase sales despite the devastating consequences of the public health crisis.

44.    Defendants' efforts were wildly successful. Opioids are now the <u>most</u> prescribed class of drugs. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors… [m]any of [whom] were taught – incorrectly that opioids are not addictive when

---

[40] Keefe, *Empire of Pain*, *supra*.

prescribed for legitimate pain."[41] The resulting epidemic, fueled by opioids lawfully prescribed by doctors, has resulted in a flood of prescription opioids available for illicit use or sale, and a population of patients physically and psychologically dependent on them. And when those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

45.    The Sacklers owned, controlled and executed this scheme.  From 1990 until January 16, 2019, members of the Sackler family served on the Board, which controlled and directed the business activities of all of Purdue. Throughout that time, the Sacklers were either the sole directors or the majority of directors on the Board, as set forth in the chart below:



---

[41] Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at http://turnthetiderx.org/.

46.     The eight Sacklers named as defendants in this complaint are former directors and officers and, at all times relevant to this lawsuit, exercised complete authority and control over business decisions. The Sacklers knew that misrepresentations about the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence. Indeed, the falsity of those misrepresentations has been repeatedly confirmed by both the FDA and the CDC as well as numerous other agencies. And, in 2007, when their company pleaded guilty to federal criminal charges for deceptively marketing opioids and reached civil settlements with 26 states and the District of Columbia, the Sacklers were intimately involved with and aware of the investigations. Moreover, the Sacklers were certainly aware of the resolutions of those investigations. As directors holding a controlling majority of the Board, the Sacklers had the power to dictate how its drugs were sold. But, rather than conforming marketing practices to comply with the law, the Sacklers deliberately caused the company to mislead and obfuscate, nationwide as in New Mexico. To protect their multi-billion-dollar revenue stream and conceal their personal involvement in the misconduct, the Sacklers perpetuated their fraudulent scheme, in clear violation of the law and with blatant disregard for the toll it took on the State and its citizens.

47.     New Mexico, much like the entire nation, has been greatly impacted by this opioid crisis. Since 2008, New Mexico has had one of the highest rates of drug overdose death rates in the United States. Between 2008-2012, almost every county in New Mexico had a higher drug overdose death rate than the rate for the entire United States. In Rio Arriba County and

Mora County, overdose death rates were more than **five times** the national rate:[42]



FIGURE 1—Drug overdose death rates by County: New Mexico, 2008–2012, and US, 2010.

48.    The opioid crisis is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[43]

49.    The Sackler Defendants' conduct, if unabated, will continue to unduly burden Plaintiff and Proposed Class Members. Plaintiff and the Proposed Class have a clearly ascertainable right to abate this nuisance and its effects and seek relief from it.

---

[42] *See* Joanna G. Katzman et al., *Rules and Values: A Coordinated Regulatory and Educational Approach to the Public Health Crises of Chronic Pain and Addiction*, 104 Am. J. Pub. Health 1356 (2014); Ctrs. for Disease Control and Prevention, *Vital Signs: Overdoses of Prescription Opioid Pain Relievers—United States, 1999–2008*, 60 Morbidity & Mortality Wkly. Rep. 1487 (2011); Douglas C. McDonald at al., *Geographic Variation in Opioid Prescribing in the U.S.*, 13 J. Pain 988 (2012).
[43] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

## II.    PARTIES

### A.  Plaintiff

50. Plaintiff Knox Kinlaw M.D., is an independent Emergency Room Physician who has practiced throughout the United States since. Plaintiff Kinlaw has practiced as an Emergency Room Physician for at least the last twenty-five (25) years.

51. Plaintiff has sustained significant damages as the result of Defendants conduct. A non-exhaustive list of said damages include, but are not limited to:

- Reduced or no compensation for the treatment of individuals with opioid-use-disorder.

- Increased administrative expenses related to the treatment of individuals with opioid-use-disorder.

- Increased staffing costs, such as medical scribe costs, associated with the increased number of patients with opioid-use-disorder.

52. Plaintiff reasonably anticipates the need for ongoing abatement to address the harm resulting from the allegations outlined herein.

### B.  Defendants

53. Defendant Dr. Richard S. Sackler is a natural person residing in Palm Beach County, Florida.  He became a member of the Purdue board in 1990 and became its Co-chair in 2003, a position in which he remained until he left the Purdue Board of Directors in 2018. He was also Purdue's head of research and development from the early 1990s through 1999, its President from 1999 through 2003, and served in other executive roles throughout the business. At all times material to this Complaint, acting alone or in concert with others, Richard Sackler was

personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Richard Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, as well as across the nation, and gave rise to the claims as alleged in this Complaint.

54. Jonathan D. Sackler died on June 20, 2020. Defendant Garrett Lynam is the executor of the Estate of Jonathan D. Sackler, which is an estate consisting of all interests and assets owned by Jonathan Sackler as of his death.  Jonathan D. Sackler served as a member of the Board of Directors of Purdue and Purdue-related entities from 1990 through 2018. At all times material to this Complaint, acting alone or in concert with others, Jonathan D. Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Jonathan D. Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, and the entirety of the United States, and gave rise to the claims as alleged in this Complaint.

55. Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York and was a member of Purdue's board from 1990 to 2018. At all times material to this Complaint, acting alone or in concert with others, Ilene Sackler Lefcourt was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Ilene Sackler Lefcourt approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico and the entirety of the United States and gave rise to the claims as alleged in this Complaint.

56. Defendant Dr. Kathe A. Sackler is a natural person residing in Fairfield County,

Connecticut and was a member of Purdue's board from 1990 through 2018. At all times material to this Complaint, acting alone or in concert with others, Kathe Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Kathe Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, and the entire country and gave rise to the claims as alleged in this Complaint.

57. Defendant Mortimer D. A. Sackler is a natural person residing in Switzerland and was a member of Purdue's board from 1993 through 2018. At all times material to this Complaint, acting alone or in concert with others, Mortimer Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Mortimer Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, and nationally, and gave rise to the claims as alleged in this Complaint.

58. Defendant Beverly Sackler died on October 14, 2019. Defendants Richard Sackler and David A. Sackler are named both in their individual capacities and in their capacities as executors of the Estate of Beverly Sackler, which is an estate consisting of all interests and assets owned by Beverly Sackler as of her death. Beverly Sackler was a member of Purdue's Board of Directors from 1993 through 2017. At all times material to this Complaint, acting alone or in concert with others, Beverly Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Beverly Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, and across the country, and gave rise to the

claims as alleged in this Complaint.

59. Defendant Theresa Sackler is a natural person currently residing in the United Kingdom who previously resided in New York County, New York, at least part-time, through 2019. Defendant Theresa Sackler was a member of Purdue's Board of Directors from 1993 through 2018. At all times material to this Complaint, acting alone or in concert with others, Theresa Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Theresa Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, and across the country, and gave rise to the claims as alleged in this Complaint.

60. Defendant David A. Sackler is a natural person residing in Palm Beach County, Florida, and was a member of Purdue's Board of Directors from 2012 through 2018. For the period 2012 through 2018, acting alone or in concert with others, David Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, David Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico and nationally alike, and gave rise to the claims as alleged in this Complaint.

61. Defendant Raymond Sackler died on July 17, 2017. Defendants Richard Sackler and David Sackler are sued both in their individual capacities and in their capacities as executors of the Estate of Raymond Sackler, which is an estate consisting of all interests and assets owned by Raymond Sackler as of his death. Raymond Sackler was a member of Purdue's Board of Directors from October 2, 1990 through July 2017. At all times material to this Complaint, acting

alone or in concert with others, Raymond Sackler was personally aware of, was responsible for, engaged in, or directed the unfair and deceptive acts or practices set forth in this Complaint. As a member of Purdue's Board of Directors, Raymond Sackler approved and oversaw unfair and deceptive conduct that was purposely directed at New Mexico, and across the country, and gave rise to the claims as alleged in this Complaint.

62. Defendants similarly include all current and former trustees of all trusts that own or control any interest in Purdue on behalf of any members of the Sackler family or any trusts for the benefit of any members of the Sackler family that have received any value from Purdue.

63. At all relevant times, Defendants have sold and supplied their prescription opioids to individuals and entities located within the State of New Mexico and nationally.

## III.    JURISDICTION AND VENUE

64. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). This Court has supplemental jurisdiction over Plaintiff and the Proposed Class's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff and the Proposed Class's federal claims that they form part of the same case or controversy.

65. This Court independently has subject matter jurisdiction over Plaintiff and the Proposed Class's state law claims under 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy, the aggregated claims of the individual Class members, exceeds the sum of five million dollars, exclusive of interest and costs, and Plaintiff is the citizen of a state different from Defendants. Under 28 U.S.C. §1332(d)(5), there are more than 100 members of the Proposed

Class.

66. Defendants derived substantial revenue as the result of the opioids which were distributed to physicians, patients, and others and later consumed by persons then residing in the United States. Defendants' intentional and tortious conduct arose out of or is incidental to each Defendant's interstate, intrastate and international business ventures conducted in the United States, and proximately caused the Plaintiff to sustain losses and damages in the State of New Mexico, and moreover caused absent putative class members nationwide to endure substantial loses. Accordingly, the Defendants have the requisite minimum contacts with New Mexico necessary to constitutionally permit this Court to exercise jurisdiction because:

a. The Defendants' contacts with New Mexico, including, but not limited to, their manufacture, sale, distribution and/or promotion of highly addictive prescription opioid drugs, are directly related to and gave rise to this Complaint;

b. Defendants purposefully availed themselves of the privilege of conducting business in New Mexico by selling, distributing and/or promoting the use of highly addictive prescription opioid drugs to doctors, hospitals, patients, health insurers and other individuals throughout the United States.

c. Defendants' fraudulent and deceptive marketing campaign and intentional misconduct was such that the Defendants should have reasonably anticipated being hauled into court.

d. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Plaintiff Kinlaw domiciled in this judicial district, because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district, and under

29

28 U.S.C. § 1391 (b)(1) and § (c)(2), because all the Defendants are subject to personal jurisdiction in this state and in this judicial district, such that Defendants are deemed to reside in this state and in this judicial district.

## IV.    FACTUAL BACKGROUND

67. Prescription opioids are dangerous narcotics. They are derived from and closely related to opium and heroin, and they are regulated as controlled substances. While opioids can work to dampen the perception of pain, they can also be deadly, with the potential to slow the user's breathing and cause fatal respiratory depression, especially at higher doses. Opioids are also highly addictive—most patients receiving more than a few weeks of opioid therapy will experience prolonged withdrawal symptoms, including severe anxiety, nausea, headaches, tremors, delirium and pain, if opioid use is delayed or discontinued. Moreover, when using opioids continuously, patients grow tolerant to their analgesic effects—requiring progressively higher doses and increasing the risks of withdrawal, addiction and overdose.

68. In recognition of these risks, the medical community historically used opioids cautiously and sparingly, typically only for short-term acute pain or for palliative (end-of-life) care. Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

69. But with the development of OxyContin in the late 1990s, the Sacklers knew that to expand the company's market (and their own profits), they needed to change perceptions to permit and encourage the use of opioids long-term for widespread chronic conditions, like back pain, migraines and arthritis. With that goal in mind, the Sacklers worked to cultivate a narrative that pain was undertreated and that pain treatment should be a higher priority for health care providers. Marketing efforts dovetailed with this narrative, as the company began to promote opioids generally, and its own opioids in particular, as safe, effective, and appropriate for long-term use for routine pain conditions. As part of the Sacklers' strategy, the risk of addiction were misrepresented as modest, manageable and outweighed by the benefits of opioid use.

70. To take advantage of the lucrative market for chronic pain patients, the Sacklers directed, the development of a well-funded marketing scheme based on deception. The Sacklers used both direct marketing and unbranded advertising disseminated by purportedly independent third parties to spread unfair and deceptive statements about the risks and benefits of long-term opioid use—statements that benefited the Sacklers. Yet these statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. The Sacklers also targeted susceptible prescribers and vulnerable patient populations.

71. In connection with this scheme, the Sacklers directed millions of dollars on promotional activities and materials that falsely denied or trivialized the risks of opioids while overstating the benefits of using them for chronic pain. As to the risks, Defendants falsely and misleadingly, and contrary to the language of their drugs' labels: (1) downplayed the serious risk of addiction; (2) promoted the concept of "pseudoaddiction" and thus advocated that signs of

addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening

tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily

managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of

"abuse-deterrent" opioid formulations to prevent addiction. Defendants also made unfair and

deceptive claims that Oxycontin provides twelve hours of pain relief. Conversely, Defendants

falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to

improve function and quality of life, even though there was no scientific evidence to support

such claims.

72. Defendants disseminated these messages to reverse the popular and medical

understanding of opioids. They disseminated the messages directly, through sales

representatives, and in speaker groups led by physicians Defendants recruited for their support of

marketing messages. Defendants also worked through third parties they controlled to (1) fund,

assist, encourage and direct doctors, known as "key opinion leaders" ("KOLs") and; (2) fund,

assist, direct and encourage seemingly neutral and credible professional societies and patient

advocacy groups (referred to hereinafter as "Front Groups"). Defendants worked together with

these KOLs and Front Groups to taint the sources that doctors and patients relied on for

ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education

("CME") programs, medical conferences and seminars, and scientific articles. In doing so,

Defendants persuaded doctors and patients that what they had long believed—that opioids are

addictive drugs, unsafe in most circumstances for long-term use—was untrue, and quite the

opposite, that the compassionate treatment of pain required opioids.

**A. The Sacklers directed the use of multiple avenues to disseminate its unfair and deceptive statements about the use of opioids for chronic pain.**

73. The Sacklers spread their unfair and deceptive statements by marketing its branded opioids directly to doctors and patients in New Mexico, as well as across the country. They also deployed seemingly unbiased and independent third parties that they controlled to spread its unfair and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain.

**1. Purdue and the Sacklers maintained inappropriate relationships with FDA Directors and deceived the FDA in gaining approval of OxyContin.**

74. The Sacklers' deceptive marketing of opioids began in 1995, when the FDA approved the use of OxyContin.

75. At that time Curtis Wright was a director at the US Food and Drug Administration who was tasked with overseeing the evaluation of pain medication.

76. Upon information and belief, Curtis Wright was directly responsible for the evaluation and approval of Purdue's opioid prescription drug OxyContin.

77. At that time, OxyContin, a formulation of the narcotic oxycodone, was said to slow down the release of the pain killer when taken as prescribed.

78. Upon information and belief, by 2001, OxyContin was the most prescribed brand name narcotic medication for treating moderate to severe pain according to the US Government Accountability Office.

79. In December of 1995, The FDA approved OxyContin believing that the controlled-release formulation of the narcotic would result in less potential for abuse. In 2001, the FDA amended the warning label and gave OxyContin a "black box" warning. This characterized the

33

narcotic as being the highest possible abuse potential, per the FDA website.

80. Upon information and belief, Wright confessed in a sworn deposition that he "might" have written the portion of the FDA package insert that said OxyContin was "believed to reduce the abuse liability of the drug."

81. Upon information and belief, Wright instructed requested documents to be sent to his home office and conducted reviews of clinical study reports regarding the safety of OxyContin.

82. Upon information and belief, following the approval of OxyContin, Wright left the FDA and worked for a private company before joining Purdue a year after his approval of the narcotic.

       **2.**  **Unfair and deceptive statements spread through direct marketing of its brand opioids.**

83. The Sacklers' direct marketing of opioids generally proceeded on two tracks. First, they conducted advertising campaigns touting the purported benefits of opioid drugs. A number of advertisements deceptively portrayed the benefits of opioids for chronic pain. For example, a series of ads, called "Pain vignettes," ran for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

84. Second, the Sacklers promoted the use of opioids for chronic pain through "detailers"—sales representatives who visited individual doctors and medical staff in their offices—and small-group speaker programs. The Sacklers devoted massive resources to direct sales contacts with doctors. In 2014 alone, the company spent $108 million on detailing branded opioids to doctors.

85. In February 2018, with legal challenges mounting, Purdue announced that it would cease detailing physicians in respect to Purdue's branded opioids. The Sacklers did not, however, make any commitment to correct the misrepresentations its multi-decade detailing campaign has engendered in the medical community. Nor did the Sacklers commit to cease other deceptive marketing tactics, including the practice addressed below of laundering promotional messages through front groups and other ostensibly unbiased third parties. Far from reversing course, Purdue has indicated it will aggressively promote its drugs that treat opioid- induced constipation—drugs that can be profitable only if opioids are widely prescribed.

86. The Sacklers also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals. These programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared for them. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct prior misrepresentations about the risks and benefits of opioids.

87. Detailing to doctors was very effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, Purdue purchases, manipulates and analyzes some of the most sophisticated data available in any industry, data available from a company called IQVIA, to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows the

company to target, tailor, and monitor the impact of their core messages. Thus, the Sacklers knew detailing to doctors was effective.

88. The Sacklers employed the same marketing plans and strategies and deployed the same messages in New Mexico as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that messages are accurately and consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. Drug companies consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

89. The Sacklers ensured marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. Sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to check on their performance and compliance. At all relevant times the Sacklers were aware of and directed these actions.

3. **The Sacklers used a diverse group of seemingly independent third parties to spread unfair and deceptive statements about the risks and benefits of using opioids for chronic pain.**

90. The Sacklers also deceptively marketed opioids in New Mexico, as well as the entire nation, through unbranded advertising—i.e., advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by

independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Sacklers controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. As much as the Sacklers controlled the distribution of their "core messages" via their own detailers and speaker programs, the Sacklers similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CMEs, and medical conferences and seminars. To this end, third-party public relations firms were used to help control those messages when they originated from third-parties.

91. The Sacklers also marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. The use of third-party, unbranded advertising to gave the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, third parties were funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long- term opioid use for chronic pain.

### B.  Key Opinion Leaders ("KOLs")

92. At the Sacklers' direction and with their knowledge, a small circle of doctors, upon information and belief, were selected, funded, and elevated because their public positions supported the use of opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs."

93. The Sacklers directed and/or knew of payment to KOLs to serve as consultants or on its advisory board and to give talks or present CMEs, and Purdue's support helped these KOLs

become respected industry experts. As they rose to prominence, the KOLs touted the benefits of opioids to treat chronic pain. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message.

94. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. Opportunities were created for KOLs to participate in research studies Purdue suggested or chose and then cited and promoted favorable studies or articles by their KOLs. By contrast, the Sacklers did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

95. KOLs also served on committees that developed treatment guidelines strongly encouraging the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. The Sacklers were able to direct and exert control over each of these activities through its KOLs.

96. Pro-opioid doctors are one of the most important avenues that the Sacklers used to spread its unfair and deceptive statements about the risks and benefits of long- term opioid use. Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

97. Thus, even though some of KOLs have recently moderated or conceded the lack of evidence for many of the claims they made, those admissions did not reverse the effect of the unfair and deceptive statements that continue to appear nationwide and throughout New Mexico in marketing as well as treatment guidelines, CMEs and other seminars, scientific articles and research, and other publications available in paper or online.

### C. Front Groups

98. At the Sacklers' direction and with their knowledge, arrangements were made with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. These "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted the Sacklers by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Sacklers. The Sacklers exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Sacklers made sure that the Front Groups would generate only the messages the Sacklers wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members— whether patients suffering from pain or doctors treating those patients.

99. The Sacklers worked, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, opioid manufacturers combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an American Pain Foundation ("APF") project. PCF is comprised of representatives from several opioid manufacturers and various Front Groups, almost all of which received substantial funding from manufacturers. Among other projects, PCF worked to ensure that an FDA- mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which would reduce prescribing.

**D. The Sacklers misrepresented the risks and benefits of using opioids for chronic pain.**

100. To convince doctors and patients in New Mexico and across the nation that opioids can and should be used to treat chronic pain, the Sacklers had to convince them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, the Sacklers directed claims be made that were not supported by or were contrary to the scientific evidence. Even though pronouncements by and guidance from the FDA and the CDC based on that evidence confirm that its claims were unfair and deceptive, the Sacklers have not corrected them, or instructed its KOLs or Front Groups to correct them, and continue to spread them today. The Sacklers falsely trivialized or failed to disclose the known risks of long-term opioid use.

101. To convince doctors and patients that opioids are safe, the Sacklers deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations—which are described below—reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

102. First, the Sacklers directed false claims that the risk of addiction is low and that

40

addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use. Some illustrative examples of these unfair and deceptive claims are described below:

a. Sponsoring APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft.

b. Sponsoring APF's *A Policymaker's Guide to Understanding Pain & Its Management*—which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]."

c. Sales representatives minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

103. These claims are contrary to longstanding scientific evidence. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

104. The FDA further exposed the falsity of claims about the low risk of addiction when it

announced changes to the labels for ER/LA opioids in 2013 and for IR opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

105. The warnings on FDA-approved drug labels caution that opioids "expose[] users to risks of addiction, abuse and misuse, which can lead to overdose and death," that the drugs contain "a substance with a high potential for abuse," and that addiction "can occur in patients appropriately prescribed" opioids.

106. *Second*, the Sacklers falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. This phenomenon was called "pseudoaddiction"—a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL for Purdue—and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Some illustrative examples of these deceptive claims are described below:

      a. Sponsoring *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of

pseudoaddiction, rather than true addiction.

b.  Publishing a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

c.  Sponsoring a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

107.  The 2016 CDC Guideline rejects the concept of pseudoaddiction. The Guideline does not recommend that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, it explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

108.  *Third,* the Sacklers falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were

43

especially insidious because the Sacklers aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher- risk  patients  on  opioids.  These misrepresentations  made  these  doctors  feel  more  comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Some illustrative examples of these deceptive claims are described below:

      a.  Sponsoring a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

      b.  As recently as 2015, representing in scientific conferences that "bad apple" patients—and not opioids—are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

109. Once again, the 2016 CDC Guideline confirms the falsity of these misrepresentations. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse—"for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

110. *Fourth*, to underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, the Sacklers falsely claimed that opioid dependence can

easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

111. For example, sponsoring APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.

112. The Sacklers deceptively minimized the significant symptoms of opioid withdrawal—which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction—and grossly understated the difficulty of tapering, particularly after long-term opioid use. Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

113. *Fifth*, the Sacklers falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples are described below:

    a. Sponsoring *APF's Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.

    b. *In the Face of Pain* website promoting the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

    c. Sponsoring APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages.

    d. Sponsoring a CME entitled *Overview of Management Options* that was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

    e. Presenting a 2015 paper at the College on the Problems of Drug Dependence, the "the oldest and largest organization in the US dedicated to advancing a scientific

approach to substance use and addictive disorders,"[44] challenging the correlation

between opioid dosage and overdose.

114. Again, these claims conflict with the scientific evidence. As the CDC explains in its

2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while

the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More

specifically, the CDC explains that "there is now an established body of scientific evidence

showing that overdose risk is increased at higher opioid dosages." The CDC also states that

"there is an increased risk for opioid use disorder, respiratory depression, and death at higher

dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90

morphine milligram equivalents per day.

115. The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013,

the FDA acknowledged "that the available data do suggest a relationship between increasing

opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear

to credibly suggest a positive association between high-dose opioid use and the risk of overdose

and/or overdose mortality."

116. Finally, at the direction of the Sacklers, deceptive marketing of the so- called abuse-

deterrent properties of some of their opioids has created false impressions that these opioids can

curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half

reported that they believed abuse-deterrent formulations are inherently less addictive.[45]

117. These numerous, longstanding misrepresentations of the risks of long-term opioid use

---

[44] www.cpdd.org.
[45] Catherine S. Hwang, *et al.*, *Prescription Drug Abuse: A National Survey of Primary Care Physicians*, 175(2) JAMA INTERN. MED. 302-4 (Dec. 8, 2014).

spread by the Sacklers successfully convinced doctors and patients to discount those risks.

### E.  The Sacklers grossly overstated the benefits of chronic opioid therapy.

118. To convince doctors and patients that opioids should be used to treat chronic pain, the Sacklers also had to persuade them that there was a significant upside to long-term opioid use. But, as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, the benefits of long-term opioid use were touted and falsely suggested that these benefits were supported by scientific evidence.

119. For example, the Sacklers falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples are described below:

> a.  A series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.
>
> b.  *Responsible Opioid Prescribing* (2007), taught that relief of pain by opioids, by itself, improved patients' function.

c.  Sponsoring APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in 2012.

d.  Sponsoring the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients."

e.  Sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

120. These claims find no support in the scientific literature. The FDA and other federal agencies have made this clear for years. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

121. The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction do not improve their function and quality of life.

122. The Sacklers also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the 2016 CDC Guideline specifically states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

123. In addition, the Sacklers misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours—a fact known at all times relevant to this action. According to research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This not only renders the promise of 12 hours of relief unfair and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the

amount of drug they are taking and spurring growing dependence.

**F.  The Sacklers exaggerated the relative risks and limitations of non-opioid pain medications.**

124. In materials they produced, sponsored or controlled, Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription non-steroidal anti-inflammatory drugs ("NSAIDs").

125. For example, in addition to failing to disclose in promotional materials the risks of addiction, overdose, and death, the opioid marketers and manufacturers, routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[46] hormonal dysfunction;[47] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[48] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[49]

---

[46] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[47] H.W. Daniell, Hypogonadism in men consuming sustained-action oral opioids, 3(5) J. Pain 37784 (2001), https://www.ncbi.nlm.nih.gov/pubmed/14622741.

[48] *See* Bernhard M. Kuschel, et al., *The risk of fall injury in relation to commonly prescribed medications among older people – a Swedish case-control study*, 25 Eur. J. Pub. H. 527-32 (July 31, 2014), doi: 10.1093/eurpub/cku120, https://www.ncbi.nlm.nih.gov/pubmed/25085470.

[49] Karen H. Seal, et al., *Association of Mental Health Disorders With Prescription Opioids and*

126. The APF's *Treatment Options: A Guide for People Living with Pain*, sponsored by Purdue and Cephalon, warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. The publication falsely attributed 10,000 to 20,000 deaths annually to NSAID overdose, when the figure is closer to 3,200.[50]

127. Purdue, for example, sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

128. As a result of the Sacklers' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[51]

### G. Inadequate controls failed to prevent and report diversion.

129. Defendants had access to and possession of the information necessary to monitor,

---

*High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940-47, (March 7, 2012) doi:10.1001/jama.2012.234, https://jamanetwork.com/journals/jama/fullarticle/1105046.

[50] Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. of Therapeutics 17-25 (2004), https://www.ncbi.nlm.nih.gov/pubmed/14704592.

[51] M. Daubresse, et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010,* 51(*10*) Med. Care, 870-878 (2013). For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady. *See also* J. Mafi, et al., *Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

report, and prevent suspicious orders and to prevent diversion. Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled. Manufacturers built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

130. Federal statutes and regulations are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose ... suspicious orders of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 USCA § 823(a)(I).

131. In 2017, the Department of Justice confirmed the obligations of opioid manufacturers, and fined Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating record keeping requirements.[52]

132. Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of

---

[52] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations(July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders (accessed July 12, 2018).

controlled substances to "downstream" registrants. Mallinckrodt agreed that, from this data, it would "'report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[53]

133. The same duties imposed by federal law on Mallinckrodt were imposed upon Purdue and Defendants.

134. The same business practices utilized by Mallinckrodt regarding "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, Defendants herein.

135. Through, inter alia, the charge back data, Defendants could monitor suspicious orders of opioids.

136. Defendants failed to monitor, report, and halt suspicious orders of opioids as required by federal law.

137. Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

138. The wrongful actions and omissions of Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations.

       **a.   The Sackler Defendants Failed to Ensure That Purdue Met Its Legal Obligations to Maintain Effective Diversion Controls.**

139. While pressing Purdue's unlawful marketing campaign, the Sackler Defendants

---

[53] 2017 Mallinckrodt Memorandum of Agreement ("MOA") at p. 5

failed to prevent opioid diversion into illegal drug markets. As a result, during relevant times, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, illegally dispensed opioids, compounding the crisis of abuse and addiction in patients using legally dispensed opioids.

140. While pressing Purdue's unlawful marketing campaign, the Sackler Defendants failed to prevent opioid diversion into illegal drug markets. As a result, during relevant times, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, illegally dispensed opioids, compounding the crisis of abuse and addiction in patients using legally dispensed opioids.

141. While pressing Purdue's unlawful marketing campaign, the Sackler Defendants failed to prevent opioid diversion into illegal drug markets. As a result, during relevant times, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, illegally dispensed opioids, compounding the crisis of abuse and addiction in patients using legally dispensed opioids.

142. While pressing Purdue's unlawful marketing campaign, the Sackler Defendants failed to prevent opioid diversion into illegal drug markets. As a result, during relevant times, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, illegally dispensed opioids, compounding the crisis of abuse and addiction in patients using legally dispensed opioids.

**b. In Order To Accelerate OxyContin Sales, The Sacklers Willfully Disregarded Their Anti-Diversion duties, And Failed To Maintain Effective Suspicious Order Monitoring ("SOM") And Abuse and Diversion Detection Program (the "ADD Program").**

143. While pressing Purdue's unlawful marketing campaign, the Sackler Defendants failed to prevent opioid diversion into illegal drug markets. As a result, during relevant times, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, illegally dispensed opioids, compounding the crisis of abuse and addiction in patients using legally dispensed opioids.

144. Purdue's ADD Program was meant to be in place from 2002 to 2018 and was to give Purdue the ability to identify prescribers engaged in abuse and diversion. For much of that time, the ADD Program was governed by Purdue's Standard Operating Procedure ("SOP") 1.7.1, which was supposed to minimize improper prescribing of opioids by requiring Purdue personnel to report any HCP engaged in certain kinds of suspicious activity, including when an HCP was engaged "in an atypical pattern of prescribing."

145. As stated in SOP 1.7.1, the ADD Program was supposed to "ensure that Purdue's interactions with Prescribers or Pharmacists that reveal observations or circumstances that suggest potential concerns generate appropriate review and follow up," and "preclude promotion of Purdue's opioid products in circumstances where there is a concern about potential abuse or diversion." The ADD Program failed to achieve these objectives.

146. The ADD Program purported to require "all members of Purdue's field sales organization, medical science liaisons, and other Purdue employees and contract or third party representatives" to report prescribers and pharmacies suspected of diversion to Purdue's law

department "promptly, ideally within 48 hours of when the Reporter learns of a circumstance or makes an observation that may be indicative of potential abuse or diversion." As laid out in SOP 1.7.1, "red flags" that would trigger an obligation to file a report with Purdue's law department included, inter alia, excessive numbers of patients, short patient visits, patients paying HCPs for opioids with cash, unexplained changes in prescribing behavior, patients overdosing, and reports of suspicious activity from pharmacists or law enforcement, among others.

147. These "ADD Reports" were meant to be reviewed by senior Purdue employees to consider whether such providers were enabling the diversion of opioids. Among other things, Purdue was to determine whether such Health Care Providers ("HCPs") should be placed on the so-called Region Zero (i.e., "do not call") list.

148. In addition, the HCP was required to be reported to appropriate medical, regulatory, or law enforcement authorities (including the DEA) consistent with the ADD Program's parameters and Purdue's regulatory obligations under the CSA. Purdue's Associate General Counsel from 2002 to 2016, Defendant Abrams, once described the law department's decision-making process as "essentially a judgment call," but did not explain exactly how the law department arrived at its decisions.

149. Despite the opacity of the decision-making process, it is clear that Purdue and its law department prioritized Purdue's sales performance at the expense of the ADD Program's stated objectives. Even though the ADD Program regularly surfaced alarming information suggesting that prescribers were likely sources of diversion, the law department continued to allow sales representatives to promote Purdue opioid products to these prescribers rather than place them on the Region Zero list and report them to the DEA and other relevant authorities, as

required. Indeed, in some instances where Purdue identified particular "high value" doctors, managers ordered representatives to keep promoting opioids to these doctors even after these representatives warned their supervisors that the doctors were involved in diversion and abuse.

150. In other situations, the law department would place a prescriber on the Region Zero list but fail to report them to the DEA even after receiving numerous reports about suspected diversion.

151. Instead, Purdue functionally used one of the primary "red flags" under its SOP 1.7.1 as a marketing list to drive opioid sales. Under the Sackler Defendants' direction, Purdue deliberately identified providers who were prone to prescribing OxyContin at higher rates.

152. Through its systematic efforts, Purdue learned that high-prescribing doctors were the most responsive to the practice of provider detailing. A July 2012 Purdue PowerPoint entitled "OxyContin Marketing Mix Modeling Result," included a chart showing a clear correlation between deciles and the impact of detailing. Extreme high-volume prescribers (top 40%) were the most responsive to detailing—with the top 20% demonstrating the greatest level responsiveness to Purdue's marketing push.

153. Purdue's Board and the Sackler Defendants were well aware of the Company's improper detailing strategy and its impact on OxyContin sales. In October 2012, Mahony emailed the Board a "Sales & Marketing" presentation that highlighted why Purdue focused on targeting high-decile prescribers: "OxyContin is still promotionally sensitive to sales calls. For every $1 spent on a decile 7-10 HCP, an[] average of $3.70 is returned."

154. While Purdue maintained certain SOM systems and a semblance of an ADD Program, its programs failed to control diversion of its opioid products and did not meet its legal

obligations. In addition, Purdue's Order Monitoring System Committee (previously defined as the "OMS Committee")—which was nominally responsible for Purdue's SOM operations for more than eight years between March 2009 and September 2017 failed to report numerous suspicious orders to the DEA despite clear evidence of diversion.

155. Purdue's ADD Program failed to report countless diversion-prone prescribers to authorities and, in many cases, the company permitted and even encouraged sales representatives to continue promoting opioid products to these prescribers.

156. There are many more examples of Purdue placing a prescriber on the Region Zero list for improper prescribing but deciding not to report the prescriber to the DEA or other authorities. For instance, in response to an information request from the Medical Board of California, Purdue represented that it placed more than 110 California doctors on the Region Zero list through September 2013, in many cases for improper prescribing. Yet, Purdue's response to the Medical Board of California indicates that no more than 20 of these prescribers were actually reported by Purdue to the DEA or other authorities.

157. Purdue's own employees acknowledged the failure of Purdue's law department to administer the ADD Program effectively. For example, in March 2013, sales representatives learned that a prescriber named Christopher Huntington had committed suicide after losing his license for improper prescribing of opioids, including OxyContin. Purdue began investigating Huntington in 2011 after sales representatives informed the law department about his suspicious prescribing practices. But the law department decided not to designate Huntington as a Region Zero prescriber or report him to the DEA or other authorities. After learning that Huntington finally had lost his license, sales representatives deflected blame from themselves and criticized

the law department for not taking action. As one sales representative wrote, the law department had "goofed and missed this . . . NOT us. When an HCP is reported to legal and he then has his license taken away . . . it should NOT impact the rep in any way. Legal missed something."

158. As part of its drive toward selling as many opioids as possible, Purdue adopted a cavalier attitude toward important regulatory limits designed to crack down on improper prescribing. For example, in 2013, a sales representative complained to her supervisor that she was having issues with a pharmacist being unable to purchase more OxyContin because of a DEA SOP that placed limits on the amount of oxycodone a pharmacy can purchase based on the pharmacy's previous buying patterns. Her supervisor responded by congratulating the representative on selling such high amounts of opioids and instructed the representative that when "customer (prescribers)" express concern about pharmacies being unable to supply OxyContin due to exceeding the DEA limit, representatives should tell the prescriber that their patient "will simply need to fill the RX at another store."

159. Despite having information on physicians' prescribing behavior, the law department not only failed to report prescribers suspected of diversion and abuse to the appropriate authorities but also continued to allow Purdue to promote them. The Board did nothing to address the law department's shortcomings. For example, at the July 2010 Board meeting, the Board asked staff about opioid sales and revenue generated by doctors on the Region Zero list and was assured that prescription information existed at the doctor level (indeed, prescription level), and that data was then shared with the Board. The Board also was given a list of the problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each prescriber's practice provided to Purdue. Despite possessing this wealth of

knowledge of suspected abuse and diversion, the Board did not halt the promotion of Purdue's products to these problematic prescribers and failed to ensure the prescribers were reported to the DEA. Nor did they ensure proper response by management.

160. The Board knew that Region Zero prescribers accounted for a meaningful portion of Purdue's proceeds from OxyContin. For example, in March 2011, staff told the Board that if Region Zero doctors stopped prescribing opioids, Purdue would lose almost 10% of its sales. By failing to report Region Zero prescribers to authorities, the Sackler-dominated Board ensured that revenue generated by such suspect prescribers would continue to flow, and that the Sackler Defendants would continue to profit from their non-medically necessary prescriptions.

161. Unsurprisingly, a number of Region Zero prescribers ultimately lost their licenses or were criminally convicted for improper opioid prescribing. By then, Purdue and the Sacklers had collected a vast amount of money from their dangerous prescriptions and poured medically unnecessary opioids into communities around the country. Notably, presumably aware that top prescribers could face liability, Mortimer Sackler Jr. suggested in 2005 that Purdue lobby Congress to shield doctors from liability when prescribing opioids in order to "eliminate doctors needing to play Russian roulette each time they write a prescription for an opioid."

162. Despite Purdue's well-known anti-diversion obligations, including and in addition to the obligations arising from the Pre-2008 DOJ/State Resolutions, the Sackler and Non-Sackler Defendants, and the Non-Sackler Officers, took insufficient steps to oversee or establish oversight controls regarding the ADD Program, let alone to address its manifest failures. The Board's failure to take steps to ensure adequate oversight of the ADD Program is especially remarkable given how assiduously they monitored Region Zero sales data and other activity

indicating diversion of Purdue's opioid products.

### H. The Sacklers Also Misrepresented Their Compliance With Controlling Federal Law With Respect To Efforts To Detect, Prevent And Report Diversion Of Its Opioid Products.

163. Upon information and belief, Defendants have repeatedly misrepresented their compliance with their legal duties under federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public.

164. Rather than abide by their non-delegable duties under public safety laws, Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[54]

165. Defendants abandoned their duties imposed under federal law, and abused the

---

[54] Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control,* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.57dd9e32043c (accessed July 13, 2018); Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis,* Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.61f36a18c2c9, (accessed July 13, 2018); Eric Eyre, *DEA Agent:"We Had No Leadership" in WV Amid Flood of Pain Pills,* Charleston Gazette-Mail, Feb. IS, 2017, https://www.wvgazettemail.com/news/health/dea-agent-we-had-no-leadership-in-wv-amid-flood/article_928e9bcd-e28e-58b1-8e3f-f08288f539fd.html, (accessed July 13, 2018).

privilege of distributing controlled substances.

### I. The Sacklers also engaged in other unfair conduct.

166. At the direction of and with the knowledge of the Sacklers, illicit and unlawful prescribing of drugs remained unlawfully unreported and unaddressed. Sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. But rather than report these doctors to state medical boards or law enforcement authorities (as is legally obligated to do) or cease marketing to them, the Sacklers used the list to demonstrate the high rate of diversion of OxyContin—the same OxyContin promoted as less addictive—in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, they failed to take action—even where Purdue employees personally witnessed the diversion of its drugs.

167. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets, and that Purdue's district manager described internally as "an organized drug ring," until years after law enforcement shut the clinic down. In doing so, Purdue protected its own profits at the expense of public health and safety.

### J. The Sacklers targeted susceptible prescribers and vulnerable patient populations.

168. As a part of its deceptive marketing scheme, the Sacklers identified and targeted susceptible prescribers and vulnerable patient populations in New Mexico and around the nation. For example, the Sacklers focused their deceptive marketing on primary care doctors, who were

more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Purdue's misrepresentations.

169. The Sacklers also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. These patients were targeted even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post- traumatic stress disorder, which interact dangerously with opioids.

**a. Vulnerable patient populations were given free product coupons.**

170. Sales representatives provided physicians, and their patients, with coupons that patients could redeem for a 7- to 30-day supplies of free OxyContin, with the promise that OxyContin was generally safe and useful to treat a variety of non-cancer pain conditions. Purdue "trained its sales representatives to carry the message that the risk of addiction was 'less than one percent,'" and "[a] consistent feature in the promotion and marketing of OxyContin was a systematic effort to minimize the risk of addiction in the use of opioids for the treatment of chronic non-cancer-related pain."[55] For example, thousands of Purdue's free product coupons

---

[55] Art Van Zee, The Promotion and Marketing of OxyContin: Commercial Triumph, Public

were distributed in Maryland through prescribers who treated common pain conditions for which Purdue's opioids were medically unnecessary. Upon information and belief, Purdue executed similar marketing schemes across the country.

### K. The Sackler Defendants' directed falsely marketed progressively higher doses and encouraged doctors to prescribe higher doses of opioid medications.

171. For patients, taking higher doses of opioids increases the risk of addiction and death. Higher doses meant higher profits. Doctors were aggressively marketed to get patients on higher and higher doses.

172. Profits increased every time a patient's dose is increased. In 2015, Purdue's prices increased dramatically at higher dosages. Purdue made $38 for each patient taking the lowest dose pill twice a day for a week. Purdue's profits increased 450% to $210 if the patient was given the highest dose instead.

**OxyContin Prices**

bottle of 100 tablets (10 mg) $269.17
bottle of 100 tablets (15 mg) $396.28
bottle of 100 tablets (20 mg) $501.99
bottle of 100 tablets (30 mg) $698.15
bottle of 100 tablets (40 mg) $859. 72
bottle of 100 tablets (60 mg) $1,217.22
bottle of 100 tablets (80 mg) $1,500.18

173. To increase profits, sales tactics were designed to increase doses. A campaign for OxyContin was created with the slogan, "Individualize The Dose." The Sacklers were given presentations explaining that Purdue would use Individualize the Dose to sell more of its highest

---

Health Tragedy, 99(2) Am. J. Pub. Health 221-27 (Feb. 2009) (hereinafter, "Van Zee, Promotion and Marketing).

doses.

174. The sales force was trained on on "titration" (escalating doses), a tactic it determined was key to making more money. Purdue pushed a one-way path of increasing doses and specifically cited "clinical need."



*Purdue Opioid Promotion from 2008*



*Purdue Opioid Promotion from 2013*

175. Purdue tracked whether sales reps were effectively getting patients on higher doses and warned staff when they were not successful that "titration up to higher strengths, especially the 40mg and 80mg strengths, is declining." Purdue required sales reps to "practice verbalizing the titration message" to get patients on higher doses.

176. Defendants knew that promotion tactics drove patients to higher doses. An internal analysis "found that there is greater loss in the 60mg and 80mg strengths (compared to other strengths) when we don't make primary sales calls." The business plans emphasized that "OxyContin is promotionally sensitive, specifically with the higher doses, and recent research findings reinforce the value of sales calls." In 2014, when public health experts tried to save patients' lives by warning against high doses opioids, Purdue pursued a "strategic initiative" to fight back and "maintain 2013 dose mix."

177. The Sacklers directed the encouragement of doctors to prescribe high doses and failed to warn that higher doses carry heightened risk of addiction, overdose, and death. The risks were further concealed from the sales force.

178. The deception was deliberate. Purdue claimed that "dose was not a risk factor for opioid overdose," even while it admitted in internal documents that it was "very likely" that patients face "dose-related overdose risk."

179. Defendants analyzed, down to the last dollar, how much of the profit depended on patients taking higher doses of opioids. In the slide below staff was reminded that a shift to lower doses, which reduces danger to patients, would be bad for the bottom line.

180. When the CDC issued a national warning against the highest and most dangerous doses of opioids, the response was to analyze prescription data to calculate how much profit it

would lose if doctors followed the CDC's advice.



*Purdue Internal Strategy Presentation from 2012*

**L.  Purdue and the Sacklers maintained distribution agreements with specialty pharmacies in order to circumvent safeguards against the dispensation of suspicious prescriptions.**

181. In its Identifying Granular Growth Opportunities for OxyContin: First Board Update, consultants, working together with Purdue to implement a growth strategy for the sale of its opioids, informed the Purdue Board dominated by the Sacklers that part of the reason for declining OxyContin sales was that "both pharmacies and distributors" were "under intense scrutiny and direct risk," causing a "clear disruption impacting patients." In particular, consultants noted a "range of obstacles" to patients' access to OxyContin, including "entire

pharmacies being shut off by distributors, pharmacies themselves imposing tablet limits, decreases in channel inventory leading to greater stockouts, and pharmacies choosing to not stock OxyContin." To address this issue, the consultants proposed creating an "alternative model for how patients receive OxyContin" that would "bypass retail, likely through a third party vendor who would provide [ ] direct distribution to patients."

182. In response, in August 2013, Mortimer Sackler Jr. emailed Baker and then-CEO Stewart soliciting ideas for a new distribution system "to help relieve this problem of product access" and asking whether they were pursuing the strategy proposed by consultants "or an alternate." Mortimer Sackler Jr. shared his own vision for a new distribution system in which Purdue "would directly ship" patients OxyContin prescriptions "after using an independent service to verify the legitimacy of their prescriptions." Stewart responded that Purdue was "considering/evaluating many options," including "shipping directly to pharmacies who can't get supply from their regular wholesalers" and finding a way "to provide guidance to patients who call [Purdue] with respect to their personal problem in filling a prescription." To this, Mortimer Sackler Jr. responded, copying additional members of Purdue's management and the entire board of the Purdue global enterprise, "I do think there may be an opportunity here for us to set up a complimentary [sic] business to handle this for Purdue as well as other controlled drug manufacturers."

183. Responding to Mortimer Sackler Jr., Richard Sackler claimed to have had the same idea and expressed it to Stewart. In turn, Stewart confirmed Mortimer Sackler Jr.'s interest in exploring an "alternative distribution process for all or essentially all opioid formulations" that would "supply pharmacies, clinics and perhaps also patients (eg mail order)," and possibly even

hospitals. Mortimer Sackler Jr. responded, "To be clear, I was thinking about selling to pharmacies," and noted his belief that the consultants "[were] talking about our fulfilling [prescriptions] to the consumer."

184. Not long after these exchanges Purdue proceeded to develop "multiple tactics to address [distribution] issues," including "alternative [supply] channels." By October 2013, Purdue approached at least six potential partners for its alternative distribution strategies, but all of them rejected Purdue's offer because they were "not comfortable with mail fulfillment" and were concerned with the "risk associated with dispensing OxyContin" under Purdue's proposed distribution models. Despite these setbacks, Purdue continued to explore alternative distribution strategies and, in October 2013, members of Purdue's management updated the Board on the status of these strategies: "What is Purdue Considering? Includes exploring opportunity to distribute directly; exploring existing channels (Specialty pharmacies, independent pharmacy networks)."

185. Purdue eventually realized its goal of establishing "alternative distribution" channels. In 2015, Purdue entered into distribution agreements with three specialty pharmacies, which proceeded to fill numerous prescriptions that (1) had been rejected by traditional retail pharmacies based on indications of diversion; (2) were for uses that were unsafe, ineffective, and medically unnecessary; and (3) were often diverted into illegal drug markets. Indeed, the findings of Purdue's own ADD Program show that many of these prescriptions were medically unnecessary. In particular, the specialty pharmacies filled Medicare prescriptions for Purdue opioids written by approximately 100 prescribers, nearly one-fourth of whom were referred to the ADD Program on suspicion of diverting opioids into illegal markets. Between 2015 and

2018, Purdue paid these specialty pharmacies more than $100,000 in kickbacks to fill prescriptions that other traditional pharmacies had rejected.

186. When prescribers and patients experienced difficulty filling prescriptions for Purdue's opioid products, including OxyContin, Purdue's sales representatives and employees in its Medical Affairs department referred them to the specialty pharmacies with which Purdue had contracted.

**M. The Sacklers directed and led the alleged misconduct.**

187. The Sacklers were the chief architects and beneficiaries of Purdue's deception. They knowingly and intentionally sent sales representatives to promote opioids to prescribers in New Mexico thousands of times, and around the nation. The Sacklers knew and intended that the sales reps in New Mexico, and similarly across the entire nation, would deceptively promote opioid sales that are risky for patients, including by:

- blaming the dangers of opioids on patients instead of the addictive drugs;

- pushing opioids for elderly patients, without disclosing the higher risks;

- pushing opioids for patients who had never taken them before, without disclosing the higher risks;

- pushing opioids as substitutes for safer medications, with improper comparative claims;

- falsely assuring doctors and patients that reformulated OxyContin was safe;

- pushing doctors and patients to use higher doses of opioids, without disclosing the higher risks;

- pushing doctors and patients to use opioids for longer periods of time,

without  disclosing the higher risks; and

- marketing opioids to doctors whom Purdue knew were writing dangerous prescriptions.

188. The Sacklers knew and intended that the sales reps would not tell New Mexico doctors or doctors in other states and patients the truth about opioids. Indeed, they knew and intended these unfair and deceptive tactics to achieve their purpose by concealing the truth.

189. The Sacklers knew and intended that prescribers, pharmacists, and patients in New Mexico and around the nation would be misled by deceptive sales campaign, and as a result would prescribe, dispense, and take opioids. Misleading these prescribers, pharmacists, and parties was the purpose of the sales campaign.

190. The Sacklers knew and intended that staff reporting to them would pay top prescribers tens of thousands of dollars to encourage other doctors to write dangerous prescriptions in New Mexico, as well as across the country.

191. The Sacklers knew and intended that staff reporting to them would reinforce these misleading acts through thousands of additional acts, including by sending deceptive publications to New Mexico doctors, and doctors nationwide.

192. The Sacklers knowingly and intentionally accepted profits from deceptive business practices in New Mexico and nationally.

193. The Sacklers knowingly and intentionally sought to conceal their personal involvement in the misconduct.

**N.  The Sacklers' efforts to conceal their misconduct internally**

194. The Sackler Directors and Purdue were doing everything they could to make sure

that their fingerprints were not on written evidence of Purdue's criminal conduct. Purdue's internal documents from before and after 2007 are filled with examples of Purdue leadership, including the Sackler Directors, discouraging written communications about topics that could raise potential liability issues for Purdue. For example:

- In 2001, a regional manager sent his sales representatives a reminder of the types of information that is "okay to communicate" but "should never ever go on e-mail." Instead, he advised that negative comments "should be placed on voicemail or typed in a hard copy memo and sent via U.S. mail or fax, so there is no permanent electronic record." The manager told his team to "[i]magine if each of these messages was displayed on an overhead projector in a court of law accusing Purdue of unethical or inappropriate marketing."

- Purdue's strictest policy against written communications prohibited sales representatives from recording details about their sales pitches to doctors in emails. The Board knew about and approved this policy, and staff assured the Board that the policy was enforced. Purdue instructed its sales representatives to avoid using words like "Meal ticket" or "I pushed her to write more OxyContin" in their call notes – "Work to remove this language from you[r] written and oral communications!" Its training presentations also advised sales representatives to "not include adverse events" – defined as "any undesirable event . . . associated with the use of a drug" – "in your call notes." Purdue required that sales representatives discuss opioids only in face-to-face oral conversations to avoid generating discoverable evidence of its misconduct. As

the top sales and marketing executive in the company, Russell Gasdia personally enforced the rule. When Gasdia learned that a sales representative had sent a doctor emails about Purdue opioids, he ordered: "Fire her now! We can't afford this."

- This, of course, was consistent with Gasdia's email playbook. For example, when staff emailed Russell Gasdia a detailed report of illegal OxyContin trafficking, he responded: "These should not be on email." When the Northeast Regional Manager emailed Gasdia about the arrest of a profitable "core physician" in Massachusetts, Gasdia ordered: "Discontinue use of email on this subject." When sales staff emailed each other about how to "push" doctors to prescribe more opioids, Gasdia instructed: "Please take this off line. I would prefer a face to face discussion on this."

- In 2014, Purdue abolished the issuance of detailed Quarterly Reports that had created a paper trail of targets for sales visits and been emailed among the Board and staff, as a result of a subpoena that the City of Chicago served on Purdue in 2013 seeking internal documents about Purdue's marketing of opioids. The subpoena provoked a flurry of activity, including discussion among the Board. Purdue fought the subpoena, and eventually it was withdrawn. But as a result of this incident, from 2014 and onward, the Board decided to limit many of Purdue's official Board reports to numbers and graphs and relayed other information orally only.

- Throughout 2018, Josephine Martin, Purdue's Senior Vice President of

Corporate Affairs and Communications, was the center of several email

exchanges concerning public affairs issues. Martin frequently ended electronic

conversations and insisted on continuing them offline, for example, writing:

"Happy to discuss offline." After such messages, the electronic

communications usually ended.

195. The Sacklers' ability to conceal their wrongdoing was augmented by the fact that

Purdue is, and at all relevant times was, a privately held corporation, meaning that it was not

subject to reporting or disclosure obligations imposed on public companies by the U.S. Securities

and Exchange Commission and other state and federal regulators. Purdue also had no

shareholders outside of the Sackler family and therefore was able to avoid disclosure of most

information beyond family members and a close-knit circle of advisors. From the beginning, the

Sacklers apparently appreciated this. For instance, in 1995, Baker advised Richard Sackler:

"since we are private, we haven't a fair disclosure requirement, and can choose and select what

we want to publish." Richard commented that the lack of a disclosure requirement was a

"definite advantage of our private status."

196. Ultimately, despite their best efforts at concealing their misconduct, the Sackler

Directors and Purdue became subject to an onslaught of claims and litigation for their significant

role in creating and fueling the opioid crisis.

### O.  The Sacklers' misconduct leading to the 2007 judgment

197. The Sacklers' misconduct was particularly deceptive, unreasonable, and unlawful

because they were already given a second chance. From the 1990s until 2007, they directed more

than a decade of misconduct, which led to criminal convictions, civil judgments, and

commitments that Purdue would not deceive doctors and patients again. That background confirms that the Sacklers' misconduct since 2007 was knowing and intentional.

198. The Sackler family's first drug company was the Purdue Frederick Company, which they bought in 1952. In 1990, they created Purdue Pharma Inc. and Purdue Pharma L.P. and, from day one, the Sackler family held a majority of seats on the Board. Richard, Ilene, Jonathan and Kathe Sackler took seats on the Board in 1990. Beverly, Mortimer, and Theresa Sackler became directors of Purdue Pharma in or around 1995. And David Sackler joined the Board in 2012.

199. The Sacklers always insisted that their family control Purdue. From 1990 on, their family always held the majority of seats on the Board. In 1994, Jonathan Sackler issued a memorandum to Purdue staff requiring that the Sacklers should receive all Quarterly Reports and any other reports directed to the Board.

200. Purdue launched OxyContin in 1996. It became one of the deadliest drugs of all time.[56] Upon information and belief, the FDA scientist who evaluated OxyContin wrote in his original review: "[c]are should be taken to limit competitive promotion." But, from the beginning, the Sacklers viewed limits on opioids as an obstacle to greater profits. To make more money, the Sacklers even considered whether they could sell OxyContin in some countries as an uncontrolled drug because of a potential "vast increase of the market potential." The inventor of OxyContin, Robert Kaiko, wrote to Richard Sackler to oppose this dangerous idea. At the

---

[56] *See e.g.*, 2016-03-15 telebriefing by CDC Director Tom Frieden ("We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently … those who got the highest doses of opioids, more than 200 MMEs per day had a 1 in 32 chance of dying in just 2 ½ years … almost all the opioids on the market are just as addictive as heroin"), available at https://www.cdc.gov/media/releases/2016/t0315-prescribing-opioids-guidelines.html.

OxyContin launch party, Richard Sackler spoke as the Senior Vice President responsible for sales. Upon information and belief, he told the audience: "the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white…" Over the next twenty years, the Sacklers made Richard's boast come true across New Mexico and the entire country. They created a manmade disaster. Their blizzard of dangerous prescriptions buried children and parents and grandparents across New Mexico, and the nation as a whole, and the burials continue.

201 From the beginning, the Sacklers were behind Purdue's decision to deceive doctors and patients. In 1997, Richard Sackler, Kathe Sackler, and other Purdue executives determined— and recorded in secret internal correspondence—that doctors had the crucial misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin much more often, even as a substitute for Tylenol. In reality, OxyContin is more powerful than morphine. But, upon information and belief, Richard directed Purdue staff not to tell doctors the truth, because the truth could reduce OxyContin sales. The Sacklers were also the driving force behind Purdue's strategy to push opioids with the false promise that they create an enhanced "lifestyle."

202. Most of all, the Sacklers cared about money. Upon information and belief, in 1999, when an employee reported to Richard Sackler that Purdue was making more than $20,000,000 per week, Richard replied immediately that sales were "not so great." "After all, if we are to do 900M this year, we should be running at 75M/month. So it looks like this month could be 80 or 90M. Blah, humbug. Yawn. Where was I?"

203. **In 1999**, Richard Sackler became the CEO of Purdue. Jonathan, Kathe and Mortimer were Vice Presidents. Under the Sacklers' direction, the company hired hundreds of sales

representatives and taught them to use false claims to sell drugs. For example, on the crucial issue of addiction, Purdue trained its sales reps to deceive doctors that the risk of addiction was "less than one percent."[57] Purdue mailed thousands of doctors promotional videos with that same false claim:

> There's no question that our best, strongest pain medicines are the opioids. But these are the same drugs that have a reputation for causing addiction and other terrible things. Now, in fact, the rate of addiction amongst pain patients who are treated by doctors is much less than one percent. They don't wear out, they go on working, they do not have serious medical side effects."[58] A sales rep told a reporter: "We were directed to lie. Why mince words about it? Greed took hold and overruled everything. They saw that potential for billions of dollars and just went after it."[59]

204. **In 2000**, the Sacklers were warned that a reporter was "sniffing about the OxyContin abuse story." The Sacklers put the threat on the agenda for the next Board meeting and began covering their tracks. They planned a response that "deflects attention from the company's owners."

205. **In January 2001**, Richard Sackler received a plea for help from a Purdue sales rep. The representative described a community meeting at a local high school, organized by mothers whose children had overdosed on OxyContin and died. He reported to Richard Sackler that, "[s]tatements were made that OxyContin sales were at the expense of dead children and the only difference between heroin and OxyContin is that you can get OxyContin from a doctor."

206. The next month, a federal prosecutor reported 59 deaths from OxyContin in a single state. But the Sacklers knew that the reports underestimated the problem. Upon information and

---

[57] Barry Meier, *Pain Killer* (1 ed. 2003) at 99.
[58] "I Got My Life Back" video transcript.
[59] 2017-10-16, Christopher Glazek, "The Secretive Family Making Billions From The Opioid Crisis," *Esquire* Magazine (quoting Purdue sales representative Shelby Sherman).

belief, Richard Sackler wrote to Purdue executives: "This is not too bad. It could have been far worse."

207. That same month, Richard Sackler wrote down his solution to the overwhelming evidence of overdose and death: blame and stigmatize people who become addicted to opioids. Upon information and belief, Sackler wrote in a confidential email: "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals." The Sacklers followed that strategy going forward by collecting millions from selling their addictive drugs, and blaming the terrible consequences on the people who became addicted.

208. **In March 2001**, the Sacklers finally achieved a long-sought goal: the front page of the New York Times reported that "OxyContin's sales have hit $1 billion, more than even Viagra's." The same article noted that "OxyContin has been a factor in the deaths of at least 120 people, and the medical examiners are still counting."

209. When Time magazine published an article shortly thereafter about OxyContin deaths in New England, Purdue employees told Richard Sackler they were concerned. Richard responded with a message to his staff. Upon information and belief, he wrote that Time's coverage of people who lost their lives to OxyContin was not "balanced," and the deaths were the fault of "the drug addicts," instead of Purdue.

210. That spring, Purdue executives met with the U.S. Drug Enforcement Administration ("DEA"). A senior DEA official sat across from Richard Sackler. Before the meeting ended, she leaned over the table and told Richard: "People are dying. Do you understand that?"[60]

---

[60] 2001 meeting described in *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* by Barry Meier, pg. 158 (2003). The DEA official was Laura Nagel, head of the DEA Office of

211. As Purdue kept pushing opioids and people kept dying, the company became engulfed in a wave of investigations by state attorneys general, the DEA and the U.S. Department of Justice. In 2003, Richard Sackler left his position as President of Purdue. A few years later, Jonathan, Kathe and Mortimer Sackler resigned from their positions as Vice Presidents. But those moves were only for show. The Sacklers maintained control of the company. Their family owned Purdue. They controlled the Board. They paid themselves the profits. And, as alleged in detail below, they continued to direct Purdue's deceptive marketing campaign.

212. **By 2006**, prosecutors found damning evidence that Purdue intentionally deceived doctors and patients about its opioids. The Sacklers caused the Purdue Frederick Company to plead guilty to a felony for misbranding OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause side effects than other pain medications. The Sacklers also voted on the Board that three Purdue executives (Michael Friedman, Paul Goldenheim, and Howard Udell)—but not a single member of the Sackler family—should plead guilty as individuals.

213. In May 2007, the Sacklers voted again to have their company plead guilty and enter a series of agreements that Purdue would never deceive doctors and patients about opioids again. The Purdue Frederick Company confessed to a felony and effectively went out of business. But the Sacklers continued their opioid business in their other companies, including Purdue Pharma Inc. and Purdue Pharma L.P.

214. The Sacklers voted to admit in an Agreed Statement of Facts that, for more than six

Diversion Control.

years, supervisors and employees intentionally deceived doctors about OxyContin: "Beginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[61]

215. To remove any doubt, the Sacklers voted to enter into a plea agreement that stated: "Purdue is pleading guilty as described above because Purdue is in fact guilty."[62] Those intentional violations of the law happened while Richard Sackler was CEO; Jonathan, Kathe and Mortimer were Vice Presidents; and Richard, Jonathan, Kathe, Mortimer, Ilene, Beverly and Theresa Sackler were all on the Board.

216. The Sacklers also voted for Purdue to enter a Corporate Integrity Agreement with the U.S. government. The agreement required the Sacklers to ensure that Purdue did not deceive doctors and patients again. The Sacklers promised to comply with rules that prohibit deception about Purdue opioids. They were required to complete hours of training to ensure that they understood the rules. They were required to report any deception. Indeed, Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler each certified in writing to the government that he or she had read and understood the rules and would obey them.[63]

217. In 2007, the Sacklers also voted to enter into a Consent Judgment in Massachusetts which ordered that Purdue "shall not make any written or oral claim that is false, misleading, or

---

[61] 2007-05-09 Agreed Statement of Facts, paragraph 20, available at https://www.documentcloud.org/documents/279028-purdue-guilty-plea.
[62] May 9, 2007 Plea Agreement.
[63] *Id.*

deceptive" in the promotion or marketing of OxyContin. The judgment further required that Purdue provide fair balance regarding risks and benefits in all promotion of OxyContin. That judgment required fair balance about the risks of taking higher doses for longer periods and the risks of addiction, overdose, and death. That judgment further required that Purdue establish and follow an abuse and diversion detection program to identify high-prescribing doctors who show signs of inappropriate prescribing, stop promoting drugs to them, and report them to the authorities

218. The 2007 agreements should have ended the misconduct for good. Instead, the Sacklers decided to break the law again and again, expanding and evolving their deceptive sales campaign to make more money at the expense of more patients and families.

### P.  The Sacklers' misconduct from 2007 until approximately 2019

219. After 2007, the Sacklers continued to control Purdue's deceptive sales campaign. They directed the company to hire hundreds more sales reps. They insisted that sales reps repeatedly visit the most prolific prescribers. They directed reps to encourage doctors to prescribe more of the highest doses of opioids. They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use those tactics in making sales. They asked for detailed reports about doctors suspected of misconduct, how much money Purdue made from them, and how few of them Purdue had reported to the authorities. Richard Sackler even went into the field himself to promote opioids to doctors and supervise reps face to face.

220. Upon information and belief, the Sacklers' micromanagement was so intrusive that staff begged for relief.

221. The Sackler's directions shot through the company with dangerous force. The

Sacklers' directions were enforced throughout the company. When the Sacklers berated sales managers, the managers turned around and fired straight at reps in the field.

222. The Sacklers cared most of all about money. From 2007 to 2018, they voted to direct Purdue to pay their family billions of dollars, including millions from opioids sold in New Mexico, as well as nationwide. These payments show the total control that the Sacklers exercised over Purdue. The payments were the motivation for the Sacklers' misconduct. And the payments were deliberate decisions to benefit from deception in New Mexico and across the country, at great cost to patients and families, and the Proposed Class members.

223. As detailed below, the Sacklers' misconduct continued from the 2007 convictions through 2018.

### a. 2007

224. **In July 2007**, staff told the Sacklers that more than 5,000 cases of adverse events had been reported to Purdue in just the first three months of 2007. Staff also told the Sacklers that Purdue received 572 Reports of Concern about abuse and diversion of Purdue opioids during Q2 2007. Staff reported to the Sacklers that they completed only 21 field inquiries in response. Upon information and belief, staff also told the Sacklers that they received more than 100 calls to Purdue's compliance hotline during the quarter, but Purdue did not report any of the hotline calls or Reports of Concern to the FDA, DEA, Department of Justice, or state authorities.

225. Purdue's self-interested failure to report abuse and diversion would continue, quarter after quarter, even though the 2007 Judgment required Purdue to report "potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities." Instead of reporting dangerous prescribers, or even directing sales reps to stop visiting them, the Sacklers chose to

keep pushing opioids to whoever prescribed the most.

226. Staff also reported to the Sacklers that they continued to mail out thousands of deceptive marketing materials, including 12,528 publications in the first half of 2007. Upon information and belief, the single most-distributed material was volume #1 of Purdue's "Focused and Customized Education Topic Selections in Pain Management" (FACETS). In FACETS, Purdue falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead improves patients' "quality of life"—just as Richard Sackler had been saying since the 1990s. In the same material, Purdue also falsely told doctors and patients that signs of addiction are actually "pseudoaddiction," and that doctors should respond by prescribing more opioids.[64] Staff told the Sacklers that another of the publications they had sent most often to doctors was "Complexities in Caring for People in Pain." In it, Purdue repeated again its false claim that warning signs of addiction are really "pseudoaddiction" that should be treated with more opioids.[65]

227. Upon information and belief, Purdue was making more money than expected. A few months earlier, they had projected a profit of $407,000,000; now they expected more than $600,000,000.

228. Sales efforts were a key reason that profits were high. Upon information and belief, staff told the Sacklers that Purdue employed 301 sales reps to promote opioids and that sales reps were the largest group of Purdue employees by far. In comparison, Purdue employed only 34 people in drug discovery.

---

[64] 2007-08 FACETS Vol. 1, pgs. 51-53.
[65] 2007 Complexities of Caring for People in Pain, pg. 2

From the 2007 convictions until today, the Sacklers ordered Purdue to hire hundreds of sales reps to carry out their deceptive sales campaign.

229. **In October**, upon information and belief, staff told the Sacklers that Purdue received 284 Reports of Concern about abuse and diversion of Purdue's opioids in Q3 2007, and they conducted only 46 field inquiries in response. Staff reported to the Sacklers that they received 39 tips to Purdue's compliance hotline during the quarter, but Purdue did not report any of them to the authorities.

230. Staff told the Sacklers that Purdue had hired more sales reps and now employed 304. They also reported to the Sacklers that Purdue was succeeding at promoting its highest doses of opioids: "OxyContin 80mg is at Rx levels not seen in over 2 years."

231. In 2007, Purdue expected to collect more than half its total revenue from sales of 80mg OxyContin—its most powerful, most profitable, and most dangerous pill.

232. **In November**, the Sacklers voted to spend $86,900,000 to employ sales reps in 2008 and another $1,000,000 to buy them laptops. The Sacklers also voted for a resolution regarding salary increases and bonus targets for the reps.

**b.  2008**

233. **In January 2008**, Purdue still employed 304 sales reps and they were succeeding at the goal of promoting higher doses of opioids. In 2007, Purdue's net sales were just over $1 billion, almost double what the company had planned. OxyContin was more than 90% of those sales.

234. Upon information and belief, staff also told the Sacklers that Purdue received 689 Reports of Concern about abuse and diversion of Purdue's opioids in Q4 2007, and they

conducted only 21 field inquiries in response. Staff also reported to the Sacklers that they received 83 tips to Purdue's compliance hotline during the quarter, but Purdue did not report any of them to the authorities.

235.    Upon information and belief, the Sacklers wanted more details on tactics for pushing sales. Richard Sackler wrote to Russell Gasdia, Vice President of Sales and Marketing (hereinafter "Sales VP"), demanding information about Purdue's opioid savings cards. Richard asked Gasdia how long the opioid savings cards lasted, how much savings they offered a patient, and whether there had been any changes since he had last been briefed on the opioid savings card scheme. Richard sent Gasdia a detailed hypothetical scenario to make sure he understood the sales tactic down to the smallest details. Staff followed up with a presentation about opioid savings cards to the Sacklers at the next Board meeting.

236.    Meanwhile, when staff proposed a plan to get pharmacies to increase their inventory of OxyContin from 2 bottles to 3 bottles, Richard Sackler demanded to know why they couldn't get up to 4 bottles or more.

237.    The Sacklers didn't only sweat the small stuff. They also made the fundamental decision to hire a sales force, and then to expand it. At Purdue, hiring more sales reps was not a matter for middle management. Selling opioids door-to-door, in visits to doctor's offices and hospitals, was the core business of the company. The Sacklers themselves made the decisions about how big the sales force would be and what it would do.

238.    **In February**, upon information and belief the Sacklers used their power on the Board of Directors to order Purdue to increase the sales force by an additional 100 sales representatives.

239.     The Sacklers knew and intended that, because of their orders, more sales reps would promote opioids to prescribers. In preparation for the Sacklers' vote, staff told them that adding 100 sales reps would allow Purdue to make 12,000 more sales visits to prescribers every month.

240.     The Sacklers also knew and intended that the sales reps would push higher doses of Purdue's opioids.

241.     Upon information and belief, on Valentine's Day, the Sacklers voted to pay former CEO and criminal convict Michael Friedman $3,000,000. It was one of several multi-million-dollar payments to the convicted executives to maintain their loyalty and protect the Sackler family.

242.     By 2008, Purdue was working on a crush-proof reformulation of OxyContin to extend Purdue's patent monopoly. The Sacklers learned that another company was planning clinical research to test whether crush-proof opioids are safer for patients. The Sacklers decided not to do the research because they wanted the profits from a new product, regardless of whether the deaths continued.

243.     Meanwhile, upon information and belief, staff gave the Sacklers projections indicating that OxyContin sales could plateau. The Sacklers demanded answers to a series of questions about why sales would not grow. Staff emailed among themselves about how the Sacklers' demands were unrealistic and harmful.

244.     **In March**, Richard Sackler dug into Purdue's strategy for selling more OxyContin. Upon information and belief, he directed sales and marketing staff to turn over thousands of pieces of data about sales trends, including data to distinguish the kilograms of

active drug from the number of prescriptions, so he could analyze higher doses. Staff began to prepare for meetings with Richard, highlighting that Richard was looking for results that could only be achieved by hiring more sales reps.

245.    Sales VP Russell Gasdia was struggling to handle the pressure to increase sales of OxyContin.

246.    Richard Sackler pushed staff to sell more of the highest doses of opioids and get more pills in each prescription. To that effect, Russell Gasdia began writing up plans for how adding sales reps, opioid savings cards, and promoting more intermediate doses of OxyContin could help increase sales.

247.    Upon information and belief, at the same time, Jonathan, Kathe, and Mortimer Sackler were also pushing staff about sales. Staff told those three Sacklers that they would use opioid savings cards to meet the challenge of keeping OxyContin scripts at the same level in 2008 as in 2007.

248.    **In April**, upon information and belief, staff told the Sacklers that Purdue employed 304 sales reps. Staff reported to the Sacklers that the reps had obtained data showing which pharmacies stocked higher strengths of OxyContin, which helped them convince area doctors to prescribe the highest doses. Staff also told the Sacklers that Purdue received 853 Reports of Concern about abuse and diversion of Purdue opioids in Q1 2008, and they had conducted only 17 field inquiries in response. Staff also reported to the Sacklers that they received 83 tips to Purdue's compliance hotline during the quarter, but did not report any of them to the authorities.

249.    On April 18, upon information and belief, Richard Sackler sent Kathe, Ilene,

David, Jonathan, and Mortimer Sackler a secret memo about how to keep money flowing to their family. Richard Sackler was concerned that Purdue's business posed a dangerous concentration of risk. After the criminal investigations that almost reached the Sacklers, Richard wrote that it was crucial to install a CEO who would be loyal to the family. Richard recommended John Stewart for CEO because of his loyalty. Richard also proposed that the family should either sell Purdue in 2008 or, if they could not find a buyer, milk the profits out of the business and distribute more profit to themselves.

250.    That month, the Sacklers voted to have Purdue pay their family $50,000,000. From the 2007 convictions until 2018, the Sacklers voted dozens of times to pay out Purdue's opioid profits to their family—*in total more than four billion dollars of non-tax distributions, and even more with tax distributions.*

*(Remainder of page intentionally left blank.)*



*Graphic based on Information and Belief*

251.    On April 18, upon information and belief, the Sacklers voted to increase the 2008

budget for Sales and Promotion to $155,802,000.

252.    **In May**, upon information and belief staff sent the Sacklers more ideas about

ways to promote Purdue's opioids. The proposal matched the Sacklers' own plan: deflect blame

from Purdue's addictive drugs by stigmatizing people who become addicted.

253.    **In June**, the Sacklers voted to appoint John Stewart as President and CEO of

Purdue Pharma Inc. and Purdue Pharma LP. On the same day, upon information and belief, the

Sacklers voted to pay their family $250,000,000.

254.    Meanwhile, upon information and belief staff reported to Richard, Jonathan,

Kathe, and Mortimer Sackler that 67,951 patients had used Purdue's opioid savings cards, and that the cards provided a discount on a patient's first five prescriptions. After five prescriptions, many patients would face significant withdrawal symptoms if they tried to stop taking opioids. Staff told Richard, Jonathan, Kathe, and Mortimer Sackler that 27% of patients (more than 18,000 people) had used the cards for all five prescriptions.

255.    **In July**, upon information and belief, Purdue's Fleet Department reported to the Sacklers that Purdue had bought one hundred new Pontiac Vibes for the expanded sales force. Staff also told the Sacklers that Purdue received 890 Reports of Concern regarding abuse and diversion of Purdue's opioids in Q2 2008 and had conducted only 25 field inquiries in response. Staff reported to the Sacklers that they received 93 tips to Purdue's compliance hotline during the quarter, but did not report any of them to the authorities.

256.    **In September**, upon information and belief, the Sacklers voted to distribute to their family $199,012,182.

257.    **In October**, upon information and belief, staff told the Sacklers that surveillance data monitored by Purdue indicated a wide geographic distribution of abuse and diversion of OxyContin. Staff told the Sacklers that availability of the product and prescribing practices were key factors driving abuse and diversion of OxyContin. On the same day, staff told the Sacklers that Purdue had begun a new contest for sales reps to win bonuses, based on how much a rep increased OxyContin use in their territory and how much the rep increased the broader prescribing of opioids. Staff also told the Sacklers that they received 163 tips to Purdue's compliance hotline during Q3 2008, but did not report any of them to the authorities.

258.    Staff also told the Sacklers that the Board-ordered sales force expansion had been

implemented and Purdue now employed 414 sales reps. The Sacklers' decision to expand the sales force caused the effect they intended in each of the Plaintiff and Proposed Class members' jurisdictions.

259.    **In November**, upon information and belief, the Sacklers turned to expanding the sales force again. Purdue's 2009 budget identified expanding the sales force as the #1 sales and marketing objective. The Sacklers voted to spend $112,400,000 on sales reps. Staff told the Sacklers that their decision would pay an average sales rep salary of $89,708 and bonus of $43,470, and the sales reps would visit prescribers 518,359 times. That same month, the Sacklers voted to pay their family $325,000,000. They also voted to pay $5,000,000 to Howard Udell— their lawyer and convicted criminal. The Sacklers spent millions to keep the loyalty of people who knew the truth.

### c.    2009

260.    **In March**, upon information and belief, the Sacklers voted to pay Purdue sales reps and sales managers bonuses of 103 percent of Purdue's target because they sold so many opioids in 2008. The Sacklers also voted to increase the base pay of sales staff for 2009. On the same day, the Sacklers voted to pay their family $200,000,000.

261.    **In April**, staff told the Sacklers that Purdue employed 412 sales reps and had made dramatic progress promoting higher doses. The Sacklers, upon information and belief, told sales executives to hire a new staff member who would contact prescribers electronically and would promote Purdue opioids through the deceptive website Partners Against Pain.

262.    Upon information and belief, staff told the Sacklers that they received 122 tips to Purdue's compliance hotline during Q1 2009, and revealed one of them to an outside monitor.

Staff reported to the Sacklers that the compliance problems included improper use of OxyContin marketing materials and opioid savings cards.

263.     **In May**, upon information and belief, staff told the Sacklers that Purdue had violated its Corporate Integrity Agreement with the U.S. government by failing to supervise its sales reps. Because sales reps lobbying doctors poses a high risk of misconduct (no witnesses, and the rep is paid to increase opioid sales), the United States required that Purdue managers supervise sales reps in person at least 5 days each year. Purdue management disregarded that obligation and did not even set up a system to track it. Even though Purdue executives had ignored the requirement and not monitored it, they responded to the violation by firing three employees in the field and letting all the executives at headquarters keep their jobs.

264.     **In July**, upon information and belief, staff told the Sacklers that Purdue employed 429 sales reps. Richard Sackler told staff that he was not satisfied with OxyContin sales and demanded a plan to increase them.

265.     **In August**, upon information and belief, Richard Sackler convened a meeting of Board members and staff about what Purdue's Sales and Marketing teams were doing and planning to do to reverse the decline in OxyContin tablets market. He emphasized that $200,000,000 in profit was at stake. At the meeting, staff told the Sacklers that the 80mg OxyContin pill was far-and-away Purdue's best performing drug. Purdue sold many more kilograms of active ingredient in the 80mg dose than any other dose (about 1,000 kilograms: literally a ton of oxycodone). Staff also reported to the Sacklers about their newest OxyContin sales campaign, with the slogan: Options. The Options campaign set the pattern that Purdue would follow for years: pushing doctors and patients up the ladder to higher doses. Staff told the

Sacklers that they would advertise the Options campaign in medical journals reaching 245,000 doctors.





Through a wide range of tablet strengths,
OxyContin® provides options to meet the individual
therapeutic needs of your appropriate patient

- Q12h dosing with as few as 2 tablets per day
- When converting from other opioids, the 7 OxyContin® Tablet strengths enable you to closely approximate the calculated conversion dose
- OxyContin® is a single-entity opioid
- You can adjust your patient's dose every 1 to 2 days, if needed, because steady-state plasma concentrations are approximated within 24 to 36 hours

*Purdue's 2009 marketing campaign 'Options'*

266.    Upon information and belief, Staff also reported to the Sacklers that more than 160,000 patients had used Purdue's opioid savings cards, more than doubling the result reported to the Sacklers the summer before.  Staff also told the Sacklers that they would advertise OxyContin using a special television network: thousands of doctors would be given free digital video recorders for their home televisions, in exchange for watching advertisements for drugs.

267.    **In September**, upon information and belief, the Sacklers voted to distribute to

their family $173,000,000.

268.    **In October**, upon information and belief, staff told the Sacklers that Purdue had expanded its sales force by 50 territories and now employed 475 sales reps.  Richard Sackler directed staff to send him weekly reports on OxyContin sales.

269.    Upon information and belief, that same month, the Sacklers and staff discussed federal sunshine legislation that would create a public database to disclose drug companies' payments to doctors.  Purdue was paying many doctors to promote its opioids, but the payments could often be kept secret.  Some of the Sacklers were concerned that doctors would be less willing to work for Purdue if the payments were disclosed.

270.    **In November**, upon information and belief, the Sacklers voted to spend $121,628,000 to employ sales reps in 2010.  Kathe and Richard Sackler were designated to review the sales projections.  They also voted to pay disgraced former employee Howard Udell up to another $1,000,000, and to pay $2,700,000 to settle personal injury claims by people harmed by Purdue's opioids.

271.    **In December**, upon information and belief, Kathe and Richard Sackler met with sales staff to review plans for 2010.  Staff warned the two Sacklers that, although OxyContin sales were at record-breaking levels (nearly $3 billion per year), the decade-long rise in the total kilograms of oxycodone prescribed in America was beginning to flatten.  Higher doses contain more of that active ingredient and are more profitable to Purdue.

### d.  2010

272.    **In January 2010**, upon information and belief, Richard Sackler started the year by asking sales staff for new customized reports. Staff complained to each other until Sales VP

Russell Gasdia asked CEO John Stewart to intervene.

273.    **In February**, upon information and belief, Purdue's Sales and Marketing Department told the Sacklers that a key objective for 2010 would be to meet or exceed targets of 545,000 visits to prescribers to promote Purdue opioids. For the next four years or more, a key objective for the sales employees was to meet a quota of sales visits, and the Sacklers tracked their performance. The target rose from 545,000 prescriber visits in 2010, to 712,000 visits in 2011, 752,417 visits in 2012, and 744,777 visits in 2013.

274.    Upon information and belief, to achieve the target for sales visits, staff told the Sacklers that another sales force expansion ordered by the Board had been implemented and Purdue employed 490 sales reps.

275.    Upon information and belief, staff also told the Sacklers that consultants estimated that new tactics by Purdue sales reps would generate $200,000,000 to $400,000,000 more sales of OxyContin, and that sales reps had been practicing the new tactics in front of management. Upon information and belief, the Sacklers voted to spend $226,000,000 on Sales and Promotion in 2010, and to pay their family $236,650,000.

276.    **In March**, upon information and belief, Richard Sackler instructed sales staff to send him monthly reports on sales of OxyContin and its competitors. The report showed that Purdue was selling more pills of its 80mg OxyContin (the highest dose) than any other dose, and that the highest dose pills were responsible for the greatest share of Purdue's revenue by far.

277.    Upon information and belief, staff also told the Sacklers that a key selling point for OxyContin compared to a competitor's product was that OxyContin could be used by patients who had not taken opioids before. Deceptively promoting opioids for opioid-naive patients who

96

had not taken them before was one of the ways Purdue put patients at risk.

278.    **In April**, upon information and belief, the Sacklers voted to distribute to their family another $141,000,000. Meanwhile, staff told the Sacklers that they were pushing back against the threat of public health rules that would limit high doses of opioids. They told the Sacklers that Purdue would oppose precautions that asked doctors to consult with specialists before prescribing the highest doses.

### (1) The Sacklers' Control of Sales Visits

279.    Upon information and belief, that same month (April 2010), staff gave the Sacklers one of many detailed reports on sales reps' visits to prescribers. As with every reference to "the Sacklers" before July 2012, that includes Beverly, Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

280.    Upon information and belief, the Sacklers required each rep to visit an average of 7.5 prescribers per day. In April 2010, staff reported that they were falling short. During Q1 2010, reps had averaged only 7.0 visits per day. Staff promised to try harder. The Sacklers continued to set a target for daily sales visits for every sales rep, and they tracked the results, quarter by quarter, for at least the next four years. The results were always close to 7 visits per day.

*(Remainder of page intentionally left blank.)*



*Graphic based* Upon information and belief

281.    Upon information and belief, the Sacklers also set targets for the total number of sales visits by the entire sales force per quarter—huge numbers that were always more than a hundred thousand visits. Meeting those targets was a top priority for the entire company. For Q1 2010, the target was to visit prescribers 127,376 times. Staff told the Sacklers that Purdue employed 489 sales reps and that, during Q1 2010, they achieved the goal. As with the daily visits per rep, the Sacklers tracked the total number of sales visits per quarter, every quarter, for at least the next four years.

*(Remainder of page intentionally left blank.)*

98



*Graphic based* Upon information and belief

282.    **In June 2010**, upon information and belief, staff gave the Sacklers an updated 10-year plan for growing Purdue's opioid sales.   According to the plan, the Sacklers expected Purdue to distribute to their family at least $700,000,000 each year from 2010 through 2020. Sales VP Gasdia wrote to the Sacklers that they planned for each rep to visit prescribers 1,540 times per year, so that 500 reps could make 770,000 visits at a cost of $212 per visit.  He

proposed to grow the sales force to 1,050 sales reps by 2015. To reach the Sacklers' expectations, Gasdia projected that Purdue would convince doctors to switch patients from Tylenol to Purdue's soon-to-be- released Butrans opioid, and Butrans would become a billion-dollar drug.

283.    **In July 2010**, the Sacklers focused on sales tactics again. Staff presented plans for selling Purdue's new Butrans opioid. Staff reported that sales reps would try to switch patients to opioids from NSAIDs like ibuprofen and explained tactics for convincing doctors that patients needed the new drug. Staff told the Sacklers that they had identified 82,092 prescribers to target with the Butrans sales campaign. Staff reported that they planned to add 125 sales reps and increase the number of prescriber visits by 30%.

284.    The Board also pushed staff about whether they were describing the benefits of opioids aggressively enough. Purdue was not legally allowed to say that Butrans was effective for 7 days, because the evidence did not show that, but the Board wanted to know why Purdue didn't claim 7 days of effectiveness in its marketing.

285.    Purdue was not legally allowed to say that Butrans was effective for osteoarthritis ("OA"), because the clinical trials testing Butrans for patients with osteoarthritis had failed, but upon information and belief the Board wanted to know if sales reps could sell more by remaining silent about the failed trial.

### (2) "Region Zero"

286.    Upon information and belief, at the July 2010 Board meeting, the Sacklers and other Board members asked staff about opioid sales generated by doctors who were suspected of diversion and abuse, which Purdue had collected on a list code-named Region Zero. Staff assured the Board that Purdue tracked prescriptions by Region Zero doctors, including the exact

prescriptions, units, and dollars from each prescriber. Staff then sent the data on those prescriptions to the Board. Staff gave the Board a list of the specific problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each provided to Purdue. The Board thus received reports of inappropriate prescribing.

287.    In fact, Defendants knew about many suspicious doctors and pharmacies from prescribing records, pharmacy orders, field reports from sales representatives and, in some instances, its own surveillance operations.[66] Since 2002, Purdue maintained a confidential roster of suspected reckless prescribers known as "Region Zero." By 2013, although there were more than 1,800 doctors in Region Zero, Purdue had reported only 8% of them to authorities. The Los Angeles Times reported that "[a] former Purdue executive, who monitored pharmacies for criminal activity, acknowledged that even when the company had evidence pharmacies were colluding with drug dealers, it did not stop supplying distributors selling to those stores. "[67]

288.    Upon information and belief, at that same Board meeting, the Sacklers voted to expand the sales force by 125 more sales reps. They ordered that the hiring begin in September 2010 and be completed before the National Sales Meeting in January 2011. They also directed Purdue to hire 18 more managers to supervise the reps.

---

[66] Purdue's "Abuse and Diversion Detection" program requires its sales representatives to report to the company any facts that suggest a health care provider to whom it markets opioids may be involved in the abuse or illegal diversion of opioid products. When a provider is reported under the program, Purdue [purportedly] conducts an internal inquiry regarding the provider to determine whether he or she should be placed on a "no-call" list. If a provider is placed on this list, Purdue sales representatives may no longer contact the provider to promote the company's opioid products. Bill Fallen, Purdue Pharma agrees to restrict marketing of opioids, Stamford Advocate (Aug. 25, 2015, 3:32 PM), http://www.stamfordadvocate.com/ business/article/Purdue-Pharma agrees-to-restrict-marketing-of-6464800.php.
[67] Ryan, More than 1 million, supra n.70.

289.    Upon information and belief, at the same meeting, the Sacklers voted to pay $10,000,000 to settle lawsuits by people injured by OxyContin.

290.    Later that month, upon information and belief, staff told the Sacklers that Purdue employed 491 sales reps and that, during Q2 2010, they visited prescribers 135,824 times. Meanwhile, staff told the Sacklers that Purdue had paid their family $389,000,000 in the first six months of 2010.

291.    **In August**, the Sacklers continued to focus on the sales force. That month, they decided not to acquire a new insomnia drug because of the risk that promoting it could distract sales reps from selling Purdue's opioids.

292.    A few days later, upon information and belief, the Sacklers discussed abuse of OxyContin. Staff told them that the most common way of abusing oxycodone, by far, was swallowing it—which a crush-proof coating on OxyContin did not affect. Staff also reported to the Sacklers that data from a prescription monitoring program showed far higher rates of "doctor-shopping" for OxyContin prescriptions than for any other opioid. The prescription monitoring program identifies "doctor-shopping"—when a patient gets opioids from multiple prescribers— as an indication that the patient is at risk of addiction, overdose, and death.

293.    **In September**, upon information and belief, staff reported to the Sacklers about the Board's July 2010 decision to hire more sales reps. Staff said they were working to implement the decision, adding 125 sales territories. Staff also told the Sacklers that 82% of prescriptions for OxyContin were to patients who were already on the drug—a key ingredient in Purdue's plans to keep patients on opioids longer. The Sacklers voted to pay their family $240,000,000.

294.    **In October**, upon information and belief, staff told the Sacklers that Purdue employed 506 sales reps and, during Q3 2010, they visited prescribers 141,116 times. Meanwhile, staff told the Sacklers that Purdue had distributed to their family $629,000,000 in the first nine months of 2010. The Sacklers voted to pay another $12,000,000 to settle claims of more patients injured by OxyContin.

295.    **In November**, upon information and belief, staff warned the Sacklers that doctors were not prescribing Purdue's highest dose and most profitable opioids as much as the company had expected, so it might be necessary to cut the family's quarter-end payout from $320,000,000 to $260,000,000 and distribute it in two parts: one in early December and one closer to the end of the month. Staff also told the Sacklers that the expansion of the sales force that the Sacklers had ordered was being implemented, including 125 new sales territories. The Sacklers voted to spend $158,086,000 to employ sales reps in 2011.

296.    Upon information and belief, staff also reported to the Sacklers that drug company leaders can be punished for breaking the law and "owners, officers, and managers will especially face even more serious scrutiny in the future."

297.    **In December**, the Sacklers voted to distribute to their family $260,000,000.

### e.  2011

298.    **In January 2011**, upon information and belief, Richard Sackler met with sales reps for several days at the Butrans Launch Meeting and discussed how they would promote Purdue's newest opioid.

299.    Upon information and belief, Richard Sackler kept pushing for more sales.  He asked for a Board discussion of the barriers that sales reps were encountering during promotion.

After trying to answer Richard's questions and getting another dissatisfied response, sales staff wrote to the CEO to ask him to intervene. The CEO announced that, from then on, staff would send a sales report to the Sacklers every week.

300.    The people who worked for the Sacklers knew their appetite for sales was extreme.

301.    Throughout that spring of 2011, the Sacklers kept up a drumbeat of aggressive sales tactics, multi-million-dollar payouts, and disregard for the law.  In January, upon information and belief, the Sacklers voted to pay the legal expenses of specific individuals if they were defendants or witnesses in investigations of Purdue, including several sales executives and John Crowley, Executive Director of Controlled Substances Act Compliance.[68]  The Sacklers knew these employees were aware of misconduct because they had directed it.

302.    **In January 2011**, upon information and belief, staff reported to the Sacklers that a key initiative in Q4 2010 had been the expansion of the sales force.  Staff told the Sacklers that Purdue employed 590 sales reps and, during Q4 2010, they visited prescribers 125,712 times.

303.    Upon information and belief, staff told the Sacklers that Purdue distributed to their family $889,000,000 in 2010.  But staff reported that Purdue's revenue was still hundreds of millions of dollars less than expected because doctors were prescribing less of Purdue's highest dose opioids.  Staff told the Sacklers that sales of the highest doses continued to fall below expectations, and the gap had cost the company $120,000,000 in the month of December 2010 alone.  The Sacklers faced the prospect that, if doctors did not prescribe more of the highest doses, their payouts would shrink.

---

[68] 2016-07-10 "More than 1 Million OxyContin Pills Ended up in the Hands of Criminals and Addicts. What the Drugmaker Knew," by Harriet Ryan, Lisa Girion, and Scott Glover, *Los Angeles Times*.

304.    **In February**, upon information and belief, staff reported to the Sacklers that law enforcement was increasingly concerned about lawbreaking by drug companies and the resulting danger to public safety. Staff also told the Sacklers that Purdue was receiving a rising volume of hotline calls and other compliance matters, reaching an all-time high during Q4 2010.  Staff reported to the Sacklers that sales reps had engaged in improper promotion of Purdue opioids, but the company had decided not to report the violations to the government.  Staff also reported to the Sacklers about the risks of OxyContin, including that 83% of patients in substance abuse treatment centers began abusing opioids by swallowing pills, and that it took, on average, 20 months for a patient to get treatment. Staff reported to the Sacklers that Purdue tracked to individual zip codes the correlation between poison control calls for OxyContin overdose, pharmacy thefts, and prescribers Purdue suspected of abuse and diversion in *Region Zero*.

305.    Upon information and belief, staff even gave the Sacklers a map correlating dangerous prescribers with reports of oxycodone poisonings, burglaries, and robberies.

306.    **In March**, upon information and belief, staff reported to the Sacklers on OxyContin sales and again focused on revenue from doctors in *Region Zero* — prescribers that Purdue suspected of improper prescribing but that Purdue had not reported to the authorities. Staff told the Sacklers that if *Region Zero* doctors stopped prescribing opioids, Purdue would lose almost 10% of its sales.

307.    **In April**, upon information and belief, the Sacklers met with Sales VP Russell Gasdia to talk about sales.  He told them that OxyContin was the best-selling painkiller in America, with more than three billion dollars in annual sales—almost double the second-place drug.  The Sacklers voted to distribute to their family $189,700,000.

308.    **In May**, upon information and belief, in response to the Sacklers' repeated requests, staff sent Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler a report on the sales tactics reps were using to push Butrans. The first tactic reported to these Sacklers was focusing on a select number of physicians that Purdue calculated would be most susceptible to sales reps lobbying to prescribe more opioids.  Purdue sales reps repeatedly reported concerns that these doctors wrote inappropriate prescriptions, but Purdue ordered the reps to keep promoting opioids to these doctors anyway.  Dozens of their patients overdosed and died. The second tactic staff reported to Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler in May 2011 was positioning of Butrans for specific patient types. Promotion for specific patient types included pushing opioids for elderly patients with arthritis. Sales reps recorded in their notes that they urged doctors to prescribe opioids for elderly patients more than a thousand times in 2011.  The reps even went to pharmacies to ask pharmacists to encourage doctors to prescribe opioids for the elderly. A third tactic reported to these five Sacklers was getting prescribers to commit to put specific patients on opioids. Sales reps recorded in their notes that they asked doctors to commit to prescribe opioids more than a thousand times in 2011.  Sales reps repeatedly asked prescribers to commit to prescribe opioids without disclosing significant risks.

309.    That same month, upon information and belief, staff reported to the Sacklers that Purdue had hired 47 more sales reps according to the Sacklers' orders.  Staff told the Sacklers that Purdue employed 639 sales reps and, during Q1 2011, they visited prescribers 173,647 times. Meanwhile, upon information and belief, the Sacklers voted to pay $10,000,000 to try to settle a lawsuit by the Attorney General of Kentucky regarding Purdue's marketing of OxyContin.  The Sacklers were on notice that Purdue's unfair and deceptive marketing raised serious concerns.

Staff also told the Sacklers that they had received another 88 calls to Purdue's compliance hotline, but not reported any of them to the authorities.

310.    **In June**, upon information and belief, staff reported to the Sacklers that Purdue's opioid sales were hundreds of millions of dollars less than expected and that a prime reason was that doctors were not prescribing enough of the highest doses. The Sacklers immediately pushed to find ways to increase sales.  Gasdia told Richard that Purdue had hired 147 new sales reps at the Board's direction.  Gasdia told Richard that Purdue instructed the sales reps to focus on converting patients who had never been on opioids or patients taking low dose Vicodin, Percocet, or tramadol—all patients for whom Purdue's opioids posed an increase in risk. Sales reps reported to Purdue that they encouraged doctors to prescribe opioids to opioid-naive patients more than a thousand times in 2011.

311.    Upon information and belief, Richard Sackler criticized Purdue's managers for allowing sales reps to target non-high potential prescribers.  Richard Sackler demanded to be sent into the field with the sales reps.  Richard wanted a week shadowing Purdue sales reps, two reps per day.  In horror, Gasdia appealed to Purdue's Chief Compliance Officer, warning that Richard Sackler promoting opioids was "a potential compliance risk." Richard Sackler indeed went into the field to promote opioids to doctors alongside a sales rep.  When he returned, Richard argued to the Vice President of Sales that a legally-required warning about Purdue's opioids wasn't needed.

312.    Meanwhile, upon information and belief, the Sacklers voted to distribute to their family $200,000,000.

313.    A few days later, upon information and belief, sales and marketing staff scrambled to prepare responses to questions from the Sacklers.  Mortimer Sackler asked about

launching a generic version of OxyContin to capture more cost sensitive patients. Kathe Sackler recommended looking at the characteristics of patients who had switched to OxyContin to see if Purdue could identify more patients to convert. Jonathan Sackler wanted to study changes in market share for opioids, focusing on dose strength.

314.    **In August**, upon information and belief, staff told the Sacklers that Purdue employed 640 sales reps and, during Q2 2011, they visited prescribers 189,650 times. Meanwhile, staff reported to the Sacklers that, in the first seven months of 2011, Purdue distributed to the family $411,000,000.

315.    **In September**, upon information and belief, Richard Sackler directed staff to study a savings card program for a widely-used cholesterol medication (not an addictive narcotic) to learn how Purdue could use it for opioids. That same month, the Sacklers voted to distribute to their family $140,800,000 more.

316.    **In November**, upon information and belief, staff told the Sacklers that Purdue still employed 640 sales reps and, during Q3 2011, they visited prescribers 189,698 times. Looking ahead, the Sacklers voted to spend $162,682,000 to employ sales reps in 2012. Meanwhile, staff told the Sacklers that, in the first nine months of 2011, Purdue paid their family $551,000,000.

**f.   2012**

317.    **In January 2012**, upon information and belief, Jonathan Sackler started the year pressing Sales VP Russell Gasdia for weekly updates on sales. A few days later, Richard Sackler jumped into the weeds with the sales staff, this time about advertising. Richard noticed that online ads appeared indiscriminately on webpages with content associated with the ad— regardless of whether the association was positive or negative. Staff assured Richard that, when

Purdue bought online advertising for opioids, it specified that the ads appear only on pages expressing positive views toward opioids.

318.    That same month, upon information and belief, staff told the Sacklers that Purdue employed 632 sales reps and, during Q4 2011, they visited prescribers 165,994 times.

319.    The Sacklers were not satisfied with the sales effort. **In February**, upon information and belief, staff reported to the Sacklers that prescriptions had dropped, and that a decrease in sales rep visits to prescribers was a major driver of the decline.  Staff asked the Sacklers to be patient, because reps had missed work for December holidays and the company's mandatory National Sales Meeting in January. Mortimer Sackler was not pleased.  Mortimer was agitated by the thought of doctors going too many days without a sales rep visiting to promote Purdue opioids.

320.    Throughout the spring, upon information and belief, the Sacklers pressed staff to promote Purdue's opioids more aggressively.  In February, Gasdia wrote to sales staff that the Board of Directors ("BOD") was not satisfied with the money coming in. Then the sales manager, at the direction of Gasdia, went person by person through a list of sales reps and criticized them for not increasing opioid prescriptions enough.  He emphasized that the pressure was coming from Richard Sackler himself.

321.    Meanwhile, upon information and belief, Gasdia pleaded with the CEO to defend him against Richard Sackler's micromanagement of sales.

322.    **In March**, upon information and belief, staff sent the Sacklers a revised 2012 budget that cut the proposed payout to their family from $472,500,000 to $418,200,000.

323.    On one Saturday morning, upon information and belief, Richard Sackler wrote to

marketing staff, demanding monthly data for all extended release pain medications for the past twelve years and an immediate meeting that Monday night. Later that month, staff created for Richard a historical summary of key events determining OxyContin sales. Eleven of the key events in sales history were changes in the size of the Purdue sales force—all known to Richard because the Sacklers had ordered them.

324.    A few days later, upon information and belief, staff sent Richard Sackler an assessment of recently-improved opioid sales. Staff told Richard that the increase in prescriptions was caused by tactics that Purdue taught sales reps: pushing opioids for elderly patients with arthritis ("proper patient selection") and encouraging doctors to use higher doses of opioids ("quick titration"). In the coming months, Purdue would study, document, and expand the use of higher doses to increase sales.

325.    **In April**, upon information and belief, staff told the Sacklers that Purdue employed 630 sales reps and, during Q1 2012, they visited prescribers 179,554 times. Meanwhile, Richard Sackler kept pushing the staff to increase sales. When the mandatory weekly report to the Sacklers showed that sales reps achieved 9,021 prescriptions in a week, Richard asked Sales VP Russell Gasdia for a commitment that the reps would get weekly prescriptions to 10,000. Gasdia tried to assure Richard Sackler that they were selling opioids aggressively

326.    **In May**, upon information and belief, executives emphasized to the managers overseeing sales reps that the Sacklers were tracking their efforts, and that Richard Sackler required weekly reports.

327.    **In June**, upon information and belief, the Sacklers discussed sales and marketing

again.  Staff reported to the Sacklers that they had added 120,000 sales visits to drive sales of OxyContin.

328.    Upon information and belief, staff also told the Sacklers that they expanded the opioid savings cards, because Purdue's latest data showed opioid savings cards led to 60% more patients remaining on OxyContin longer than 90 days.  The Sacklers reviewed the results of Purdue's confidential studies showing that opioid savings cards kept more patients on opioids for 90 day, 120 days, 150 days, 180 days, 210 days, 240 days—even an entire year. Keeping patients on opioids for these lengths of time was especially dangerous for the patients and especially profitable for Purdue.



*Purdue internal analysis about keeping patients on opioids longer, Graphic based on information and belief*

329.    Upon information and belief, staff also told the Sacklers that (as they had in 2009) they were again targeting prescribers for OxyContin promotion through a special television

network. The video featured a doctor paid by Purdue to promote opioids, and encouraged prescribers to use opioid savings cards.

330. **In July**, David Sackler (Richard Sackler's son) took a seat on the Board. For events after July 2012, this Complaint includes David in "the Sacklers."

331. Upon information and belief, staff calculated that Purdue was spending more than $9,000,000 per year to buy food for doctors who prescribe opioids. Staff also told the Sacklers that Purdue employed 633 sales reps and, during Q2 2012, they visited prescribers 183,636 times.

332. **In August**, upon information and belief, the Sacklers voted to direct Purdue to recruit an additional marketing executive and make candidates available to meet with members of the Board.

333. **In November**, upon information and belief, staff told the Sacklers the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose influences patient length of therapy. The results showed that patients on the highest doses are the most persistent.

334. That same month, upon information and belief, the Sacklers voted to set Purdue's budget for Sales and Promotion for 2013 at $312,563,000. Staff told the Sacklers that Purdue employed 622 sales reps and, during Q3 2012, they visited prescribers 180,723 times.

### g. 2013

335. **In January 2013**, upon information and belief, Richard Sackler questioned staff about the drop in opioid prescriptions caused by Purdue sales reps taking time off for the holidays.

336.    Upon information and belief, Staff told the Sacklers that they continued to reinforce the Individualize The Dose campaign, which the Sacklers knew and intended would promote higher doses. Staff also told the Sacklers that sales reps would place greater emphasis on the opioid savings cards, which the Sacklers knew and intended would keep patients on opioids longer. Staff reported to the Sacklers that Purdue had conducted a sensitivity analysis on the opioid savings cards to maximize their impact and, as a result, had increased the dollar value and set the program period to be 15 months long. Staff also reported to the Sacklers that Purdue had created promotional materials to support these tactics and had distributed them to the sales force. Staff also told the Sacklers that Purdue showed an opioid promotional video to 5,250 physicians on the Physician's Television Network. The video urged doctors to give patients Purdue's opioid savings cards.

337.    That same month, upon information and belief, staff told the Sacklers that Purdue employed 609 sales reps and, during Q4 2012, they visited prescribers 153,890 times.

338.    **In February**, upon information and belief, the Sacklers met with staff about tactics for promoting Purdue's opioids. They discussed research on what influences prescriptions, how doctors had responded to Purdue's increased promotion, and sales force promotion themes. On the same day, the Sacklers voted to award bonuses and salary increases to executives, including those involved in marketing Purdue's opioids.

339.    **In March**, upon information and belief, staff reported to the Sacklers on the devastation caused by prescription opioids. Staff told the Sacklers that drug overdose deaths had more than tripled since 1990—the period during which Purdue had made OxyContin the best-selling painkiller. Staff reported that, for every death, there were more than a hundred people

suffering from prescription opioid dependence or abuse.

340.    **In May**, upon information and belief, staff reported to the Sacklers again that they were successfully using opioid savings cards to get patients to remain on therapy longer. Staff told the Sacklers that they were using direct mail and email, as well as sales visits, to push the opioid savings cards.

341.    Upon information and belief, Staff reported to the Sacklers that, despite these sales efforts, they were not achieving the goals of getting enough patients on higher doses of opioids and getting doctors to prescribe more pills in each prescription. Staff told them Purdue was losing tens of millions of dollars in revenue because sales of the highest doses (60mg and 80mg) were too low. Staff told the Sacklers that doctors were not prescribing enough pills during each patient visit, Purdue was losing tens of millions of dollars in revenue.

342.    Upon information and belief, The Sacklers met with Sales VP Russell Gasdia about the strategy for selling high doses. Gasdia told the Sacklers that Purdue's #1 tactic to sell higher doses was sending sales reps to visit prescribers. The #2 tactic was a marketing campaign designed to promote high doses—Purdue's Individualize The Dose campaign. After that, Gasdia told the Sacklers, came opioid savings cards. After that, special focus on the most prolific opioid prescribers. Gasdia told the Sacklers that the staff would develop even more tactics to sell higher doses.

343.    That same month, upon information and belief, staff told the Sacklers that Purdue employed 637 sales reps and, during Q1 2013, they visited prescribers 155,354 times.

344.    **In July**, upon information and belief, the Sacklers discussed threats to their business from data on long-term opioid use, as public health authorities reacted to the danger of

keeping patients on opioids for longer periods of time. Meanwhile, staff sent the Sacklers a report that OxyContin sales had dropped $96,400,000 from the year before. Staff explained to the Sacklers that insufficient volume of sales rep visits to promote OxyContin to prescribers was an important reason for the dropping sales. Staff told the Sacklers that they would increase the number of sales visits and had hired consultants to study how to get doctors to prescribe more OxyContin.

345.    Upon information and belief, Mortimer Sackler asked for more detail on what was being done to increase sales. Staff told the Sacklers that these consultants would analyze whether sales reps were targeting the prescribers who were most susceptible to increasing opioid use. Staff told the Sacklers that these consultants would study whether Purdue could use incentive compensation to push reps to generate more prescriptions. Making the sales reps' income depend on increasing prescriptions could be a powerful lever.

346.    Staff, upon information and belief, also reported to the Sacklers that they had trained Purdue's sales reps to use new sales materials designed to get patients on higher doses of opioids for longer periods. Staff told the Sacklers that Purdue employed 634 sales reps and, during Q2 2013, they visited prescribers 177,773 times. Staff assured the Sacklers that they were trying to achieve even more sales visits by monitoring the reps.

347.    Later, upon information and belief, staff told the Sacklers that Purdue distributed to their family $42,000,000.

348.    **In August**, upon information and belief, the Sacklers met to discuss a new consultant report on sales tactics: Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates. Consultants recommended that the Sacklers

immediately order a series of actions to increase sales. Consultants urged the Sacklers to direct sales reps to the most prolific opioid prescribers. The consultants told the Sacklers that prescribers in the more prolific group write 25 times as many OxyContin scripts as less prolific prescribers. They also reported to the Sacklers that sales rep visits to these prolific prescribers cause them to prescribe even more opioids: if Purdue ordered reps to focus on the most prolific prescribers, it could increase sales.

349.    Second, upon information and belief, Consultants recommended that the Sacklers fight back against steps that the DEA, the U.S. Department of Justice, and others were taking to stop illegal drug sales. Two months earlier, the Walgreens pharmacy company admitted that it broke the law by filling illegitimate prescriptions, and it agreed to new safeguards to stop illegal prescribing. For the longer term, consultants worked with the Sacklers and Purdue to develop a direct-to-patient mail order business for Purdue opioids, so they could sell the high doses without pharmacies getting in the way.

350.    Third, upon information and belief, consultants advised the Sacklers that they should use their power on the Board to insist on increasing sales, with monthly accountability.

351.    **In September and October**, upon information and belief, the Sacklers met again to discuss implementation of the sales tactics consultants had developed to maximize Purdue's sales. The Sacklers discussed DEA efforts to stop illegal dispensing of opioids at CVS and Walgreens and how Purdue could get around the new safeguards by shifting to mail-order pharmacies, specialty pharmacies, or Purdue distributing opioids to patients directly.

352.    **In October**, upon information and belief, Mortimer Sackler pressed for more information on dosing and the breakdown of OxyContin market share by strength. In response to

the Sacklers' insistent questions, staff explained that sales of the highest doses were not keeping up with the Sacklers' expectations because some pharmacies had implemented "good faith dispensing" policies to double-check prescriptions that looked illegal and some prescribers were under pressure from the DEA. Staff promised to increase the budget for promoting OxyContin by $50,000,000, and get sales reps to generate more prescriptions with a new initiative to be presented to the Sacklers the following week.

353.    At the end of the month, upon information and belief, the Sacklers met to discuss Purdue's budget for sales and marketing for 2014. Looking ahead at 2014, staff reported to the Sacklers that doctors shifting away from high doses and towards fewer pills per prescription could cost Purdue hundreds of millions of dollars in lost sales. To fight against that threat, staff told the Sacklers the that they would increase the sales visits by each rep to 7.3 visits per day and visit prescribers 758,164 times in the year.

354.    **In November**, upon information and belief, Richard Sackler complained that he was getting too much information about the dangers of Purdue opioids. Richard had set up a Google alert to send him news about OxyContin. Staff immediately offered to replace Richard's alert with a service that provided more flattering stories.

355.    Consultants advising the Sacklers identified pharmacist scrutiny as a hurdle to sales and told the Board: "Access to OxyContin for some patients has become quite challenging in specific local markets. This is due to a combination of factors including: regulations, DEA initiatives, [Physicians for Responsible Opioid Prescribing], wholesaler initiatives and local pharmacist perceptions. . . . While the wholesaler issues are quite visible and real, we believe the daily decisions being made at local pharmacies, while less publicly visible, are in fact creating far

greater access issues."

356.    Purdue received a presentation from a vendor that identified the top 20 OxyContin prescribers whose OxyContin prescriptions had declined as a result of a pharmacy's "good faith dispensing" policy designed to hinder the dispensing of medically unnecessary prescriptions. Later in 2014, a Purdue regional manager similarly wrote that "[t]he retail pharmacist is an integral part of our business. As the old adage in pharmaceutical sales goes, 'The pharmacist isn't likely to generate business, but they sure can kill it.'"

357.    To ensure that prescriptions from extreme high-volume prescribers would be filled, Purdue engaged in a variety of strategies, including instructing its sales representatives to detail pharmacies to fill "red flag" prescriptions. For example, Purdue sales representatives also encouraged pharmacists to "reach out to a [p]rescriber to recommend that a patient be switched from immediate release oxycodone to OxyContin." These pharmacy calls, at times, effectively functioned to bypass safeguards such as the Region Zero list, which forbade Purdue's sales force from contacting certain prescribers directly. In a similar vein, Purdue also trained its sales force to call on pharmacies that dispensed a "high volume of opioid scripts" and were near a "[l]arge pain practice."

358.    Despite Purdue's knowledge of the red flags indicating the pharmacy was engaged in abuse and diversion, the OMS Committee voted to "continue to monitor" the pharmacy and allowed the sales representatives to continue to call on the pharmacy for the next five years.

359.    Staff, upon information and belief, also reported to the Sacklers that a key initiative during Q3 2013 was for sales reps to encourage doctors to prescribe OxyContin to

elderly patients on Medicare. Staff also reported to the Sacklers that another key initiative during Q3 2013 was for sales reps to promote OxyContin for patients who had never taken opioids before.

360.    Staff also told the Sacklers that analysis conducted in July 2013 showed that opioid savings cards earned the Sacklers more money by keeping patients on opioids longer; specifically, more patients stayed on OxyContin longer than 60 days. Staff reported to the Sacklers that Purdue was pushing opioid savings cards in sales rep visits, through email to tens of thousands of health care providers, and online. The sales reps did not tell doctors that savings cards led patients to stay on opioids longer than 60 days, or that staying on opioids longer increased the risk of addiction and death.

361.    Staff reported to the Sacklers, upon information and belief, that Purdue distributed to their family $399,920,000 during January-September 2013. But staff told the Sacklers that, from January to September 2013, Purdue lost hundreds of millions of dollars in profits because some prescribers were shifting away from higher doses of Purdue opioids. Staff told the Sacklers that, in Q4 2013, sales reps would increase the number of visits to prescribers.

362.    Upon information and belief, staff also reported to the Sacklers that a key initiative in 2013 was to train sales reps to keep patients on Butrans opioids longer. They told the Sacklers that, at the same time as the initiative to keep patients on opioids longer, Purdue launched a new high dose of its Butrans opioid; sales reps began promoting the new high dose to physicians using new sales materials; and initial orders were double the company's forecasts. Staff reported to the Sacklers that marketing and sales activities generated 266,842 additional prescriptions and highlighted that opioid savings cards generate high returns by keeping patients

on opioids longer.

363.    Upon information and belief, staff reported to the Sacklers that Purdue had sent more than 880,000 emails to health care professionals to promote its Butrans opioid, and posted online advertising seen more than 5 million times for Butrans and nearly 4 million times for OxyContin. They told the Sacklers that hundreds of thousands of communications to prescribers nationwide presented the same selling messages designed to get more patients on OxyContin at higher doses for longer periods of time, and specifically promoted Purdue's opioid savings cards.

364.    Upon information and belief, staff reported to the Sacklers that they were working with consultants to study ways to sell more OxyContin. Staff also reported that they had direct access to physician level data to analyze prescriptions by individual doctors. Staff gave the Sacklers the latest results regarding how opioid savings cards led to patients staying on OxyContin longer. Staff also reported results from Purdue's marketing through the "OxyContin Physicians Television Network." Staff told the Sacklers that it increased opioid prescriptions.

365.    Upon information and belief, staff also told the Sacklers that they would begin reviews of sales reps according to their sales ranking, with a focus on the bottom ten percent. Staff reported to the Sacklers that Purdue employed 637 sales reps and, during Q3 2013, they visited prescribers 179,640 times.

366.    **In December**, upon information and belief, staff told Richard Sackler that Butrans sales were increasing, and they suspected the increase was caused by Purdue's improved targeting, in which sales reps visited the most susceptible prolific prescribers. Meanwhile, staff contacted Richard Sackler because they were concerned that the company's internal documents could cause problems if investigations of the opioid crisis expanded. Early the next year, staff

told Jonathan Sackler about the same concern. Jonathan studied collections of news reports and asked staff to assure him that journalists covering the opioid epidemic were not focused on the Sacklers.

### h.  2014

367.    **In January 2014**, upon information and belief, staff reported to the Sacklers on how Purdue's program for complying with state and federal law compared to recent agreements between other drug companies and the government. Other companies had agreed that sales reps should not be paid bonuses based on increasing doctors' prescriptions, but Purdue still paid reps for generating sales. Other companies disclosed to the public the money they spent to influence continuing medical education, but Purdue did not. Other companies had adopted "claw-back" policies so that executives would forfeit bonuses they earned from misconduct; but Purdue had not. The boards of other companies passed resolutions each quarter certifying their oversight of the companies' compliance with the law; but the Sacklers did not.

368.    **In February**, upon information and belief, staff sent the Sacklers the final results from 2013. Staff told the Sacklers that net sales were hundreds of millions of dollars below budget because doctors were not prescribing enough of the highest doses of opioids and were including too few pills with each prescription, and sales reps were not visiting doctors enough.

369.    Upon information and belief, to get higher sales, staff told the Sacklers that they had tightened the requirements for sales reps' pay: from now on, sales reps would lose bonus pay if they did not visit 'high value' prescribers often enough.

370.    Upon information and belief, a few days later, staff told the Sacklers that Purdue's marketing had an immense effect in driving opioid prescriptions: according to Purdue's analysis,

its sales and marketing tactics generated an additional 560,036 prescriptions of OxyContin in 2012 and 2013. Nevertheless, staff reported to the Sacklers that net sales for 2013 had been $377,000,000 less than budgeted. Staff again reported that Purdue was losing hundreds of millions of dollars in expected profits because prescribers were shifting away from higher doses of Purdue opioids and including fewer pills per prescription.

371.    Upon information and belief, staff also told the Sacklers that key sales priorities were again to encourage doctors to prescribe Purdue opioids for elderly patients and patients who had not taken opioids before. Staff reported to Sacklers again that sales reps were continuing the Individualize The Dose campaign. As the Sacklers knew, Purdue designed that campaign to encourage higher doses. Staff also told the Sacklers that Purdue's eMarketing campaign for OxyContin reached 84,250 health care providers during Q4 2013. Staff told the Sacklers that they found increasing compliance concerns with Purdue's speaker programs, in which the company paid doctors to promote Purdue opioids to other doctors. Staff also told the Sacklers that Purdue employed 632 sales reps and, during Q4 2013, they visited prescribers 176,227 times.

372.    Upon information and belief, that February report was the last of its kind. After Q4 2013, Purdue abolished the detailed Quarterly Reports that had created a paper trail of targets for sales visits and been emailed among the Board and staff. In 2013, the City of Chicago served Purdue with a subpoena seeking internal documents about Purdue's marketing of opioids. That provoked a flurry of activity, including discussion among the Sacklers. Purdue fought the subpoena, and it was withdrawn. For 2014, Purdue decided to limit many of its official Board reports to numbers and graphs, and relay other information orally. But the Sacklers continued to

demand information about sales tactics, and their control of Purdue's deceptive marketing did not change.

373.    **In March and April**, upon information and belief, staff told the Sacklers that Purdue was achieving its goals of selling higher doses of OxyContin and more pills of OxyContin per prescription, but weekly prescriptions of Purdue's Butrans opioid were below expectations because of a reduced number of sales rep visits promoting that opioid. The Sacklers had assumed prescriptions would fall, but staff were concerned that the effect could be greater than anticipated.

374.    **In May**, upon information and belief, Richard and Jonathan's father, Raymond Sackler, sent David, Jonathan, and Richard Sackler a confidential memo about Purdue's strategy, including specifically putting patients on high doses of opioids for long periods of time. The memo recounted that some physicians had argued that patients should not be given high doses of Purdue opioids, or kept on Purdue opioids for long periods of time, but Purdue had defeated efforts to impose a maximum dose limit or a maximum duration of use. Raymond asked David, Jonathan, and Richard to talk with him about the report.

375.    **In June**, upon information and belief, the Sacklers removed Russell Gasdia as Vice President of Sales and Marketing, and began pushing his replacement to sell more opioids faster. Gasdia warned his replacement that Richard managed the sales operation intensely.

376.    **In July**, upon information and belief, Richard Sackler called staff to complain about studies that the FDA required for opioids and how they might undermine Purdue's sales. He emphasized that Purdue Board members felt the requirements to conduct studies were unfair.

377.    **In July** and again in **August**, **September**, and **October**, upon information and

belief, staff warned the Sacklers that two of the greatest risks to Purdue's business were the continued pressure against higher doses of opioids, and the continued pressure against long term use of opioids. Staff told the Sacklers that Purdue's #1 opportunity to resist that pressure was by sending sales reps to visit prescribers; and, specifically, by targeting the most susceptible doctors, who could be convinced to be prolific prescribers, and visiting them many times.

### Q. Project Tango

378.    In September 2014, upon information and belief, Kathe Sackler dialed in to a confidential call about *Project Tango*. *Project Tango* was a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction. In their internal documents, Kathe and staff wrote down what Purdue publicly denied for decades: that addictive opioids and opioid addiction are naturally linked. They determined that Purdue should expand across 'the pain and addiction spectrum', to become an end-to-end pain provider.

379.    Upon information and belief, Kathe Sackler and the *Project Tango* team reviewed their findings that the 'market' of people addicted to opioids, measured coldly in billions of dollars, had doubled from 2009 to 2014.

380.    Upon information and belief, Kathe Sackler and the staff revealed in their internal documents that Purdue's tactic of blaming addiction on untrustworthy patients was a lie. Instead, the truth is that opioid addiction can happen to anyone who is prescribed opioid

381.    Kathe and the staff concluded that millions of people who became addicted to opioids were the Sacklers' next business opportunity. The team identified eight ways that Purdue's experience getting patients *on* opioids could now be used to sell treatment for opioid addiction.

382.    In February 2015, upon information and belief, staff presented Kathe Sackler's work on *Project Tango* to the Board.  The plan was for a Joint Venture controlled by the Sacklers to sell the addiction medication suboxone.

383.    Upon information and belief, the *Tango* team mapped how patients could get addicted to opioids through prescription opioid analgesics such as Purdue's OxyContin or heroin, and then become consumers of the new company's suboxone.  The team noted the opportunity to capture customers: even after patients were done buying suboxone the first time, 40-60% would relapse and need it again.

384.    The next month, *Project Tango* came to an end.  Kathe, David, Jonathan, and Mortimer Sackler discussed the discontinuation of the project at their Business Development Committee meeting.  But the Sackler's efforts to sell addictive opioids continued.

385.    **In October 2014**, upon information and belief, staff sent the Sacklers a Proposed Operating Plan and Budget to be approved by the Board for 2015.  Staff told the Sacklers that a key tactic for 2015 would be to convert patients from short-acting opioids to OxyContin.  Staff warned the Sacklers that prescribers were shifting away from the highest doses of Purdue's opioids, and toward fewer pills per prescription, and those shifts would cost Purdue $99,000,000 a year.  Staff told the Sacklers that a key tactic to increase Butrans sales in 2015 would be for Purdue sales reps to push doctors to higher doses.  Staff likewise told the Sacklers that visits to doctors by sales reps would be a key tactic to launch Purdue's new Hysingla opioid.  Staff proposed that Purdue employ 519 sales reps, paid an average salary of $81,300 plus a bonus of up to an additional $124,600 based on sales.

386.    Meanwhile, upon information and belief, sales staff exchanged news reports of a

lawsuit accusing Purdue of deceptive marketing in Kentucky. They quoted Purdue's own attorney and Chief Financial Officer stating that the company faced claims of more than a billion dollars that "would have a crippling effect on Purdue's operations and jeopardize Purdue's long-term viability."[69] Purdue's communications staff were delighted by the article, because it did not reveal the Sacklers' role in the misconduct.

387.    **In November**, upon information and belief, staff reported to the Sacklers that their sales tactics were working, and the shift away from higher doses of OxyContin had slowed.

388.    **In December**, upon information and belief, staff told the Sacklers that Purdue would distribute to their family $163,000,000 in 2014 and projected $350,000,000 in 2015.

389.    On New Year's Eve, upon information and belief, Richard Sackler told staff that he was starting a confidential sales and marketing project on opioid prices and instructed them to meet with him about it on January 2.

### a.  2015

390.    Early in the morning of **January 2**, upon information and belief, staff began scrambling to collect sales data for Richard Sackler. They didn't move quickly enough. Days later, Richard demanded a meeting with sales staff to go over plans for selling the highest doses. Richard asked for an exhaustive examination to be completed within 5 days.

391.    That same month, upon information and belief, the Sacklers voted to evaluate employees' 2014 performance on a scorecard that assigned the greatest value to the volume of

---

[69] 2014-10-20 Bloomberg Businessweek report.

Purdue opioid sales. Employees were expected to generate more than one-and-a-half billion dollars. The Sacklers also voted to establish the company's scorecard for 2015: once again, the biggest factor determining employees' payout would be the total amount of Purdue opioid sales.

392.    **In April**, upon information and belief, staff told the Sacklers that sales of Purdue's highest dose 80mg OxyContin were down 20% and that the average prescription had declined by eight pills since 2011.

393.    The Sacklers, upon information and belief, voted to expand the sales force by adding another 122 reps. As with every reference to "the Sacklers" after July 2012, that includes Beverly, David, Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

394.    **In October**, upon information and belief, Purdue executives identified avoiding investigations of Purdue's opioid marketing as being a key component in the company's Operational Plan.

395.    **In November**, upon information and belief, the Sacklers voted on the budget for Purdue for 2016. Staff warned the Sacklers that public concern about opioids could get in the way of Purdue's plans. Staff told the Sacklers that declining prescriptions of the highest doses and fewer pills per prescription would cost Purdue $77,000,000.

396.    Upon information and belief, staff proposed to the Sacklers that, for 2016, Purdue would plan for prescribers to average 60 pills of Purdue opioids per prescription. They told the Sacklers that they would aim to make enough of those pills be high doses to make the average per pill 33 milligrams of oxycodone. That way, Purdue could hit its target for the total kilograms of oxycodone it wanted to sell.

397.    Upon information and belief, to make sure Purdue hit the targets, staff told the

Sacklers that sales reps were visiting prescribers 21% more often than before. Staff told the Sacklers that they had aggressively reviewed and terminated reps who failed to generate prescriptions. Staff reported to the Sacklers that, in 2015 alone, Purdue replaced 14% of its sales reps and 20% of its District Managers for failing to create enough opioid sales.

398.    Looking ahead, upon information and belief, staff told the Sacklers that the 2016 investment strategy focuses on expanding the Sales Force. They reported that the proposed budget for sales and promotion was $11,600,000 higher than 2015. The top priority for the sales reps would be to visit the highest-prescribing doctors again and again. Staff proposed to the Sacklers that the #1 overall priority for 2016 would be to sell OxyContin through focus on key customers. They told the Sacklers that sales reps would also target prescribers with the lowest levels of training, physician's assistants and nurse practitioners. Purdue executives expected that, each quarter, the sales reps would visit prescribers more than 200,000 times and would get 40,000 new patients onto Purdue opioids.

399.    **In December**, upon information and belief, staff prepared to address wide-ranging concerns raised by the Sacklers. Kathe and Mortimer Sackler wanted staff to break out productivity data by indication versus prescriber specialty for each drug. Richard Sackler sought details on how staff was calculating 2016 mg/tablet trends. Jonathan Sackler sought a follow-up briefing on how public health efforts to prevent opioid addiction would affect OxyContin sales.

400.    Before the year ended, upon information and belief, the Sacklers were invited to a 'Beneficiaries Meeting' where Purdue staff reported to Sackler family members about the company's efforts to sell opioids.

**b.  2016**

401.    **In 2016**, upon information and belief, the Sacklers met with the Board in January, March, April, June, August, October, November, and December.

402.    **In April**, upon information and belief, the Sacklers considered exactly how much money was riding on their strategy of pushing higher doses of opioids. The month before, the U.S. Centers for Disease Control announced guidelines to try to slow the epidemic of opioid overdose and death. The CDC urged prescribers to avoid doses higher than 30mg of Purdue's OxyContin twice per day. The CDC discouraged twice-a-day prescriptions of all three of Purdue's most profitable strengths—40mg, 60mg, and 80mg. Staff studied how much money Purdue was making from its high-dose strategy and told the Sacklers how much was at risk each year.

403.    **In May**, Richard Sackler told staff to circulate a New York Times story reporting that opioid prescriptions were dropping for the first time since Purdue launched OxyContin twenty years earlier. The Times wrote: "Experts say the drop is an important early signal that the long-running prescription opioid epidemic may be peaking, that doctors have begun heeding a drumbeat of warnings about the highly addictive nature of the drugs."

404.    **In June**, upon information and belief, the Sacklers met to discuss a revised version of Project Tango—another try at profiting from the opioid crisis. This time, they considered a scheme to sell the overdose antidote NARCAN. The need for NARCAN to reverse overdoses was rising so fast that the Sacklers calculated it could provide a growing source of revenue, tripling from 2016 to 2018. Like Tango, Purdue's analysis of the market for NARCAN confirmed that they saw the opioid epidemic as a money-making opportunity and that the Sacklers understood—in private, when no one was watching—how Purdue's opioids put patients

at risk. The Sacklers identified a strategic fit because NARCAN was a complementary product to
Purdue opioids. They specifically identified patients on Purdue's prescription opioids as the
target market for NARCAN. Likewise, they identified the same doctors who prescribed the most
Purdue opioids as the best market for selling the overdose antidote; they planned to leverage the
current Purdue sales force to "drive direct promotion to targeted opioid prescribers. Finally, they
noted that Purdue could profit from government efforts to use NARCAN to save lives.

405.    That same month, upon information and belief, staff presented the 2016 Mid-Year
Update. They warned the Sacklers that shifts in the national discussion of opioids threatened their
plans. The deception that Purdue had used to conceal the risks of opioids was being exposed.
First, upon information and belief, to convince doctors to prescribe dangerous opioids, Purdue
promoted its drugs as the solution to undertreatment of pain. Richard Sackler made sure that
Purdue bought the internet address 5thvitalsign.com so it could promote pain as the "fifth vital
sign" (along with temperature, blood pressure, pulse, and breathing rate) to expand the market for
opioids. But now, staff reported to the Sacklers, doctors and patients were starting to worry more
about the epidemic of opioid addiction and death.

406.    Second, upon information and belief, to conceal the danger of addiction, Purdue
falsely blamed the terrible consequences of opioids on drug abuse. But now, staff reported to the
Sacklers, doctors and patients were realizing that addiction was a true danger.

407.    Third, upon information and belief, to avoid responsibility for Purdue's dangerous
drugs, the Sacklers chose to stigmatize people who were hurt by opioids, calling them "junkies"
and "criminals." Richard Sackler wrote that Purdue should 'hammer' them in every way
possible. But now, staff reported to the Sacklers, Americans were seeing through the stigma and

recognizing that millions of families were victims of addictive drugs. Staff told the Sacklers that nearly half of Americans reported that they knew someone who had been addicted to prescription opioids.

408.     Fourth, upon information and belief, the Sacklers had long sought to hide behind the approval of Purdue's drugs by the FDA. But FDA approval could not protect the Sacklers when their deceptive marketing led thousands of patients to become addicted and die. The U.S. Centers for Disease Control ("CDC") reported that opioids were, indeed, killing people. The CDC Director said: "We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently."[70] The 2016 Mid-Year Update warned that the truth was threatening Purdue.

409.     Staff, upon information and belief, also told the Sacklers that four states had passed laws limiting opioid prescriptions. In the face of this pressure, staff told the Sacklers that the sales team was focusing on the doctors who prescribe the most opioids.

410.     **In November**, upon information and belief, staff prepared statements to the press denying the Sacklers' involvement in Purdue. That was a lie. Sackler family members held the controlling majority of seats on the Board and, in fact, controlled the company.

411.     **In December**, upon information and belief, Richard, Jonathan and Mortimer Sackler had a call with staff about another revised version of Project Tango. The new idea was to buy a company that treated opioid addiction with implantable drug pumps. The business was a strategic fit. The Sacklers kept searching for a way to expand their business by selling both

---

[70] 2016-03-15 briefing by CDC Director Tom Frieden.

addictive opioids and treatment for opioid addiction.

### c.  2017

412.    **In 2017**, upon information and belief, the Sacklers met with the Board in February, March, April, June, July, August, October, November, and December.

413.    **In May 2017**, upon information and belief, staff told the Sacklers that an independent nonprofit had concluded that Purdue's reformulation of OxyContin was not a cost-effective way to prevent opioid abuse. Theresa Sackler asked staff what they were doing to fight back to convince doctors and patients to keep using the drug.

414.    That same month, upon information and belief, the Sacklers were looking for a new CEO. Long-time employee Craig Landau wanted the job and prepared a business plan titled "SACKLER PHARMA ENTERPRISE." Landau was careful to acknowledge their power: he acknowledged that Purdue operated with the Board of Directors serving as the "de facto" CEO. He proposed that Purdue should take advantage of other companies' concerns about the opioid epidemic through an opioid consolidation strategy and become an even more dominant opioid seller as other companies abandon the space. The Sacklers made him CEO a few weeks later.

415.    **In June**, upon information and belief, staff told the Sacklers that getting doctors to prescribe high doses of opioids and many pills per prescription were still key drivers of Purdue's profit. Purdue's management was concerned that the CDC's efforts to save lives by reducing doses and pill counts would force the company to adjust down their revenue expectations.

416.    Upon information and belief, staff told the Sacklers that Purdue's opioid sales were being hurt by cultural trends such as the HBO documentary, "Warning: This Drug May Kill

You." HBO's film was a problem for Purdue because it showed actual footage from Purdue's misleading advertisements next to video of people who overdosed and died.[71]

417.    Staff, upon information and belief, felt the pressure of the opioid epidemic, even if the billionaire Sacklers did not. The Sacklers led Purdue so far into the darkness that employees proposed 'appropriate use' of drugs to reinvent the company. Staff also suggested that the Sacklers create a family foundation to help solve the opioid crisis.

418.    The Sacklers did not redirect the company toward appropriate use or create the suggested family foundation. Instead, they decided to sell harder. For 2018, upon information and belief, the Sacklers approved a target for sales reps to visit prescribers 1,050,000 times— almost double the number of sales visits they had ordered during the heyday of OxyContin in 2010.

419.    **In October**, upon information and belief, Richard Sackler learned that insurance company Cigna had cut OxyContin from its list of covered drugs and replaced it with a drug from Purdue's competitor, Collegium. Richard read that Collegium had agreed to encourage doctors to prescribe lower doses of opioids, and Collegium's contract with Cigna was designed so Collegium would earn less money if doctors prescribed high doses. Richard's first thought was revenge. He immediately suggested that Purdue drop Cigna as the insurance provider for the company health plan.

420.    On October 17, upon information and belief, Beverly Sackler served her last day on the Board. It was the beginning of the end for the Sackler family. A week later, the New

---

[71] 2017-05-01 "*Warning: This Drug May Kill You* Offers a Close-Up of the Opioid Epidemic," https://www.theatlantic.com/entertainment/archive/2017/05/warning-this-drug-may-kill-you-opioid- epidemic-hbo/524982

Yorker published an article entitled "The Family That Built an Empire of Pain."

421.    **In November**, upon information and belief, Jonathan Sackler suggested that Purdue launch yet another opioid. Staff promised to present a plan for additional opioids at the next meeting of the Board. At the Board meeting that month, the remaining Sackler Board members (Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa) voted to cut the sales force from 582 reps to 302 reps.

### d.  2018

422.    **In January 2018**, Richard Sackler received a patent for a drug to treat opioid addiction—his own version of *Project Tango*.  Richard had applied for the patent in 2007.  He assigned it to a different company controlled by the Sackler family (Rhodes Pharmaceuticals L.P.), instead of Purdue.  Richard's patent application says opioids *are* addictive.  The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of treating addiction.[72]

423.    In January, upon information and belief, Richard Sackler also met with Purdue staff about the sales force again. They discussed plans to cut the force to 275 reps.  In February, Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler decided to lay off 300 sales reps.

424.    **By April**, upon information and belief, staff were scared.  Richard Sackler was again asking questions about sales.

425.    **On May 3** and again on **June 6 and 8**, upon information and belief, all seven

---

[72] 2018-01-09, U.S. Patent No. 9,861,628 ("a method of medication-assisted treatment for opioid addiction"); 2007-08-29, international patent publication no. WO 2008/025791 Al.

remaining Sacklers attended meetings of the Board: Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa.

426. **In June of 2018**, upon information and belief, the Sacklers tried to run. Richard Sackler was the first to go: he resigned from the Board in July. David Sackler quit in August. Theresa Sackler served her last day in September.

427. The Sacklers, both directly and indirectly, made, promoted, and profited from misrepresentations about the risks and benefits of opioids for chronic pain. Research and clinical experience over the last several decades clearly establishes that opioids are highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned the Sacklers of this, and the Sacklers had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths— all of which made clear the harms from long-term opioid use and that patients were (and are) suffering from addiction, overdoses, and death in alarming numbers. Furthermore, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of the misrepresentations, and Purdue entered into agreements explicitly prohibiting it from making the misrepresentations.

428. Moreover, the Sacklers took steps to avoid detection of and to fraudulently conceal their personal involvement in the deceptive marketing, fraudulent and negligent conduct. For example, the Sacklers never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by Purdue to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. The Sacklers exerted considerable influence on these promotional and educational materials. The Sacklers distorted

the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for the Sacklers' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions.  The Sacklers purposefully hid behind Purdue to conceal their own misconduct and negligence.

### e.  2020 Guilty Plea

429.    In November 2020, Purdue plead guilty in federal court in Newark, New Jersey, to conspiracies to defraud the United States and violate the anti-kickback statute.

430.    Purdue plead guilty to three felony offenses: one count of dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts of conspiracy to violate the Federal Anti-Kickback Statute.

431.    Deputy Attorney General Jeffrey A. Rosen said "[t]he abuse and diversion of prescription opioids has contributed to a national tragedy of addiction and deaths, in addition to those caused by illicit street opioids."

432.    "Purdue admitted that it marketed and sold its dangerous opioid products to healthcare providers, even though it had reason to believe those providers were diverting them to abusers," said Rachael A. Honig, First Assistant U.S. Attorney for the District of New Jersey. "The company lied to the Drug Enforcement Administration about steps it had taken to prevent such diversion, fraudulently increasing the amount of its products it was permitted to sell. Purdue also paid kickbacks to providers to encourage them to prescribe even more of its products."

433.    As part of the guilty plea, Purdue admitted that from May 2007 through at least March 2017, it conspired to defraud the United States by impeding the lawful function of the Drug Enforcement Administration (DEA). Purdue represented to the DEA that it maintained an

effective anti-diversion program when, in fact, Purdue continued to market its opioid products to more than 100 health care providers whom the company had good reason to believe were diverting opioids. Purdue also reported misleading information to the DEA to boost Purdue's manufacturing quotas. The misleading information comprised prescription data that included prescriptions written by doctors that Purdue had good reason to believe were engaged in diversion. The conspiracy also involved aiding and abetting violations of the Food, Drug, and Cosmetic Act by facilitating the dispensing of its opioid products, including OxyContin, without a legitimate medical purpose, and thus without lawful prescriptions.

434.    Purdue also admitted it conspired to violate the federal Anti-Kickback Statute. Between June 2009 and March 2017, Purdue made payments to two doctors through Purdue's doctor speaker program to induce those doctors to write more prescriptions of Purdue's opioid products. Also, from April 2016 through December 2016, Purdue made payments to Practice Fusion Inc., an electronic health records company, in exchange for referring, recommending, and arranging for the ordering of Purdue's extended-release opioid products ─ OxyContin, Butrans, and Hysingla.

435.    Under the terms of the plea agreement, Purdue agreed to the imposition of the largest penalties ever levied against a pharmaceutical manufacturer, including a criminal fine of $3.544 billion and an additional $2 billion in criminal forfeiture. For the $2 billion forfeiture, the company will pay $225 million within three business days following the entry of a judgment of conviction in accordance with the Plea Agreement. The department is willing to credit the value conferred by the company to state and local governments under the department's anti-piling on and coordination policy if certain conditions are met.

436.    Purdue has also agreed to a civil settlement that provides the United States with an allowed, unsubordinated, general unsecured bankruptcy claim for recovery of $2.8 billion to resolve its civil liability under the False Claims Act. Separately, the Sackler family has agreed to pay $225 million in damages to resolve its civil False Claims Act liability.

## V.    RICO ALLEGATIONS

437.    Defendants joined other opioid Manufacturers and Distributors to form an association-in-fact enterprise (the "Opioid Enterprise") for the common purpose of increasing and maintaining sales of prescription opioids for the financial gain of the members of the Opioid Enterprise.

438.    Through their personal relationships, contractual relationships, and participation in groups like the PCF, HDA, NACDS, NWDA, and PCMA, and through their use of the same Front Groups and KOLs, Defendants had the opportunity to form relationships and agreements, and to take actions in furtherance of the Opioid Enterprise's common purpose.

439.    The "closed system" created by the CSA for the manufacture, distribution, and dispensing of controlled substances facilitated the creation of the Opioid Enterprise and the coordination between and among its members. Manufacturers, who were registrants under the CSA, could sell only to distributors and dispensers who were also registrants. Distributors, in turn, could sell only to dispensers who were also registrants. This "closed system" ensured a finite universe of participants as well as common regulatory oversight, which allowed Defendants to form their association-in-fact and develop common "standards" and approaches, in which they would all work to maintain for the common purpose of increasing the sales of prescription opioids for their collective profit.

440.     Defendants did not merely work separately or in parallel with other Manufacturers and Distributors to accomplish their common purpose. Rather, Defendants recognized and understood that they needed to work in conjunction with other Manufacturers and Distributors to subvert the limits placed on opioids as controlled substances in order to accomplish their goal of increasing opioid sales. Only through cooperative and coordinated actions could Defendants change the paradigm for opioid prescribing and ensure that their failures to provide effective controls against diversion would not be detected by others.

441.     As alleged more fully below, Defendants took actions to grow the market for prescription opioids and allowed every entity in the Opioid Enterprise to continue amassing profits. The Defendants were members of the enterprise, and each member played different roles in bringing about their common purpose. Specifically:

a.  *Manufacturing and Marketing Members*: Manufacturing and Marketing Members, working with Pharmacy and the Major PBMs, engaged in a massive marketing campaign to promote prescription opioids as a class of drugs in order to increase the frequency and amount of opioid prescribing. Were it not for their marketing campaign, coordinated through their trade associations, Front Groups, and KOLs, the common purpose of the Opioid Enterprise could not have been fulfilled. Manufacturing and Marketing Members also coordinated with the other members of the enterprise regarding their common failure to identify, report, and halt suspicious orders of opioids, in order to ensure that controls against diversion did not interfere with increasing sales of prescription opioids.

b.  *Distributor Members*: Distributor Members coordinated with each other and with
other enterprise members through their trade associations to ensure a common course
of conduct with respect to the identification, reporting, and halting of suspicious
orders. Their conduct allowed every entity to continue to profit from the sale of
prescription opioids. The common purpose of the Opioid Enterprise would have been
thwarted if the Distributor Members, or any one of them, had reported and halted
suspicious orders when others did not.

c.  *Pharmacy Members*: Pharmacy Members worked with Manufacturer and the Major
PBMs to promote prescription opioids as a class of drugs in order to increase the
frequency and amount of opioid prescribing. They also coordinated with other
members through their trade associations to ensure a common course of conduct with
respect to the identification, reporting, and halting of suspicious orders (on the
distribution side), and the treatment of red flag prescriptions (on the dispensing side).

442.    There was regular communication between and among the Defendants and other
opioid enterprise members in which information was shared, marketing campaigns were
coordinated, and payments were exchanged. Typically, the coordination, communication, and
payment occurred through the repeated and continuing use of the wires and mail, in which the
Defendants and other members shared information regarding overcoming objections and
resistance to the use of opioids for chronic pain about suspicious orders, illegitimate
prescriptions, and payments for prescription opioid sales. Members functioned as a continuing
unit for the purpose of accomplishing the Opioid Enterprise's common purpose, and each
Defendant agreed and took actions to accomplish those purposes and continue the enterprise's

existence.

### A. Defendants Conducted the Opioid Enterprise's Affairs Through a Pattern of Racketeering Activity

443.   Defendants used the Opioid Enterprise to perpetrate an unlawful Opioid Marketing Scheme. Through the Opioid Marketing Scheme, the Manufacturing and Marketing Members, such as Defendants, fraudulently promoted prescription opioids, disseminating the misrepresentations and omissions described above. In perpetrating the Opioid Marketing Scheme, Defendants used fraudulent and unlawful means to accomplish the purpose of the Opioid Enterprise to increase sales of prescription opioids in order to extract greater profits for the members of the Opioid Enterprise.

444.   As public scrutiny and media coverage focused on how opioids ravaged communities in New Mexico and throughout the United States, no member of the Opioid Enterprise challenged or corrected misrepresentations, sought to correct their previous misrepresentations, terminated their role in the Opioid Enterprise, reported suspicious orders, refused illegitimate prescriptions, or publicly disclosed their conduct or participation in the Opioid Enterprise.

445.   The impact of the Opioid Enterprise's schemes has been devastating, the effects of which remain felt throughout the country, injuring Plaintiff and members of the Proposed Class in their business, causing economic loss, and consuming Plaintiff and class members' resources.

446.   As a result, it is clear that the Defendants were willing participants in the Opioid Marketing Scheme, and the Defendants had a common purpose and interest in the objects of the

schemes, and functioned within a structure designed to effectuate the Opioid Enterprise's

common purpose.

447.    In order to carry out the Opioid Marketing, Defendants conducted and

participated in the conduct of the Opioid Enterprise through a continuing pattern of racketeering

activity. Predicate acts making up this pattern included mail fraud, wire fraud, and felonious

violation of the CSA and Code of Federal Regulations (CFR). The Manufacturing and Marketing

Members, such as Defendants, used the mail and wire facilities of the United States in order to

effectuate the campaign of fraudulent misrepresentations and omissions that constituted the

Opioid Marketing Scheme. Defendants and other members used the mail and wire facilities of

the United States in order to effectuate their scheme to evade the diversion controls required by

the CSA. Defendants also violated the CSA in failing to comply with their obligations to provide

effective controls against diversion. Defendants' felony violations involved multiple violations of

the CSA and CFR that may be punishable as felonies as alleged below. All told, Defendants

engaged in thousands of instances of mail fraud, wire fraud, and felony violation of the CSA and

CFR.

448.    The Defendants' predicate acts constituted a variety of unlawful activities, each of

which was conducted with the common purpose of obtaining significant monies and revenues

from the manufacture, distribution, and dispensing of prescription opioids. The predicate acts

also had the same or similar results, participants, victims, and methods of commission. The

predicate acts were related and not isolated events.

449.    The predicate acts all had the purpose of contributing to the oversupply that

substantially injured Plaintiff and members of the Proposed Class's business and property, while

simultaneously generating billion- dollar revenue and profits for the Defendants. The predicate

acts were committed or caused to be committed by the Defendants through their participation in

the Opioid Enterprise.

450.    Each instance of racketeering activity alleged herein was related, had similar

purposes, and involved the same or similar participants and methods of commission. The

Defendants and other members of the enterprise calculated and intentionally crafted their

schemes to increase and maintain profits from unlawful sales of opioids, without regard to the

effect such behavior would have on Plaintiff and members of the Proposed Class and the patients

that they treat.

451.    Indeed, as alleged elsewhere in this Complaint, Defendants were aware that the

costs of their sought-after increases in opioid prescribing would be ultimately paid for by

Independent Emergency Room Physicians treating those with Opioid Use Disorder.

## 1. The Opioid Marketing Scheme

452.    In order to unlawfully increase the demand for opioids, the Manufacturing and

Marketing Members, such as Defendants, perpetrated a scheme (the "Opioid Marketing

Scheme") with each other, with the Major PBMs, Front Groups, and KOLs described above, and

with certain unwitting participants. Through their personal relationships, participants in the

Opioid Marketing Scheme had the opportunity to form and take actions in furtherance of the

Opioid Enterprise's common purpose. The Manufacturing and Marketing Members' substantial

financial contributions as part of the Opioid Marketing Scheme, the contractual relationships

between and among Manufacturer and Major PBM participants in the scheme to promote

opioids, and the collective advancement of misleading opioid-friendly messaging together fueled

the U.S. opioids epidemic.

453.     The Manufacturing and Marketing Members' Opioid Marketing Scheme concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff and members of the Proposed Class, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included, *inter alia*: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Manufacturing and Marketing Members named "pseudo-addiction"; (4) that withdrawal is easily managed; (5) that increased dosing present no significant risks; (6)that long-term use of opioids improves function; and (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids.

454.     The Opioid Marketing Scheme devised, implemented, and conducted by Defendants and other members was designed to ensure that the Manufacturing and Marketing Members were able to unlawfully increase their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Manufacturing and Marketing Members' drugs. The Manufacturing and Marketing Members, Major PBMs, Front Groups, KOLs, and others acted together for the common purpose of increasing opioid sales and perpetrated the Opioid Marketing Scheme.

455.     The Manufacturing and Marketing Members, Major PBMs, Front Groups, and KOLs engaged in certain discrete categories of activities in furtherance of the Opioid Marketing Scheme. Those activities involved: (1) misrepresentations regarding the risk of addiction and safe

use of prescription opioids for long-term chronic pain (described in detail above); (2) lobbying to defeat measures to restrict over-prescription; (3) efforts to criticize or undermine CDC guidelines; (4) efforts to limit prescriber accountability; (5) devising and executing plans to increase opioid use and sales, and circumvent CDC guidelines in doing so; (6) efforts to ensure that no UM would be placed on prescription opioids and that no Manufacturing and Marketing Members' prescription opioids would be disadvantaged against any others; and (7) ensure that prescriptions from Manufacturing and Marketing Members' mail-order pharmacies would be dispensed without any interruption.

456.    In addition to disseminating misrepresentations about the risks and benefits of opioids, the Opioid Marketing Scheme also functioned to criticize or undermine the CDC Guideline. Members of the Opioid Enterprise criticized or undermined the CDC Guideline, which represented "an important step—and perhaps the first major step from the federal government—toward limiting opioid prescriptions for chronic pain."

457.    Several Front Groups, including the USPF and the AAPM, criticized the draft CDC guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."

458.    The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."

459.    The Manufacturing and Marketing Members alone could not have accomplished the Opioid Marketing Scheme without the assistance of the Major PBMs, Front Groups, and

KOLs, whose messaging and/or marketing activities were perceived as "neutral" and more "scientific" than the Manufacturing and Marketing Members themselves. Without the work of the Front Groups and KOLs, the Opioid Marketing Scheme could not have been achieved.

**B. Defendants' and the Manufacturing and Marketing Members' Conduct in the Opioid Marketing Scheme**

460.    From approximately the late 1990s to the present, each of the Manufacturing and Marketing Members exerted control over the Opioid Enterprise, participated in the operation or management of the affairs of the Opioid Enterprise, directly or indirectly, and worked towards achieving the Opioid Marketing Scheme in the following ways:

   a.  Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

   b.  Implementing various joint programs (between and among Manufacturing and Marketing Members and Major PBMs) with the goal of spreading deceptive, misleading, and unsupported messaging about the use of opioids to treat chronic pain and the risks of opioid addiction;

   c.  Through information obtained pursuant to their contractual relationships (between and among Manufacturing and Marketing Members and Major PBMs), identifying and targeting the highest opioid prescribers with deceptive, misleading, and unsupported marketing material about the use of opioids to treat chronic pain and the risks of opioid addiction;

d.  Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

e.  Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

f.  Creating and providing a body of deceptive, misleading and unsupported CMEs and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

g.  Selecting, cultivating, promoting and paying KOLs based solely on their willingness to communicate and distribute the Manufacturing and Marketing Members' messages about the use of opioids for chronic pain;

h.  Providing substantial opportunities for KOLs to participate in research studies on topics the Manufacturing and Marketing Members suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

i.   Paying KOLs to serve as consultants or on the Manufacturing and Marketing Members' advisory boards, on the advisory boards and in leadership positions on Front Groups, and to give talks or present CMEs, typically over meals or at conferences;

j.   Selecting, cultivating, promoting, creating, and paying Front Groups based solely on their willingness to communicate and distribute the Manufacturing and Marketing Members' messages about the use of opioids for chronic pain;

k.   Providing substantial opportunities for Front Groups to participate in and/or publish research studies on topics the Manufacturing and Marketing Members suggested or chose (and paid for) with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

l.   Paying significant amounts of money to the leaders and individuals associated with Front Groups;

m.   Donating to Front Groups to support talks or CMEs that were typically presented over meals or at conferences;

n.   Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

o.   Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

p.   Developing and disseminating pro-opioid treatment guidelines with the help of KOLs as authors and promoters and Front Groups as publishers and supporters;

q. Encouraging Front Groups to disseminate their pro-opioid messages to patient groups targeted by the Manufacturing and Marketing Members, such as veterans and the elderly, and then funding that dissemination;

r. Identifying high prescribers of opioids and disseminating marketing materials to those prescribers, and then funding that dissemination;

s. Concealing their contractual and interpersonal relationships (between and among the Manufacturing and Marketing Members and Major PBMs) from the Plaintiff, members of the Proposed Class and the public at large;

t. Concealing their relationship to and control of Front Groups and KOLs from Plaintiff, members of the Proposed Class and the public at large;

u. Intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities, promotional and other materials that claimed opioids could be safely used for chronic pain, and causing such materials to be distributed through the U.S. mail and interstate wire facilities;

v. Communicating misrepresentations and pro-opioid messages to prescribers and pharmacies; and

w. Filling prescriptions without any interruption, including prescription that raised red flags about which pharmacists had conducted no due diligence.

461. The Opioid Enterprise members, to achieve the Opioid Marketing Scheme, had a hierarchical decision-making structure that was headed by the Manufacturing and Marketing Members and corroborated by the Major PBMs, KOLs, and Front Groups. The Manufacturing and Marketing Members, such as Defendants, controlled representations made about prescription

opioids and worked together to conduct research using the Major PBMs' data, doled out funds to Major PBMs and payments to KOLs, and ensured that representations made by Major PBMs, KOLs, Front Groups, and the Manufacturing and Marketing Members' sales detailers were consistent with the Manufacturing and Marketing Members' messaging throughout the United States. As described above, the Major PBMs were dependent on the other Manufacturing and Marketing Members for a significant amount of revenue received as a result of their collaboration. The Major PBMs, Front Groups, and KOLs in the Opioid Enterprise depended on the Manufacturing and Marketing Members for their financial structure and for career development and promotion opportunities.

462.    The Opioid Marketing Scheme, devised and implemented by the Manufacturing and Marketing Members and members of the Opioid Enterprise, amounted to a common course of conduct intended to increase the Manufacturing and Marketing Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

463.    The Manufacturing and Marketing Members worked together with each other through the Major PBMs to achieve the Opioid Marketing Scheme.

464.    Various Front Groups, including APF, AAPM/APS, FSMB, APA, USPF, and AGS, were funded and controlled by Manufacturing and Marketing Members. The Front Groups, which appeared to be independent, but were not, transmitted Manufacturing and Marketing Members' misrepresentations and joint promotional materials. The Front Groups thus worked together with Manufacturing and Marketing Members to perpetrate the Opioid Marketing

Scheme.

465.    The Manufacturing and Marketing Members worked together with each other through the Major PBMs, Front Groups, and KOLs to actualize the Opioid Enterprise's goals.

466.    Similarly, KOLs, including Drs. Portenoy, Fine, Fishman, and Webster, were paid by Manufacturing and Marketing Members to spread their misrepresentations and promote their products. Manufacturing and Marketing Members and KOLs thus worked together to perpetrate the Opioid Marketing Scheme.

467.    In carrying out the Opioid Marketing Scheme, the Manufacturing and Marketing Members Engaged in a Pattern of Racketeering Activity.

468.    The Opioid Marketing Scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

469.    The pattern of racketeering activity used by the Manufacturing and Marketing Members in the Opioid Marketing Scheme likely involved thousands of separate instances of the use of the U.S. mail or interstate wire facilities in furtherance of the unlawful Opioid Enterprise, These mailings and interstate wire transmissions included essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Manufacturing and Marketing Members' drugs induced by consumers, prescribers, regulators, and Plaintiff's and members of the Proposed Class's reliance on the Manufacturing and Marketing Members' misrepresentations.

470.    Each of these fraudulent mailings and interstate wire transmissions constitutes

racketeering activity, and, collectively, these violations constitute a pattern of racketeering activity, through which the Manufacturing and Marketing Members, in conjunction with the Major PBMs, Front Groups, and KOLs, defrauded and intended to defraud consumers, Plaintiff, members of the Proposed Class and other intended victims.

471.    The Manufacturing and Marketing Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive, and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. The Manufacturing and Marketing Members and members of the Opioid Enterprise knew that these representations violated the FDA-approved use of these drugs, and were not supported by actual evidence. The Manufacturing and Marketing Members intended that the Opioid Marketing Scheme to defraud would, and did, use the U.S. mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

472.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators, and the public, including Plaintiff, members of the Proposed Class, the Manufacturing and Marketing Members, Major PBMs, Front Groups, and KOLs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

473.    The Manufacturing and Marketing Members' use of the U.S. mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, and

payments, including:

   a.  Marketing materials about opioids, and their risks and benefits, which the
       Manufacturing and Marketing Members sent to health care providers and pharmacies,
       transmitted through the internet and television, published, and transmitted to Major
       PBMs, Front Groups, and KOLs located across the country and the United States;

   b.  Written representations and telephone calls between the Manufacturing and
       Marketing Members and Front Groups regarding the misrepresentations, marketing
       statements, and claims about opioids, including the non-addictive, safe use of opioids
       for chronic long-term pain generally;

   c.  Written representations and telephone calls between the Manufacturing and
       Marketing Members, Major PBMs, Front Groups, and/or KOLs regarding the
       misrepresentations, marketing statements, and claims about opioids, including the
       non-addictive, safe use of opioids for chronic long-term pain generally;

   d.  E-mails, telephone, and written communications between the Manufacturing and
       Marketing Members, Major PBMs, Front Groups, and/or KOLs, agreeing to or
       implementing the Opioid Marketing Scheme;

   e.  E-mails, telephone, and written communications between the Manufacturing and
       Marketing Members, Major PBMs, Front Groups, and/or KOLs, agreeing to or
       implementing the Opioid Marketing Scheme;

   f.  Contracts between Major PBMs and the Manufacturing and Marketing Members,
       setting out aspects of their collaboration as part of the Opioid Marketing Scheme;

g.   Communications between the Manufacturing and Marketing Members and/or Front

Groups and the media regarding publication, drafting of treatment guidelines, and the

dissemination of the same as part of the Opioid Marketing Scheme;

h.   Communications between the Manufacturing and Marketing Members and/or KOLs

and the media regarding publication, drafting of treatment guidelines, and the

dissemination of the same as part of the Opioid Marketing Scheme;

i.   Written and oral communications directed to State agencies, federal and state courts,

and private insurers throughout the United States that fraudulently misrepresented the

risks and benefits of using opioids for chronic pain; and

j.   Receipts of increased profits sent through the U.S. mail and interstate wire facilities –

the wrongful proceeds of the scheme.

474.    In addition to the above-referenced predicate acts, it was intended by and

foreseeable to the Manufacturing and Marketing Members that misrepresentations would be

published throughout the U.S. mail and by interstate wire facilities and, in those publications,

claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

475.    To achieve the common goal and purpose of the Opioid Enterprise, the

Manufacturing and Marketing Members and members of the Opioid Enterprise hid from the

consumers, prescribers, regulators, Plaintiff, and members of the Proposed Class : (a) the

fraudulent nature of the Opioid Marketing Scheme; (b) the fraudulent nature of statements made

by the Manufacturing and Marketing Members, and by Major PBMs, KOLs, Front Groups, and

other third parties regarding the safety and efficacy of prescription opioids; and (c) the true

nature of the relationship between and among the members of the Opioid Enterprise.

476.    The Manufacturing and Marketing Members and each member of the Opioid Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Scheme, and they participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

477.    Indeed, for the Manufacturing and Marketing Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that the Manufacturing and Marketing Members each financed, supported, and worked through the same Major PBMs, KOLs, and Front Groups, and the Manufacturing and Marketing Members collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

478.    The Manufacturing and Marketing Members' predicate acts all had the purpose of fraudulently increasing the opioid market, by, *inter alia*, increasing the number of opioid prescriptions. This scheme generated billion-dollar revenue and profits for the Manufacturing and Marketing Members at the expense of communities, consumers, and Plaintiff, and members of the Proposed Class, who paid for the related costs by treating those with Opioid Use Disorder, and were the ultimate bearer of the costs, and of the burden of the necessary medical treatment of the Opioid Marketing Scheme. The predicate acts were committed or caused to be committed by the Manufacturing and Marketing Members through their participation in the Opioid Enterprise and in furtherance of its fraudulent Opioid Marketing Scheme.

## VI.    CLASS ALLEGATIONS

479.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on his own behalf and on behalf of all others similarly situated, as representatives of

the following Proposed Class: All Independent Emergency Room Physicians* ("IERP") in the United States for any five years between January 1, 1996, through Final Judgment and during that time and in that capacity, such IERP (a) treated patients diagnosed with opioid use disorder and/or other opioid-related conditions, and (b) has been damaged in the past and/or reasonably anticipate incurring additional treatment, educational and abatement expenses in the future arising from patients suffering from opioid use disorder (OUD) and opioid misuse (the "Proposed Class").

 *"Independent Emergency Room Physician" is defined as an Emergency Room Physician that was a non-hospital employee that worked in an Emergency Room Physicians whose billing and revenue collection were entirely separate from the billing and revenue collection practices of the medical facility at which such ER Physician practiced, and such ER Physician was not employed by such medical facility; who treated patients with opioid use disorder (who were either uninsured or underinsured), at any time, since 1996 through the present.

480. Available datasets identify Emergency Room Physicians nationally, rendering the members of the Proposed Class readily identifiable.

481. According to publicly available data and records, there are thousands of Emergency Room Physicians across the United States, rendering the class so numerous that individual joinder of the members is impracticable. The members of the Proposed Class are geographically dispersed throughout the United States.

482. There are questions of law and of fact common to all members of the proposed class as described below.

483. Plaintiff's claims are typical of those of the Proposed Class as all members of the

Proposed Class have suffered an operational impact on their practice from the opioid epidemic created by Defendants' illegal conduct. Plaintiff's claims and those of the Proposed Class are based on identical legal theories concerning Defendants' conduct, which was common as to all members of the Proposed Class. Plaintiff and the members of the Proposed Class seek damages for the same sort of injuries to their operations caused by Defendants' conduct.

484.    Plaintiff and their counsel will fairly and adequately represent the interests of the members of the Proposed Class. Plaintiff has no interest agnostic to, or in conflict with, the interests of the members of the Proposed Class. Plaintiff's counsel are highly experienced in the prosecution of class actions and complex litigation. Plaintiff's counsel have the financial resources necessary to adequately and vigorously litigate this class action.

485.    A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the members of the Proposed Class. Plaintiff and the members of the Proposed Class have been harmed in identical ways by Defendants' conduct. Although the members of the Proposed Class have each suffered extensive damages including the need for abatement, these damages are still likely smaller than the expense and complexity of litigation on an individual basis against Defendants involved in the pernicious conduct alleged in this complaint. Therefore, it is unlikely that any individual Emergency Room Physician would be able to obtain effective redress for the wrongs committed against them by these Defendants.

486.    Common questions of law and fact relating to the claims of Emergency Room Physicians nationally predominate over individual questions.

VII.    **CLAIMS FOR RELIEF**

### A.  FIRST CLAIM FOR RELIEF
### Violation of RICO, 18 U.S.C. § 1961 et seq.

487. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein.

488. At all relevant times Defendants were and are "persons" under 18. U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

489. As alleged more fully herein, Defendants formed and participated in an association-in-fact enterprise, as described above as the Opioid Enterprise, for "the common purpose of expanding the prescription opioid market," *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4279233, at *2, in order to maximize profits for themselves in the promotion, sale, possession, distribution, and dispensing of controlled substances.

490. As alleged more fully herein, the Opioid Enterprise consisted of, *inter alia*, business and personal relationships formed through contractual negotiations, conduct, and racketeering activities consistent with and in advancement of the Opioid Enterprise's purpose of expanding the prescription opioid market, and participation in and through both formal and informal coalitions and working groups.

491. Defendants conducted the Opioid Enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry out the Marketing Scheme. In furtherance of the Marketing Scheme, the Defendants disseminated multiple fraudulent misrepresentations and omissions, as described above, using the multiple channels described above.

492. Through these racketeering activities, the Defendants sought to further the common purpose of the enterprise through the Opioid Marketing Scheme, a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use by convincing them that each of the false propositions alleged earlier was true—all with the ultimate goal of inducing more opioid prescriptions, which the Enterprise members knew the medical costs associated with the increased use of opioids would be paid for by medical providers like Plaintiff and members of the Proposed Class. In so doing, each of the Defendants knowingly conducted and participated in the conduct of the Opioid Marketing Scheme by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

493. Defendants' common purpose depended upon Independent Emergency Room Physicians providing uncompensated treatment to individuals with Opioid Use Disorder. Uncompensated treatment provided by Independent Emergency Room Physicians allowed the Defendants and other Enterprise participants to increasing and maximizing sales of prescription opioids. IERPs, and the patients to whom they provide lifesaving medical treatment, were the intended victims of Manufacturing and Marketing Members' common purpose.

494. The Opioid Enterprise alleged above is an association-in-fact enterprise whose Opioid Marketing Scheme consists of the Manufacturing and Marketing Members (Purdue, by and through the Sacklers, Teva, Janssen, Endo, Allergan, and Mallinckrodt); the Major PBMs (Express Scripts, OptumRx, and CVS Caremark); the Front Groups (APF, AAPM, APS, FSMB, USPF, and AGS); and the KOLs (Dr. Portenoy, Dr. Webster, Dr. Fine, and Dr. Fishman).

495. Defendants and the other participants in the Opioid Marketing Scheme conducted and participated in the conduct of the Opioid Marketing Scheme by playing a distinct role in the

scheme of maximizing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to unlawfully increase the market for prescription opioids by changing prescriber habits and public perceptions.

496. Specifically, the Manufacturing and Marketing Members each worked together to coordinate the Opioid Marketing Scheme and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; (iii) funding, editing, and distributing CME programs to advance their false messages; and (iv) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians and, in particular, at physicians lacking the expertise of pain care specialists (a practice known as sales detailing).

497. Each of the Front Groups helped disguise the role of the Manufacturing and Marketing Members by purporting to be unbiased, independent patient-advocacy and professional organizations in order to disseminate patient education materials, a body of biased and unsupported scientific "literature" and "treatment guidelines" that promoted the Manufacturing and Marketing Members false messages.

498. Each of the KOLs were physicians chosen and paid by each of the Manufacturing and Marketing Members to influence their peers' medical practice by promoting the Manufacturing and Marketing Members' false message through, among other things, writing favorable journal articles and delivering supportive CMEs as if they were independent medical professionals, thereby further obscuring the Manufacturing and Marketing Members' role in the

enterprise and the enterprise's existence.

499. Moreover, each of the Manufacturing and Marketing Members, such as Defendants, Major PBMs, KOLs, and Front Groups that furthered the Opioid Marketing Scheme had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed participants in the Opioid Marketing Scheme the opportunity to agree to conduct and participate in the scheme. Specifically, each of the Manufacturing and Marketing Members coordinated their efforts through the same KOLs and Front Groups, based on their agreement and understanding that the Front Groups and KOLs were industry friendly and would work together with the Manufacturing and Marketing Members to advance the Opioid Marketing Scheme; each of the individuals and entities who formed the Opioid Enterprise and participated in the Opioid Marketing Scheme acted to enable the common purpose and fraudulent scheme.

500. At all relevant times, the Opioid Enterprise: (a) had an existence separate and distinct from each Manufacturing and Marketing Member, and Defendants listed herein; (b) was separate and distinct from the pattern of racketeering in which the Manufacturing and Marketing Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each Defendants; (d) was characterized by interpersonal relationships between and among each participant in the Opioid Marketing Scheme, including between the Manufacturing and Marketing Members and each of the Major PBMs, Front Groups, and KOLs; (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

501. The persons and entities engaged in the Opioid Enterprise's Opioid Marketing Scheme are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities, as spearheaded by the Manufacturing and Marketing Members, and Defendants listed herein.

502. The Manufacturing and Marketing Members conducted and participated in the Opioid Enterprise's Opioid Marketing Scheme through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

503. The Defendants, as Manufacturing and Marketing Members, committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Manufacturing and Marketing Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Manufacturing and Marketing Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Enterprise, the U.S. mail, and interstate wire facilities.

504. The Defendants, as Manufacturing and Marketing Members, participated in the scheme to defraud by using mail, telephones, and the internet to transmit mailings and wires in interstate or foreign commerce.

505. Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a. Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b. Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

506. Indeed, as summarized herein, Defendants used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions, and payments to carry out the Opioid Marketing Scheme.

507. Because Defendants disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Enterprise's uses of the U.S. mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) to perpetrate the Opioid Marketing Scheme have been hidden and cannot be alleged without access to the books and records maintained by the Manufacturing and Marketing Members, Major PBMs, Front Groups, and KOLs. Indeed, an

essential part of the successful operation of the Opioid Enterprise alleged herein depended upon secrecy. However, Plaintiff has described the occasions on which the Manufacturing and Marketing Members, Major PBMs, Front Groups, and KOLs disseminated misrepresentations and false statements to consumers, prescribers, regulators, Plaintiff, and members of the Proposed Class, as well as how those acts were in furtherance of the Opioid Marketing Scheme.

508. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in New Mexico, and throughout the United States, prescribers, regulators, and Plaintiff. The Manufacturing and Marketing Members, Major PBMs, Front Groups, and KOLs calculated and intentionally crafted the Opioid Marketing Scheme and common purpose of the Opioid Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Manufacturing and Marketing Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding Defendants' products.

509. Defendants' pattern of racketeering activity alleged herein and the Opioid Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the Opioid Enterprise.

510. The pattern of racketeering activity alleged herein has continued for well over a decade, is continuing as of the date of this Complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

511. The racketeering activities conducted by the Manufacturing and Marketing

Members, Major PBMs, Front Groups, and KOLs amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, the Plaintiff and members of the Proposed Class.

512. Each separate use of the U.S. mail and/or interstate wire facilities employed by Defendants, as Manufacturing and Marketing Members, was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and Plaintiff, and members of the Proposed Class. Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Enterprise.

513. Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

514. As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

515. The pattern of racketeering activity alleged herein has continued for well over a decade, is continuing as of the date of this Complaint, and, upon information and belief, will continue into the future unless enjoined by this Court. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

516. Defendants' violations of law and their pattern of racketeering activity directly and

proximately caused Plaintiff's injury and the injuries to the Proposed Class members in their business and property. Defendants' pattern of racketeering activity logically, substantially. and foreseeably caused an opioid epidemic. Plaintiff injuries, as described below, were not unexpected, unforeseen, or independent. Rather, as Plaintiff alleges, Defendants knew that opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, Defendants engaged in a scheme of deception that utilized the mail and wires in order to carry out the Opioid Enterprise's fraudulent Opioid Marketing Scheme, thereby increasing sales of their opioid products. It was foreseeable and expected that Defendants participating in the Opioid Enterprise through a pattern of racketeering activities to carry out the Opioid Marketing Scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

517. It was foreseeable to Defendants and members of the Opioid Enterprise that Plaintiff and members of the Proposed Class would be harmed when they engaged in the fraudulent schemes that form the common purpose of the Opioid Enterprise and the pattern of racketeering activities alleged herein. Indeed, extracting money from commercial payors like Plaintiff was a primary goal of Defendants' racketeering activities.

518. Specifically, Defendants' participation in the Opioid Enterprise through a pattern of racketeering activities to carry out the fraudulent Opioid Marketing Scheme has injured Plaintiff and members of the Proposed Class in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid addiction epidemic requiring abatement.

519. Plaintiff's injuries and injuries to members of the Proposed Class, as alleged

throughout this Complaint and expressly incorporated herein by reference, include:

a. Emergency Medical care, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths without compensation or reimbursement;

b. Emergency Medical treatment of infants born with opioid-related medical conditions, or born addicted to opioids due to drug use by a mother during pregnancy without compensation or reimbursement;

c. Emergency Medical treatment for hospital and/or urgent care emergency department visits and other treatment for opioid misuse, addiction, and/or overdose without compensation or reimbursement;

d. Emergency Medical treatment for infections related to opioid misuse, addiction, and/or overdose without compensation or reimbursement;

e. Emergency Medical treatment for hospitalizations related to the misuse, addiction, and/or overdose of opioids without compensation or reimbursement;

f. Costs for providing opioid overdose reversal medication such as Naloxone Hydrochloride (Narcan) without compensation or reimbursement.

g. Costs related to additional costs of hiring administrative staff in order to properly treat the increased number of individuals with Opioid Use Disorder seeking emergency medical treatment.

h. Costs related to additional costs of hiring scribes needed to properly treat the increased number of individuals with Opioid Use Disorder seeking emergency medical treatment.

i.   Abatement addressing the opioid addiction epidemic.

520. Plaintiff's injuries and the injuries to members of the Proposed Class were directly and proximately caused by Defendants' racketeering activities because they were the logical, substantial, and foreseeable cause of Plaintiff and the Proposed Class members' injuries.

521. Plaintiff and members of the Proposed Class are the most directly harmed entities, as Independent Emergency Physicians treat individuals with Opioid Use disorder disproportionally compared to all other medical professionals, and there are no other plaintiffs better suited to seek a remedy for the economic harms at issue here.

522. Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of court supervised corrective communication, actions, and abatement programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*, as appropriate:

a.   Actual damages and treble damages, including pre-suit and post-judgment interest;

b.   An order enjoining any further violations of RICO;

c.   An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d.   An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e.   An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved

by the FDA;

f.  An order enjoining any future marketing of opioids through non-branded marketing including through the Major PBMs, Front Groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

g.  An order enjoining any future marketing to vulnerable populations, including, but not limited to, persons over the age of 55, anyone under the age of 21, and veterans;

h.  An order compelling the Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court, but not less than print advertisements in national and regional newspapers and medical journals, televised broadcast on major television networks, and displayed on their websites, concerning:(1) the risk of addiction among patients taking opioids for pain; (2) the ability to manage the risk of addiction; (3) pseudo-addiction is really addiction, not a sign of undertreated addiction; (4) withdrawal from opioids is not easily managed; (5) increasing opioid dosing presents significant risks, including addiction and overdose; (6) long term use of opioids has no demonstrated improvement of function; (7) use of time-released opioids does not prevent addiction; (8) ADFs do not prevent opioid abuse; and (9) that manufacturers and distributors have duties under the CSA to monitor, identify, investigate, report and halt suspicious orders and diversion but failed to do so;

i.  An order enjoining any future lobbying or legislative efforts regarding the

manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

j.  An order requiring all Defendants to publicly disclose all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

k.  An order prohibiting all Defendants from entering into any new payment or sponsorship agreement with, or related to, any: Front Group, trade association, doctor, speaker, CME, or any other person, entity, or association, regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

l.  An order establishing abatement remedies;

m.  An order establishing a national foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the Defendants in an amount to be determined by the Court;

n.  An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious orders or diversion of opioids;

o.  An order requiring all Defendants to publicly disclose all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding suspicious orders for or the diversion of opioids;

p.  An order divesting each Defendant of any interest in, and the proceeds of any interest in, the Opioid Enterprise, including any interest in property associated with the Opioid Enterprise;

q.  Dissolution and/or reorganization of any trade industry organization, Front Group, or any other entity or association associated with the Opioid Enterprise as described in this Complaint, as the Court sees fit;

r.  Dissolution and/or reorganization of any Defendant named in this Complaint as the Court sees fit;

s.  Suspension and/or revocation of the license, registration, permit, or prior approval granted to any Defendant, entity, association or enterprise named in the Complaint as related to prescription opioids;

t.  Forfeiture as deemed appropriate by the Court; and

u.  Attorney's fees and all costs and expenses of suit.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, ask that the Court:

(a) Certify the Proposed Class proposed herein;

(b) Appoint Plaintiff as representative of the Proposed Class;

(c) Appoint Plaintiff's counsel as attorney for the Proposed Class;

(d) Enter judgment establishing abatement remedies;

(e) Enter judgment awarding Plaintiff and the Proposed Class members treble damages on their RICO claims;

(f) Award Plaintiff and the class members prejudgment interest and post-judgment interest as provided by law;

(g) Award Plaintiff and the Proposed Class members a reasonable attorney's fee and costs;

and

(h) Provide such further relief as may be just and proper.

## IX.    JURY DEMAND

Plaintiff, individually and on behalf of the Proposed Class members, demand a trial by

jury on all issues so triable.

DATED: September 23, 2025

Respectfully Submitted,

*/s/Paul S. Rothstein*_____
Paul S. Rothstein
New Mexico District Court Bar
Number: 25-244
Florida Bar Number: 310123
Attorney Paul S. Rothstein, P.A.
626 N.E. 1st Street
Gainesville, FL 32601
Main: (352) 376-7650
Fax: (352) 374-7133
E-Mail:psr@rothsteinforjustice.com